D. Gill Sperlein, CA Bar No. 172887
RANDAZZA LEGAL GROUP, PLLC
345 Grove Street, 2nd Floor
San Francisco, CA  94102
Telephone: 702-420-2001
Facsimile: 305-437-7662
ecf@randazza.com

Marc J. Randazza, CA Bar No. 269535
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
Telephone: 702-420-2001
ecf@randazza.com

*Attorneys for Plaintiff,*
*N.Y.*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **N.Y.**, through his guardians David and Leilanie Yu, | Case №.:  3:17-CV-03906-MMC |
| Plaintiff, | **SECOND AMENDED COMPLAINT:** |
| vs. | **42 U.S.C. § 1983 - FIRST AMENDMENT VIOLATIONS (FREE SPEECH) AND FOURTEENTH AMENDMENT VIOLATIONS (DUE PROCESS AND EQUAL PROTECTION)** |
| **SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT; RICK SCHMITT** in his personal and official capacities as Superintendent of the San Ramon Valley Unified School District; **DR. JASON REIMANN**, in his personal and official capacities as Director of Education Services of the San Ramon Valley Unified School District; **RUTH STEELE**, in her personal and official capacities as Principal of San Ramon Valley High School; **JASON KROLIKOWSKI**, in his personal and official capacities as | **VIOLATIONS OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 42 U.S.C. § 7 *ET SEQ.*** **DEMAND FOR JURY TRIAL** |

*RANDAZZA | LEGAL GROUP*

RANDAZZA | LEGAL GROUP

1
2
3
4
5
6
7
8
9
10
11
12
13

Principal of San Ramon Valley High
School; **JAMIE KEITH** in her personal
and official capacities as Assistant
Principal of San Ramon Valley High
School; **DEARBORN RAMOS** in her
personal and official capacities as
Assistant Principal of San Ramon
Valley High School; **BERNIE PHELAN**
in his personal and official
capacities as Assistant Principal of
San Ramon Valley High School;
**JANET WILLFORD**, in her personal
and official capacities as
Leadership Teacher of San Ramon
Valley High School; and **KERRI
CHRISTMAN GILBERT** in her personal
and official capacities as Resident
Substitute Teacher of San Ramon
Valley High School,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

14
15
16
17
18
19
20
21
22
23
24
25
26
27

## INTRODUCTION

1.     By all accounts N.Y is an outstanding student.  He has been involved in student government since elementary school.

2.     In February 2017, while serving as Junior Class President, N.Y. ran for the student government position that would be the crowning achievement of his high school career – Associated Student Body (ASB) President.  His term would coincide with his senior year.

3.     In connection with his candidacy, N.Y. and four fellow students from San Ramon Valley High School (SRVHS) created a campaign video.  The video was a parody in which N.Y. portrayed a James Bond type character who saves a fellow student captured by kidnappers.

4.     Although the First Amendment affords political speech the highest level of speech protection and the video did not cause a material and

substantial disruption to school activities, school administrators punished N.Y. for his protected speech.

5.     Defendants punished N.Y. even though by their own admission the video did not contain "hate speech."

6.     Also, by their own admission, the guideline setting forth what constitutes permissible content for campaign materials is so vague that it does not give a student of ordinary intelligence a reasonable opportunity to know what is prohibited and allows school administrators unbridled discretion to discipline students based on the content of their speech.

7.     N.Y. did not post the video himself and therefore did not have the ability to remove the video from YouTube.  However, immediately after a fellow student told him that a few other students found the video offensive, he asked the student who posted the video to remove it.

8.     The Defendants' punishment of N.Y. was severe.   The school stripped him of his position as Junior Class President and disqualified him in the election for Associated Student Body (ASB) President even though he received the highest number of votes.   The school also expelled him from his student Leadership class.   He remained expelled from that class for most of the Spring 2017 Semester.

9.     The school based its punishment on an unacceptably vague election rule prohibiting "inappropriate material."

10.     Not only was the rule vague on its face, but the School applied the rule to N.Y. in a discriminatory manner.

11.      N.Y. brings this action to vindicate his rights.

12.     N.Y.'s younger brother, K.Y. is the elected Junior Class President at SRVHS and will run for elected ASB President position so that he can continue to serve as an officer the following year.  The impermissibly vague and overbroad

regulations directed at election speech has a chilling effect and serves as a prior restraint on his speech, as well as the speech of other students.

**JURISDICTION AND VENUE**

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(4) in that the controversy arises under the United States Constitution and under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202.  This Court has authority to award attorneys' fees pursuant to 42 U.S.C. § 1988.  Each of the acts, or threats of acts, alleged herein were done by Defendants, or their officers, agents, and employees, under color and pretense of the statutes, ordinances, regulations, customs, and usages of San Ramon Valley High School (SRVHS) and the San Ramon Valley Unified School District (SRVUSD).

14.    Personal jurisdiction is proper over Defendants because they reside or work in this District and because the wrongful activity at issue occurred in this District.

15.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391.

**THE PARTIES**

16.    Plaintiff N. Y., who brought this action by and through his guardians Leilanie Yu and David Yu, is a natural person and a citizen of the United States and the State of California, residing in Contra Costa County.

17.    Plaintiff is informed and believes and based thereon alleges that SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT ("SRVUSD) is a public entity in the State of California duly organized under the laws of the State of California, and more specifically the provisions of the California Education Code, to provide, among other things, education to minors in public schools within the District. SRVUSD has at all times mentioned herein has had its principal place of business in Contra Costa County, California.   Defendant SRVUSD is responsible for

1   enacting and enforcing its customs, policies, practices, and laws related to the

2   suspension and student discipline complained about below.

3          18.    Plaintiff is informed and believes and based thereon alleges that

4   Defendant RICK SCHMITT[1] is a natural person and a citizen of the United States

5   and the State of California.    Plaintiff sues Mr. Schmitt in both his personal

6   capacity and in his official capacity as Superintendent of the San Ramon

7   Valley Unified School District.

8          19.    Plaintiff is informed and believes and based thereon alleges that

9   Defendant DR. JASON REIMANN is a natural person and a citizen of the United

10  States and the State of California.  Plaintiff sues Dr. Reimann in both his personal

11  capacity and in his official capacity as Director of Education Services of the

12  San Ramon Valley Unified School District.

13         20.    Plaintiff is informed and believes and based thereon alleges that

14  Defendant RUTH STEELE is a natural person and a citizen of the United States

15  and the State of California.    Plaintiff sues Ms. Steele in both her personal

16  capacity and in her official capacity as Principal of San Ramon Valley High

17  School.

18         21.    Plaintiff is informed and believes and based thereon alleges that

19  Defendant JASON KROLIKOWSKI is a natural person and a citizen of the United

20  States and the State of California.    Plaintiff sues Mr. Krolikowski in both his

21  personal capacity and in his official capacity as Principal of San Ramon Valley

22  High School.

23         22.    Plaintiff is informed and believes and based thereon alleges that

24  Defendant JAMIE KEITH is a natural person and a citizen of the United States

---

26  [1]    All titles herein refer to titles held by the individuals at the time of the
incident.  Some of the Defendants may no longer hold those positions.

RANDAZZA | LEGAL GROUP

and the State of California.  Plaintiff sues Ms. Keith in both her personal capacity and in her official capacity as Assistant Principal of San Ramon Valley High School.

23.    Plaintiff is informed and believes and based thereon alleges that Defendant DEARBORN RAMOS is a natural person and a citizen of the United States and the State of California.  Plaintiff sues Ms. Ramos in both her personal capacity and in her official capacity as Assistant Principal of San Ramon Valley High School.

24.    Plaintiff is informed and believes and based thereon alleges that Defendant BERNIE PHELAN is a natural person and a citizen of the United States and the State of California.  Plaintiff sues Mr. Phelan in both his personal capacity and in his official capacity as Assistant Principal of San Ramon Valley High School.

25.    Plaintiff is informed and believes and based thereon alleges that Defendant JANET WILLFORD is a natural person and a citizen of the United States and the State of California.  Plaintiff sues Ms. Willford in both her personal capacity and in her official capacity as Leadership Instructor of San Ramon Valley High School.

26.    Plaintiff is informed and believes and based thereon alleges that Defendant KERRI CHRISTMAN GILBERT is a natural person and a citizen of the United States and the State of California.  Plaintiff sues Ms. Gilbert in both her personal capacity and in her official capacity as Resident Substitute Teacher of San Ramon Valley High School.

## PRIOR PROCEEDINGS

27.    On April 7, 2017, Plaintiff filed an *ex parte* petition for writ of mandamus in the Superior Court of California for Contra Costa County, that

- 6 -

case being numbered MSN17-0585.  The court set a briefing schedule and hearing date.

28.     Prior to the April 26, 2017 hearing, the court issued a tentative ruling stating that N.Y. had not "met the requirements for writ relief" and that "the Court cannot grant the petition as presented."   "However," the Court continued, "it appears the District made its decisions without fully considering whether or not Petitioner's First Amendment constitutional rights had been violated.   Thus, an issue to be resolved is whether the video constituted protected speech and whether or not Respondent's disciplinary action violated Petitioner's 1st Amendment constitutional rights."   No hearing was conducted, and the Court denied the Petition.

29.     Defendants moved to dismiss Plaintiff's First Amended Complaint. The Court granted the motion in part.  Dkt. No. 66.

## FACTS COMMON TO ALL CLAIMS

30.     Plaintiff N.Y., is a resident of Contra Costa County, California.  He recently graduated from San Ramon Valley High School.  N.Y. carried a 3.85 grade point average.  He has never been disciplined by the school for any reason.  Specifically, he has never bullied any other student, nor has he been accused of bullying another student.  To the contrary, he received the Safe School Ambassadors Appreciation Award for three consecutive years when he was at Charlotte Wood Middle School (CWMS) and was a member of the anti-bullying intervention club from 2012 to 2015, an honor bestowed with the recommendation of a teacher.

31.     In addition, N.Y. is active in many leadership, charitable, and other extra-curricular activities including:

- Black belt in Tae Kwon Do (assisted in teaching class to less advanced students)

- Elected as 4th Grade Student Council Representative
- Elected as 5th Grade Student Council Representative
- Member of CJSF (California Junior Scholarship Federation) at Charlotte Wood Middle School (CWMS)
- "Strong Work Ethic" Student of the Month – 6th Grade at CWMS
- 4.0 Honor Roll of Excellence Award – 6th Grade at CWMS
- Top 10% "Science" Achievement Award – 6th Grade at CWMS
- Top 10% "Core" Achievement Award - 6th Grade at CWMS
- "Safe School Ambassadors" Appreciation Award - 6th Grade at CWMS
- "Successful Student" Student of the Month – 7th Grade at CWMS
- 4.0 Honor Roll of Excellence Award – 7th Grade at CWMS
- Top 10% "Core" Achievement Award – 7th Grade at CWMS
- Top 10% "Physical Education" Achievement Award – 7th Grade at CWMS
- "Safe School Ambassadors" Appreciation Award - 7th Grade at CWMS
- "Good Citizenship" Student of the Month – 8th Grade at CWMS
- Top 10% "English" Achievement Award – 8th Grade at CWMS
- Top 10% "Physical Education" Achievement Award – 8th Grade at CWMS
- Top 10% "Science" Achievement Award – 8th Grade at CWMS
- "Charlotte Wood Student of the Year All Around Excellence" Award, 8th Grade at CWMS
- "4.0 GPA for 3 years" Award, 8th Grade at CWMS
- "CAPER (Cooperation Achievement Progress Effort Responsibility)" Award (awarded only to students with Top 10% achievements
- "Student Ambassador for 3 years" Award, 8th Grade at CWMS (6th, 7th, and 8th grade)
- Anti-bullying intervention club (must be recommended by teachers to be selected)
- Recommended for Accelerated Biology for 9th Grade (required Letter of Recommendation from Science Teacher) - 8th Grade at CWMS
- Recommended for Advanced Geometry (required recommendation from Math Teacher) - 8th Grade at CWMS
- CWMS Leadership Student (7th and 8th grade)
- Ran for President for 8th grade
- Chaired and Led the Wheelchair Foundation Fundraising Project
- Received a Letter of Recommendation for medical school from Ken Behring, Philanthropist and Founder of Wheelchair Foundation
- Raised over $3200 to send 21 wheelchairs to Honduras and Costa Rica

- Attended WE day Charity event/Convention promoting Humanitarian Efforts
- Participated in the Capes 4 Heroes fundraiser / "build capes for kids with disabilities, kids with life threatening illnesses and kids who just need to feel empowered."
- Head of End of the Year BBQ Dance and other school dances
- Head of the Veteran's Assembly in honor of Marine Corporal Chachi Corral
- Delivered presents to students of Cambridge Elementary School (Concord) for Christmas
- Danville Little League Umpire (Since 7th Grade)
- 5th Year Senior Umpire for Danville Little League
- Asked to Umpire Championship Games for Danville Little League
- Umpired Majors upper division 13u
- Umpired Chachi Corral Tournament
- Umpired Joey Moore Tournament
- Umpired Brett Slinger Tournament
- 2013-2014, Certified U.S. Soccer Federation Referee
- Ran for President Freshmen Year at San Ramon Valley High School
- Won $200 from EBMUD (Water hyacinth science project)
- Third Place – Senior Division, Excellence in Water Research, Contra Costa County Science Fair
- 2015 Recipient, Certificate of Achievement for outstanding achievement in science and engineering innovation
- Accelerated Biology Student
- Ran for Sophomore President
- California Scholarship Federation (CSF) Member since Freshman Year
- HOSA (Health Occupation Students of America) Member since Sophomore Year
- Renaissance Award winner 9 times (3.5 GPA or higher per quarter)
- Awards Committee Leadership (Sophomore Year)
- Pitched for sponsorship of academic rewards for students
- Head of Staff Choice Awards where Teachers recognize students and honor them at a luncheon
- Glenview Aquatics Club Lifeguard
- 2016-2017 Elected Junior Class President
- 2015-2017 JV Volleyball player
- 2015-2016 Recipient of Athlete of the Month
- Participated in Eagle Scout Community Project: Create benches for Stone Valley Middle School (2017)

32.    He has taken the following Advanced/AP/Honors classes:
- Accelerated Biology

- Geometry
- Chemistry Honors
- AP Environmental Science
- AP U.S. History
- AP Psychology
- Spanish IV Honors

33.   Prior to the unconstitutional acts of the Defendants, N.Y. served as the elected Junior Class President for the 2016-2017 school year.  In conjunction with his office, N.Y. was enrolled in an elective Leadership Class.  The class meets four times a week and counts 10 credits per year towards graduation.

34.   In February of 2017, N.Y. ran for the elected ASB President position for the following academic year.

35.   N.Y. agreed to the provisions of the Leadership Election Package which included the following rules:

> - Campaign signs and materials may be posted **beginning Monday at 6:00 AM**.  This includes posting anything on Twitter, Snapchat, Instagram, etc.
> - There is a maximum budget of **$75** for campaigning materials. Please keep your receipts as we will check them
> - You may only have 30 signs up on campus at any given time. Yes, we count.
> - ***Please have discretion when creating campaign signs and slogans, as any inappropriate material will be removed and the candidate is [sic] subject to be pulled from the election.***

Emphasis in the original.

36.   At no time did the administration further explain or define "inappropriate material."  Nor do the campaign rules cross reference any other school policies, rules, or procedures.

37.   In conjunction with running for office, N.Y. participated in the creation of a short parody video in which N.Y. portrayed a James Bond type hero.  In the video, N.Y. rescues a fellow student who had been captured by a

1  radical group with the intention of forcing him to participate in an international

2  video gaming competition.

3     38.   Two of N.Y.'s fellow students at SRVHS, both of whom are practicing

4  Muslim Afghan-Americans, volunteered to play the antagonists.

5     39.   N.Y. and his fellow students produced the video off campus on

6  Saturday, February 4, 2017.  The group did not use any school property or

7  school equipment in conjunction with the production of the video.

8     40.   There was no script for the video.  The students participated in

9  developing the storyline and adlibbing dialogue.

10    41.   At the end of the day of filming, one of the other students took all

11  the raw footage with him.  The student edited the footage and at

12  approximately 9:00 p.m. on February 6, 2017, he uploaded the final video to his

13  (not the Plaintiff's) YouTube account.  N.Y. did not see the final version of the

14  video before it was uploaded to YouTube.

15    42.   The next morning, a fellow student sitting beside N.Y., told him that

16  a couple of students found the video to be offensive.  N.Y. felt concerned, so

17  he texted his fellow student and requested that he remove the video from

18  YouTube.  The fellow student complied.  The video was online for about 12.5

19  hours, most of those through the night.  YouTube statistics showed that the

20  video had been viewed a total of approximately 30 times.

21    43.   To the best of N.Y.'s knowledge, no one downloaded or further

22  distributed the video.

23              **Defendants' Unconstitutional Acts**

24    44.   At 2:36 p.m. on Tuesday, February 7, N.Y. received a text from

25  Janet Willford, his Leadership teacher who also runs the Leadership Program.

26  Ms. Willford inquired about the video and requested a link.  N.Y. explained that

27

RANDAZZA | LEGAL GROUP

1   the video had been removed from YouTube and thus, there was no longer any

2   active link.

3       45.     At 8:42 a.m. on Wednesday, February 8, Ms. Willford again texted

4   N.Y., stating that she wanted to protect him, but that she needed to see the

5   video to do so.  N.Y. and the other four students who created the video met

6   with Ms. Willford at school that day and agreed to bring a copy of the video

7   the following day.

8       46.     Plaintiff is informed and believes and based thereon alleges that

9   on February 9th, despite Ms. Willford's offer to watch the video together so that

10  N.Y. and the other four students could explain, she surreptitiously conspired with

11  Chad Chochran, the Video Production teacher to retrieve the copy of the

12  video from the student who edited and uploaded the video on YouTube early

13  in the morning.

14      47.     Plaintiff is informed and believes and based thereon alleges that

15  after receiving a copy of the video, Janet Willford viewed the video with at

16  least one other teacher, other members of the SRVHS administration, as well as,

17  other students in the Leadership Program without N.Y.'s knowledge or

18  permission from him or his parents.

19      48.     On the same day, just before 1:00 p.m., the administration

20  summoned N.Y. to the school administrative offices.   Assistant Principal

21  Dearborn Ramos and Assistant Principal Jamie Keith interrogated N.Y. about

22  the video and asked him to write a statement.   N.Y. hesitated because he

23  believed they were demanding an admission of wrong doing.

24      49.     Ms. Ramos belittled N.Y., accused him of being "smug" and

25  "unremorseful."  During the interrogation, Ms. Ramos and Ms. Keith interrogated

26  N.Y., they played the video, and Ms. Keith pointed out suspension guidelines

27  N.Y. allegedly violated, although nothing in the video violated any of the

RANDAZZA | LEGAL GROUP

guidelines.  Keith followed up by asking what college N.Y. wanted to attend and threatened that a suspension would have a significant effect in the admissions process in colleges.  In a thinly veiled reference to the stereotype that Asians are poor drivers, she criticized his driving in the video stating that N.Y. broke the law.

50.     Later, Assistant Principal Bernie Phelan joined in the interrogation. Mr. Phelan focused on the imitation guns used in the video and argued that if a student brought a photo of himself holding a firearm, even if for recreational purposes or hunting with his father, the school would have the School Resource Officer keep him for questioning and get a warrant to search his house for contraband.  Since no real guns were used in the video, this clearly was an effort to apply pressure by manufacturing charges.

51.     N.Y. had not eaten lunch and was not given an opportunity to eat lunch the entire time he was held.  His interrogators did not even offer him water and he was not allowed to leave to use the restroom.  In a tactic more appropriate for Guantanamo Bay, Assistant Principal Keith then ate her lunch in the interrogation room in front of N.Y.

52.     The three assistant principals harassed, threatened, and intimidated N.Y. by engaging in intense interrogation techniques and making repeated suspension threats.  Hungry, tired, thirsty, and in need of a restroom, N.Y. eventually wrote the following statement:

> Me and my friends got together on a Saturday to make a video for my ASB campaign.  We all got together to make a James Bond type film.  We wanted something entertaining and to keep the people who viewed it laugh.  There was no script.  Everyone came up with their own lines and everyone consented to their roles.  After the video was released, there were a lot of kids that enjoyed the short film, but as soon as we got word that some people got offended by the video, we took it down immediately.  We did not ever intend to hurt anybody's feeling or make them feel unsafe.

> When I was younger I used to get bullied a lot. I don't really talk much about it now. I was beat by another student in a bathroom. I have never wished or want anybody to experience the pain that I felt, whether it is physical or verbal. I am sorry that this incident turned out the way that it did. I was not raised by my parents to stereotype, be a racist or offend other people. My intent for the video was to portray me as a hero like James Bond saving the day. I personally didn't expect the turnout. I want to be able to apologize personally to anyone that was affected. I understand that people didn't take it the way me and my friends wanted people to see it. I am sorry for all the trouble this has caused, for admin, other students, and especially my leadership teacher. This video does not depict my personal character nor ability to be a good student. I am not the type of person who doesn't care or is selfish. I hope that this decision that I have made doesn't affect more people.

53.     At no point did the interrogators explain what possible punishment N.Y. faced or what procedures or guidelines would be used to determine a proper punishment. He had no opportunity to discuss the matter with his parents. In fact, the school never contacted his parents about the incident. For reasons that remain unclear, the administrators contacted the parents of the other four students involved but not N.Y.'s parents.

54.     While the interrogation process for N.Y.'s four fellow students lasted less than an hour, the interrogation process for N.Y. with the Assistant Principals lasted almost three hours. In violation of District policy, N.Y. was even detained past the end of the school day without notice to his parents. Although the interrogation was completed at 3:00 p.m., N.Y. was detained in the administrative offices until approximately 3:20 p.m., ten minutes after the election results were scheduled to be posted and 20 minutes past school hours ended. Unsure why N.Y. continued to be kept in the administrative offices, Assistant Principal Keith asked another administrator if she could release N.Y.

55.     While administrators detained N.Y. in the administrative offices, the school announced that another student won the ASB President election.

N.Y. later learned that the school administration had disqualified him from the election based solely on the video he and his four fellow students produced. Therefore, N.Y.'s votes were simply disregarded.

56.    On Monday, February 13, 2017, at an in-person meeting, Assistant Principal Jamie Keith informed N.Y. and his parents that because of the video and upon the recommendation of Janet Willford, the school was expelling N.Y. from the Leadership class.

57.    At the February 13, 2017 meeting, Ms. Keith provided a copy of a SRVUSD Suspension Notice.  She did not fill out the student information or sign the form as the Suspending Official.  She merely checked the following violations:

> a. Possessed, sold, or otherwise furnished any firearm, knife, explosive, or other dangerous object, unless, in the case of possession of an object of this type, the pupil obtained written permission to possess the item from a certificated school employee, which is concurred in by the principal or the designee of the principal.
>
> b. Disrupted school activities or otherwise willfully defied the valid authority of supervisors, teachers, administrators, school officials, or other personnel engaged in the performance of their duties.
>
> c. Possessed an imitation firearm.  As used in this section, "imitation firearm" means a replica of a firearm that is so substantially similar in physical properties to an existing firearm as to lead a reasonable person to conclude that the replica is a firearm.
>
> d. Harassed, threatened, or intimidated a pupil who is a complaining witness or a witness in a school disciplinary proceeding for the purpose of either preventing that pupil from being a witness or retaliating against that pupil for being a witness, or both.
>
> e. Engaged in an act of bullying, including, but not limited to, bullying committed by means of an electronic act, as defined in subdivisions (f) and (g) of Section 32261, directed specifically toward a pupil or school personnel.
>
> f. Harassment, threats, or intimidation creating an intimidating or hostile educational environment (Ed Code 48900.4)

- 15 -

58.    Ms. Keith apparently intended the form as a threat, even though none of N.Y.'s actions violated any of the suspension guidelines, especially since they only apply to on campus behavior.  Ms. Keith alluded to the intent to make an example out of N.Y., stating that if the School did not punish N.Y., it would create bad optics for the administration.

59.    On Friday, March 10, 2017 at a meeting attended by N.Y., his parents, his attorney, and Defendants Willford and Steele, Principal Steele informed N.Y. that the decision to remove him from the position of Junior Class President was final.

60.    At the March 10th meeting, Defendant Willford admitted that the Leadership election guideline prohibiting "inappropriate material" was unclear. In fact, she proposed that N.Y. create clearer election guidelines as part of his punishment.

61.    For creating a video that the school administration found "inappropriate," the school stripped N.Y. of his title as Junior Class President, suppressed his election to ASB President for the following year, and permanently expelled him from the Leadership Class.

62.    For several months, despite repeated requests, Defendants refused to reverse their decision.

63.    During this time, Defendants refused to release the actual election results despite repeated requests from N.Y., his parents, and his counsel.

64.    On May 15, 2017, N.Y.'s counsel informed the School District by letter that N.Y. intended to file a lawsuit based on Defendants' unconstitutional acts.  The letter demanded returning N.Y. to the *status quo anti*, reimbursement for legal fees, damages, an apology, and "[i]mplementation of procedures designed to prevent future violations…".

65.     On May 16, 2017, the District informed N.Y. that effective May 18, 2017, N.Y. would be returned to the Leadership class and reinstated as Junior Class President.  Further, the District confirmed that N.Y. "received the most votes" and that he will "serve in the position of ASB Class President" for the 2017-2018 school year.  The school refused N.Y.'s other demands.

66.     Although the Defendants seemed to accept responsibility on the surface, they continued to castigate N.Y., both directly and by encouraging surrogates to retaliate against N.Y. on their behalf.

67.     Plaintiff is informed and believes and based thereon alleges that on Thursday, May 18, 2017 an official from the School District believed to be Dr. Jason Reimann, spoke with the Leadership class about N.Y.  Kerri Christman Gilbert, the resident substitute teacher of San Ramon Valley High School, was also present.  The message delivered to the students was that the only reason the District reversed the punitive actions taken against N.Y. was because N.Y. was suing the District, implying that the decision was only about avoiding litigation rather than admitting the school errored and acted inappropriately. The presentation was specifically designed to align the student body against N.Y.

68.     Plaintiff is informed and believes and based thereon alleges that between May 23, 2017 and June 30, 2017, Ms. Gilbert published a series of posts concerning the topic on the Facebook page for the parents of SRVUSD including the following:

> Then we will agree to disagree.  It is not about content it's about breaking the rules of the contract.  What message does it send to the rest of the kids who followed the rules.  How about the kids who have been working towards becoming asb president their senior year.  It sends the message that they can skirt the rules and get away with it.  What kind of kids are we raising that look for a way to get around what is stated.  I was there when the kids were informed

> and they were outraged and rightfully so.  When he takes over he's going to have a heck of a time earning their respect.  And respect is not granted it's earned.  Next school year ought to be interesting.

69.     Plaintiff is informed and believes and based thereon alleges that Janet Willford contacted a leadership teacher at California High School (Cal High) and discussed having N.Y. address the Muslim Union of Cal High to publicly apologize for the video.  Cal High has a significantly higher population of Muslim students than SRVHS, and Ms. Willford's intention was to publicly shame N.Y.  The contact with the teacher from another school, on a matter that should have been handled only by the administration, only served to bring further unwarranted attention to the matter and to stoke the flames of racial tension.

70.     On May 18, 2017, Karen Pearce, a close personal friend of Janet Willford wrote on Facebook.

> "San Ramon Valley Unified School District just caved in to legal bullying by parents of a junior who ran for SRVHS ASB President using a racially offensive "joke" video as his campaign tactic.
>
> He and his friend dressed up like Muslim terrorists and had fake guns. I saw the video and was so outraged.
>
> These kids agree to a campaign contract with clear consequences for breaking it…you will not get an office.  I know it well bc my daughter is the current ASB president.  Initially the boy was not allowed to be president.  Parents sued. Parents refused to have their son apologize or take any responsibility for a dreadful decision.
>
> AND I heard from students that parents changed their (losing) lawsuit to a freedom of speech suit and asked for big $$$.  DISTRICT caved!!!! Gave in rather than stand up for all the principles they expect our kids to learn and exhibit.  Boy returns tomorrow as new ASB President.  UNBELIEVABLE!!
>
> As a mom who expects (forces) her kids to abide by their contracts…As a mom who saw the ASB kids have to enforce their ASB contract on their friends this year…
>
> As a parent who expects my kids to accept responsibility for
>
> poor choices and apologize…

As a citizen in a country where racial slurs (even in jest) are NOT OK...

I am outraged.

SRVUSD--think about the precedent you just set.  You pretty much tied the hands of your principals, teachers and safety staff.  Get caught drinking--just sue.  Don't like your grade--sue.  Apparently things like right and wrong don't matter here anymore.

There is a Board meeting on Tuesday.  It would be awesome to have a strong show of support and speakers to speak on our Leadership program's behalf.  The reinstatement of this student is a blatant disrespect to rules, in general, and his video that mocked Muslims was sufficient to disqualify the student from the campaign. This situation is not just a HS thing.  The outcome is precedent for all sorts of unfair behavior.

#thisiscrazy #srvusd #srvhs #upside_down #charactermatters

doing the right thing isn't always easy but it's always right."

71.     She continued her tirade on Instagram:

Raising kids just got harder thanks to SRVUSD and the parents of a SRVHS student who used a racially insensitive video against Muslims as his campaign for ASB President.  Parents didn't like that the campaign contract he signed dictated that he wasn't allowed into office so they brought multiple suits against the District AND refused to have their son apologize/take responsibility for a poor decision. SRVUSD caved and are forcing the leadership class and school to have this boy as their role model and leader next year.  What kind of example is this SRVUSD???  How do you hope to uphold all the other behavior and conduct contracts with students?? Kids make mistakes --I get it.  But it's the authority figures (parents, school, District) that need to teach accountability. Parents--this is what your tax dollars are supporting.  I feel so bad for this boy and the life lesson his parents are choosing...don't like something--sue.

I hope the local media follows this.  It's just not right.  Please share. I have to believe good will win!!!@ktvujuliehaener @eastbaytimes

#thisiscrazy #srvusd #srvhs #upside_down #charactermatters

72.     Some of the information in Ms. Pearce's post could only have come from someone within the School District.  For example, the fact that the Yu's were considering further legal action was only transmitted from N.Y.'s

1  attorney to the attorney for the San Ramon Valley Unified School District.
2  Somehow that information was transmitted to Ms. Pearce.

3      73.   Ms. Pearce's social media posts created media frenzy and
4  communities' uproar.  Neighborhood discussions on sites like social media site
5  Nextdoor.com got so heated that Nextdoor.com had to completely shut down
6  the threads.   N.Y. and his family received threatening messages and were
7  targets of hate speech based on the Defendants' unsubstantiated claims that
8  N.Y. had engaged in racist stereotyping.

9      74.   Plaintiff is informed and believes and based thereon alleges that
10  Janet Willford encouraged Karen Pearce to make publish these statements.

11      75.   Ms. Willford's existing animus towards N.Y. is evidenced by the fact
12  that the other students involved in the production and distribution of the video,
13  including the students who developed the characters that Ms. Willford claims to
14  be offended by, the student who edited the video, and the student who
15  actually posted the video, were only required to make a video displaying the
16  proper way to stay within school guidelines when making campaign videos as
17  their punishment.  This option was never offered to N.Y. who only learned about
18  the punishment video from his fellow students.  Also, the school contacted the
19  parents of those students while it did not contact N.Y.'s parents.

20      76.   Plaintiff is informed and believes and based thereon alleges that
21  on May 24th, Geraldine Herron, N.Y.'s Spanish teacher encouraged her
22  students to e-mail the Superintendent in protest of the school's decision to
23  reinstate N.Y. so that "all [their] voices are heard."

24      77.   On May 18th, N.Y.'s History teacher, Heidi Stepp contacted Karen
25  Pearce, other friends, politicians, the Council on American Islamic relations
26  (CAIR), and the media to foment outrage against N.Y. and to have the school
27  board reinstate the unconstitutional sanctions against him.

78. On May 29th, Andrew Williams, N.Y.'s photography teacher e-mailed his class that, "[t]he last week has brought a lot of negative attention to our school. We've made international news and not for good reasons…Integrity is doing the right thing when no one is looking" – a statement that indirectly condemns N.Y.

79. Plaintiff is informed and believes and based thereon alleges that many SRVHS teachers excused the absences of students who participated in a walkout to protest the School Board's decision to reinstate N.Y., in tacit support of taking retaliatory action against N.Y.

80. Over one hundred and forty SRVUSD teachers, staff, and employees signed a letter that was presented to the District Board on June 13, 2017. The letter, which contains numerous misstatements of law and fact, admonishes the School Board for reversing the decision to punish N.Y. for the campaign video.

81. Further, there is evidence that Janet Willford has a history of animus directed towards N.Y. even in advance of the video incident. When viewed in totality, her actions demonstrate a consistent pattern of favoritism towards Caucasian students, especially students who were members of her church and treating N.Y., who is Asian and belongs to a different religion, as if he did not belong in the Leadership Class or in a leadership position.

82. At the end of his sophomore year, N.Y. was elected to the position of Junior Class President. In front of the entire leadership class, Willford brought up the fact that N.Y. had lost elections for leadership positions three years in a row before attaining this achievement, intentionally embarrassing him.

83. Traditionally, incoming Junior Class Officers (still in their sophomore year) are invited to the Junior Class Prom so that they can see first-hand what their job will be the following year. Ms. Willford invited all the incoming Junior

Class Officers who were Caucasian, including the candidate that N.Y. defeated in the Junior Class President election, also a Caucasian, well in advance of the event, but excluded N.Y. Two days prior to the event, N.Y. finally received his invitation with the explanation that Ms. Willford "forgot" to include him on the list. He was unable to attend at that late date, because his parents had already made plans for him to be away.

84. At the beginning of the year, Ms. Willford established and used a group chat to discuss Junior Class Leadership topics with the Junior Class Officers. She added all the other officers but again "forgot" to add N.Y. to the group chat, even though he was Junior Class President. N.Y. was not even aware the group chat existed until he casually asked the Vice President how she had received a copy of a prom invitation design that N.Y. created. This was in January, half way through the year.

85. Defendant Willford targeted N.Y. the way she did because N.Y. is an Asian Catholic while the other leadership members, who mostly attend her Presbyterian Church, are Caucasian.

86. Ms. Willford maintains a close and personal friendship with the family of G.W., the student who benefited from N.Y.'s disqualification by being named incoming ASB President. That family contacted Ms. Willford and expressed concern about the video. Ms. Willford is also a close friend of Karen Pearce, the woman who appeared on TV interviews and published the Facebook and Instagram postings condemning N.Y., initiating and supporting a smear campaign against N.Y. and his parents, and encouraging people to pressure the School Board to reconsider the reinstatement of N.Y. They all attend and are heavily involved in the same local Presbyterian Church. Ms. Willford's father-in-law is a church deacon. Ms. Pearce held various volunteer positions in the Women's Ministry program at the church before

joining its staff in January 2016 as Director of Connection.  G.W. is an active member of the church's Student Life Group and is the church's current High School Intern.  She also 'liked' Ms. Pearce's Instagram post condemning N.Y. and supporting the smear campaign.  G.W.'s father organized sporting events for Men on the Mountain, church's annual men's conference.

87.   Ms. Willford knew G.W. would serve as ASB President if she disqualified N.Y., and she let her personal relationship with G.W. and her family and her preference for G.W. to serve as next year's ASB President influence her decision to disqualify N.Y. and overturn a legitimate election.  We do know that the family contacted Ms. Willford after learning about the video.  Certainly, it was not prudent for Ms. Willford to be the one to make the decision to disqualify N.Y. and thereby place the child of her friend in position to ascend to the presidency.

88.    After the Board reversed SRVHS's decision to punish N.Y. for his political speech, Superintendent Schmitt reached out to the Yu Family to arrange a meeting "to make sure [N.Y.] [was] doing OK and to provide support."  However, when the Yus requested to have their attorney present and asked to discuss the issues which were causing N.Y. not to be "OK" the Superintendent, through counsel, unilaterally cancelled the meeting and refused to meet with the Yus.

89.   The unconstitutional acts directed at N.Y. and the continued actions of the Defendants towards him have caused a great deal of stress.  N.Y. has lost weight.  Recently, he had to be admitted to the hospital for elevated heart rate caused by the stress brought on by the unlawful acts of defendants.

90.    Having no other means for protecting themselves, the Yus brought this action to vindicate N.Y.'s constitutional rights, recover damages for the Defendants' unconstitutional acts, to prevent further harassment directed at

him in retaliation for standing up for Free Speech, and to protect other students from additional unconstitutional attacks on Free Speech.

91.    The Yu's other son, K.Y. is currently the elected Junior Class President and desires to run for the office of the elected Associated Student Body (ASB) President.  His speech and the speech of other students in relation to running for office is restrained by the impermissibly vague and overbroad language in the regulations that burdens election speech.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Violation of the 1st and14th Amendment to the**
**United States Constitution overbreadth and vagueness**
**Facial Challenge**

*Seeking declaratory and injunctive relief against*
*Defendant SRVUSD and against Defendants Schmitt,*
*Reimann, Krolikowski, Keith, Ramos, Phelan, and Willford*
*in their official capacities*

92.    Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this Second Amended Complaint.

93.    Defendants sanctioned N.Y. for allegedly violating rules governing election materials for students running for leadership positions at SRVHS. Specifically, they claimed that N.Y. violated the following rule set forth in an election packet: "***Please have the discretion when creating campaign signs and slogans, as any inappropriate material will be removed and the candidate is [sic] subject to be pulled from the election.***"

94.    The above regulation governing election speech is unconstitutional on its face and as applied to Plaintiff under the First and Fourteenth Amendments to the United States Constitution for numerous and various reasons, including, but not limited to, the following:

a.  The regulation effectuates an impermissible prior restraint on speech and expression;

b.  The regulation unduly, impermissibly, and unconstitutionally restricts the ability of students from engaging in First Amendment activities;

c.  The regulation permits unbridled discretion by SRVHS teachers and administrators in determining what speech to sanction;

d.  The regulation denies Plaintiffs and others their procedural due process rights under the First and Fourteenth Amendments;

e.  The regulation fails to further any important, substantial, or compelling governmental interest;

f.  The regulation permits restrictions on speech and expression that are greater than what are essential to further any asserted governmental interests;

g.  The regulation allows restrictions on speech and expression that are greater than what are essential to further any asserted governmental interests;

h.  The regulation allows restrictions on speech and expression that are not the least restrictive means available;

i.  The regulation contains criteria that are both arbitrary and capricious and which are not supported by any legislative or administrative record;

j.  The regulation contains various terms and phrases that are impermissibly vague and ambiguous;

k.  The regulation contains various terms which are impermissibly and substantially overbroad when judged in relation to its plainly legitimate sweep;

The regulation has been applied against Plaintiff by SRVUSD in an unconstitutionally vague manner;

95.     SRVUSD and the other Defendants relied on the regulation to sanction Plaintiff out of distaste for or disagreement with the nature, content, or message of presumptively protected speech.

96.     The regulation continues to act as a prior restraint on other students who desire to address their classmates relating to running for officer positions in the leadership program.

97.     Because each student affected by this provision may graduate shortly after bringing an action challenging the provision, the provision falls into the unique species of cases covered by the well-established doctrine that when problems capable of repetition, yet evading review are raised by plaintiffs who having during the course of the litigation, primarily through simple passage of time, lost for one reason or another some of the objective adverseness which characterized their initial posture, the suits begun by such plaintiffs will not necessarily be defeated.[2]  Thus, in spite of Plaintiff's recent graduation he has standing to proceed with his facial challenge seeking to enjoin the enforcement of the statute.

98.     Pursuant to Rule 57 of the Federal Rules of Civil Procedure, as well as 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the regulation is unconstitutional on its face and as applied to Plaintiff for the reasons set forth above.

---

[2]  *See Grossberg v. Deusebio*, 380 F. Supp. 285, 292 (E.D. Va. 1974), *citing Moore v. Ogilvie*, 394 U.S. 814 (1969) and *Roe v. Wade*, 410 U.S. 113 (1973). The Ninth Circuit distinguished *Grossberg* but cited it approvingly in *Wilson v. Nevada*, 666 F.2d 378, 382 (9th Cir. 1982).

RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

### SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983
### Violations of the First Amendment to the U.S. Constitution

*Seeking Declaratory Relief, Monetary Relief, or in the alternative, nominal damages, against Defendants Schmitt, Reimann, Steele, Keith, Ramos, Phelan, and Willford in their personal capacities*

99.    Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this Second Amended Complaint.

100.    Plaintiff has a federally protected right and privilege to be free from deprivation of his freedom of speech, expression, and association under the First Amendment to the United States Constitution as incorporated and applicable to the state by the Fourteenth Amendment to the United States Constitution.

101.    The First Amendment rights violated by the Defendants were clearly established at the time Defendants violated them.

102.    The Defendants are aware or should be aware that despite pedagogical concerns, neither students nor teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.

103.    The actions the Individual Defendants engaged in were routine duties incident to the normal operations of the school and did not involve discretionary acts.

104.    In an act of deliberate indifference to the First Amendment rights of Plaintiff, Defendants arbitrarily and capriciously punished Plaintiff based on his protected speech by stripping him of his office as Junior Class President for nearly four months, disqualifying him from the position as next year's ASB President despite having received a majority of the vote thereby casting a cloud over the leadership role, and expelling him from the Leadership Class for nearly a full semester.

105.    The production, distribution, and display of the video occurred off campus.

106.    The protected speech did not cause a material and substantial disruption to school activities or to the work of the school, nor was it reasonably likely to do so.

107.    As such, Defendants' acts violate Plaintiff's First Amendment rights.

108.    The general rule that schools may not regulate merely inappropriate out-of-school speech (as opposed to truly threatening or substantially disruptive speech) has been well established for decades.  Thus, the rights violated by the Defendants was clearly established.

109.    Defendants' actions deprived N.Y. of his right to an education, specifically but not limited to the right to attend the leadership class from which he was expelled during the majority of the Spring 2017 Semester.

110.    As a further direct result of Defendants' actions, Plaintiff suffered damages including but not limited to, the chilling of his First Amendment Rights, emotional damages, harm to reputation, embarrassment, humiliation, stress and/or mental anguish, and all other damages directly and/or consequentially associated with the deprivation of one's civil rights, including attorneys' fees and costs associated with vindicating his civil rights.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Violations of the First Amendment to the**
**U.S. Constitution by Retaliation**

*Seeking Declaratory Relief, Monetary Relief, or in the*
*alternative, nominal damages, against Defendants*
*Schmitt, Reimann, Steele, Krolikowski, Keith, Ramos,*
*Phelan, Willford, and Gilbert in their personal capacities*

111.    Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this Second Amended Complaint.

- 28 -

112. N.Y.'s parody campaign video is First-Amendment-protected speech.

113. N.Y.'s petitioning the state court for a writ of mandate is also activity protected by the First Amendment.

114. The general rule that schools may not regulate merely inappropriate out-of-school speech (as opposed to truly threatening or substantially disruptive speech) has been well established for decades. It is also well established that citizens may not be punished for petitioning the government. Thus, the rights violated by the Defendants was clearly established.

115. The First Amendment rights violated by the Defendants were clearly established at the time Defendants violated them.

116. Although the District agreed to reinstate N.Y., the District, its employees, and its teachers engaged in and continue to engage in retaliatory conduct, including without limitation:

a. encouraging students to express hostility toward N.Y. by telling those students that the only reason the District reinstated N.Y. was because N.Y. and his parents threatened to file a lawsuit;

b. encouraging students to contact the Superintendent to protest against N.Y.;

c. signing a petition to the School Board condemning N.Y. for engaging in First Amendment Activity and condemning the School Board for reinstating N.Y.;

d. encouraging students to leave class to protest the School District's decision to reinstate N.Y. by excusing the absences of those students;

e.  showing the subject video, a copy of which was obtained by demanding a copy from the students involved, to members of the Muslim community, to further provoke community backlash;

f.  disseminating through social media additional information from N.Y.'s private school records including discussing his attendance;

g.  intentionally withholding N.Y.'s semester grades throughout the summer even when all required work had been completed, prior to 2017-2018 school year;

h.   creating a school Constitution to degrade N.Y.'s authority as the elected ASB President;

i.  not allowing N.Y. to take full authority as president as exemplified by not allowing him to select his cabinet;

j.  operating a shadow government that takes on responsibilities that would normally be the purview of the president; and

k.  failing to protect N.Y. against harassment from other students including incidents of vandalism and hate speech on N.Y.'s assigned parking space.

117.   The District's retaliatory conduct has denied N.Y. of various benefits and privileges.  The actions of the District and its failure to prevent the acts of its administrators, teachers, and employees have created such a toxic environment at the school and in the community.

118.   The actions the Individual Defendants engaged in were routine duties incident to the normal operations of the school and did not involve discretionary acts.

119.   Gilbert's participation in the retaliation against N.Y. included encouraging students to essentially shun N.Y. for engaging in free speech and

RANDAZZA | LEGAL GROUP

1   for petitioning the government seeking redress for the unlawful sanctions levied

2   against him.

3       120.   SRVUSD has a social media policy that prohibits employees from

4   posting statements that mention or are associated with the employee's

5   professional role or employment by the District, unless they include a disclaimer

6   that the article does not represent the opinion of SRVUSD.

7       121.   Gilbert's statement as set forth at Paragraph 68 was made on a

8   social media site specifically designed to discuss issues relating to the school

9   district.  Her statement discussed a meeting held at the school where a high-

10  ranking District administrator was present.  She did not include the required

11  disclaimer that would have distinguished her as a private actor.  When

12  considered in this context, Gilbert's statements were reasonably understood by

13  readers as official action on behalf of the school.  Thus, Gilbert acted under the

14  color of state law.

15      122.   Moreover, Gilbert made other statements suggesting that she

16  spoke from a position of authority.  On May 23 at 9:30 am she wrote,

17  
> What many are missing here is the main point as to why he was
> initially disqualified.  These kids sign a contract in that contract it
18 > states no racially or offensively motivated marketing. Everyone has
> a different opinion on that but the video is definitely racially
19 > motivated.  That is why he was disqualified.

20  And on June 26th she wrote:

21  
> Part of the bigger picture was how he handled it at the time.  He
22 > blew it off and was kind of rude to the team making the decisions.

23  And:

24  
> I was there when the class was told about him being reinstated.
> Even if he comes back there is very little support for him.
25

26  Each of these statements and others suggest that Gilbert was speaking from

27  the position of an insider.

123.   The retaliatory acts will negatively impact the right of N.Y. to attend the college of his choice.

124.   The motivation for the retaliatory adverse actions taken by the District, its administrators, teachers, and employees is to punish N.Y. for engaging in First Amendment protected activity including ideas N.Y. conveyed in his James Bond parody campaign video and his right to petition the government.

125.   As a direct result of Defendants' actions, Plaintiff suffered damages including but not limited to, the chilling of his First Amendment Rights, emotional damages, harm to reputation, embarrassment, humiliation, stress and/or mental anguish, and all other damages directly and/or consequentially associated with the deprivation of one's civil rights, including attorneys' fees and costs associated with vindicating his civil rights.

### FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### (Violation of the 14th Amendment to the United States Constitution – Right to Due Process)

*Seeking Injunctive and Declaratory Relief against Defendants Schmitt, Reimann, Steele, Keith, Ramos, Phelan, and Willford in their official capacities; and*

*Seeking Monetary Relief against Defendants Schmitt, Reimann, Steele, Keith, Ramos, Phelan, and Willford in their personal capacities*

126.   Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this Second Amended Complaint.

127.   The policies and conduct of the Defendants constitute a violation of the First and Fourteenth Amendments of the U.S. Constitution.

128.   Fundamental Due Process requires that school disciplinary rules must be sufficiently explicit to inform those who are subject to them what conduct on their part will render them liable to their penalties and not so vague

RANDAZZA | LEGAL GROUP

that people of common intelligence must necessarily guess at their meaning and differ as to their applications.

129.    Fundamental Due Process and ordinary notions of fair play further require that the school give adequate notice of the school disciplinary rules so as to allow a student and his parent to govern his or her conduct and or action in a fashion that would comport with the school restrictions.

130.    Prior to February 4, 2017, when Plaintiff and his four fellow students produced and distributed the video that Defendants censured, the School did not give proper and adequate notice of what it considered to be inappropriate speech that would subject students to disciplinary actions.

131.    Plaintiff is entitled to Due Process notice of school policies, rules and/or procedures which could subject him to disciplinary action, so as to enable him to adequately govern his conduct accordingly.

132.    Like all citizens, Defendants are deemed to know the applicable law governing their behavior, authority, duties and procedures.

133.    Plaintiff has a federally protected right and privilege to be free from deprivation of life, liberty, or property without Due Process of the law under the Fourteenth Amendment to the United States Constitution.

134.    The Defendants knew or should have known Plaintiff has a federally protected right and privilege to be free from deprivation of life, liberty, or property without Due Process of the law, under the Fourteenth Amendment to the United States Constitution.

135.    The rights violated by these Defendants were well-established at the time of the violations, and the Defendants knew or should have known that they could not craft, adopt, pass, ratify and/or enforce "secret" and/or unwritten standards for regulating election materials to which Plaintiff was not provided Due Process notice.

136.   The actions the Individual Defendants engaged in were routine duties incident to the normal operations of the school and did not involve discretionary acts.

137.   Defendants decided in an act of deliberate indifference to the rights of Plaintiff to arbitrarily and capriciously take action to circumvent the written disciplinary policies, rules, and procedures of SRVHS and SRVUSD.

138.   As a direct and proximate result of their actions, the Defendants, under color of law, deprived Plaintiff of certain civil rights secured under the 1st and 14th Amendments of the United States Constitution, by wrongfully censoring his United States Constitutional freedom of speech, expression, and association without Due Process of law.

139.   As a direct and proximate result of the Defendants actions, Plaintiff was deprived of a liberty interest and suffered damages, as a result of the violation of his Civil Rights, including but not limited to the chilling of his constitutional rights, emotional damages, embarrassment, harm to reputation, humiliation, stress and/or mental anguish and all other damages directly and or consequentially associated with the deprivation of one's civil rights, including attorneys' fees and costs associated with vindicating his civil rights.

140.   Plaintiff had no adequate and/or available post deprivation remedy.

141.   Although Plaintiff has graduated and will not campaign again, the rule remains in place.  Students to whom the rule is applied generally will not have sufficient time to bring a claim and enforce their rights prior to graduation. Because the unconstitutional rule is capable of repetition, yet evading review, Plaintiff's request for injunctive relief is not moot under Ninth Circuit law.

## FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### (Violation of the Equal Protection Clause of the14th Amendment)

*Seeking Declaratory and Monetary relief against
Defendants Schmitt, Reimann, Steele, Keith, Ramos,
Phelan, and Willford in their official capacities.*

142.   Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this Second Amended Complaint.

143.   N.Y. is a first-generation Chinese/Filipino American and practicing Catholic.  He is believed to be the first elected Asian ASB President in SRVHS.

144.   While only two ASB officer positions are elected by the student body (ASB President and ASB Vice President), the rest of the ASB officers are selected by Defendant Willford based largely on subjective factors.  Defendant Willford, her family and friends are heavily involved in the Community Presbyterian Church (CPC).  Willford gives preferences to the members of CPC. Plaintiff is informed and believes and based thereon alleges that the outcome of Defendant Willford's discrimination favoring members of her church has resulted in a disproportionate number of selected leadership students who are members of CPC.  Similarly, a disproportionate number are Caucasian and female.

145.   Defendant Willford recommended to the administration that N.Y. be disqualified from the election for ASB president.  For months after N.Y. was disqualified, the Defendants told N.Y., his parents, and his prior counsel that at the time they disqualified him they had no way of knowing who had received the most votes.  This was not true.  One of the features of the software used for the elections is that it provides real-time results. Defendants' deliberately misleading statements evidences an attempt to cover up Defendant Willford's desire to advance the student who was then in second place; not coincidentally a Caucasian female student who interns at CPC.

146.   Defendants' treatment of other similar videos demonstrates that they used the content of N.Y.'s video as a ruse to disqualify him from the elections and allow someone from a favored class to ascend to the ASB presidency.  One school-sponsored video portrays Latinos as sexual predators who prey on weak women and makes a mockery of their accents. The video also portrays extensive imagery of kidnapping, sexual assault and harassment, torture, a perpetrator/interrogator dressed as an ISIS radical, and disturbing depiction of violence and terrorism using C4 designed to bomb the school and hurt the school community.  The video even makes an inference that De la Salle, a rival Catholic school, is a terrorist organization.  Another video glorified drug use.  Still another includes explicit sexual imagery of rubbing nipples and performing a striptease while money is thrown as part of the skit performed in real time in front of the student body and approved by Defendant Willford, the other defendants (the school administration), and leadership team.  There are numerous other videos like these that were produced, approved, and supported by the board of education, the other defendants (the district, the school administration), and teachers as part of the school curriculum and activities.  And perhaps the most relevant was a tweet by the previous ASB President, during her tenure as ASB President, also Caucasian and a CPC member, during N.Y.'s expulsion, mocking Catholics. Finally, a "Pepe the Frog" poster, which typically connotes racist, anti-Semitic, or other bigoted theme was created by a leadership student and posted on school campus during school hours in preparation for a football match against Monte Vista High School and was approved by Defendant Willford.  *See* "ADL Adds "Pepe the Frog" Meme, Used by Anti-Semites and Racists, to Online Hate Symbols

Database", Anti-Defamation League (Sept. 27, 2016).[3]  Each of these projects addressed subjects similar to those the Defendants condemned Plaintiff for including in his campaign video, but in each incident, the treatment of those subjects was far more egregious.

147.   Plaintiff is informed and believes and based thereon alleges that all the students participating in the creation of the videos described above were Caucasian and many belonged to Willford's church and religion and received preferential treatment based on those characteristics.

148.   Plaintiff is informed and believes and based thereon alleges that he has been intentionally treated differently from others similarly situated and that there is no compelling governmental reason for the difference in treatment.

149.   The students who created the videos made in connection with non-election activities discussed above are similarly situated to the Plaintiff.  In the broadest sense, they are all students at SRVHS, creating and distributing videos for the consumption of the student body.  Any justification for controlling N.Y.'s speech would apply equally to the students who created and distributed the similar, yet unsanctioned videos.  In fact, some of the videos were created under circumstances such that they would bear the imprimatur of the school and therefore would be subject to greater regulation under *Hazelwood School District et al. v. Kuhlmeier et al.*, 484 U.S. 260 (1988).

150.   None of these videos, projects, performances or activities received any condemnation or sanctions from the Defendants.

---

3   Available at: <https://www.adl.org/news/press-releases/adl-adds-pepe-the-frog-meme-used-by-anti-semites-and-racists-to-online-hate?ncid=edlinkushpmg00000313> (last accessed June 20, 2018).

151. Although the creators of the other videos were similarly situated, Defendants treated those students differently, precisely because they were, mostly, if not exclusively, Caucasian and some were members of Willford's church/religion.

152. The only student punished for images in a video was the Asian Catholic student.  Part of that punishment was to divest N.Y. of his elected office and give it to a student of a favored class.

153. Willford sought support for her actions against N.Y. by turning to a Muslim-American friend.  Through the friend, whom she used as a surrogate, Willford fermented outrage in the Muslim-American community in order to provide cover for her unconstitutional treatment of N.Y.

154. The conduct previously alleged violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. constitution, rights that were clearly established at the time of the violations.

155. The actions the Individual defendants engaged in were routine duties incident to the normal operations of the school and did not involve discretionary acts.

156. Defendant Willford's violations were intentional in that she engaged in acts, practices, or omissions that have the foreseeable effect of discriminating against N.Y. based on his religion, and race.

157. The remaining Defendants knew or should have known that Defendant Willford's actions were motivated by animus towards N.Y. based on his religion, and race.

158. The actions made by each of the Defendants were ratified by each of the other Defendants.

159. Plaintiff is informed and believes and based thereon alleges that one of the ways that the other defendants ratified Willford's actions was by

RANDAZZA | LEGAL GROUP

authorizing her to contact a leadership teacher at California High School (Cal High) and discussed having N.Y. address the Muslim Union of Cal High to publicly apologize for the video.  Cal High has a significantly higher population of Muslim students than SRVHS, and Ms. Willford's intention was to publicly shame N.Y.

160.   On February 13, 2017, during a meeting with Assistant Principal Jamie Keith, Plaintiff brought the other videos produced and created by other students in classes like Video Production, Leadership, and English that exhibited the same attributes like the James Bond parody that N.Y. participated in to her attention.  She informed N.Y. and his parents that despite these videos, they (all the defendants) support Willford's decisions and actions regarding N.Y.'s punishment.

161. The defendants further ratified each other's actions by surreptitiously conducting an alternate punishment for the other student participants in the James Bond parody video without offering the same to N.Y. The other students, two Caucasians and two Afghan-Americans had to only create a video that reflects the furtherance of chilling students' civil liberties.

162.   As a direct and proximate result of the Defendants actions, Plaintiff was deprived of a liberty interest and suffered damages, as a result of the violation of his Civil Rights, including but not limited to the chilling of his constitutional rights, emotional damages, embarrassment, harm to reputation, humiliation, stress and/or mental anguish and all other damages directly and or consequentially associated with the deprivation of one's civil rights, including attorneys' fees and costs associated with vindicating his civil rights.

## SIXTH CAUSE OF ACTION
### Violations of Title VI of the Civil Rights Act of 1964
### 42 U.S.C. § 7 et seq.

*Seeking Declaratory and Monetary relief against*
*Defendant SRVUSD and against Defendants Schmitt,*
*Reimann, Steele, Keith, Ramos, Phelan, and Willford*
*in their official capacities*

163.   Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this SAC.

164.   Plaintiff is informed and believes and based thereon alleges that SRVUSD and the leadership program receives federal financial assistance.

165.   N.Y. is a first-generation Chinese/Filipino American.  He is believed to be the first elected Asian ASB President in SRVHS.

166.   While only two ASB officer positions are elected by the student body (ASB President and ASB Vice President), the rest of the ASB officers are selected by Defendant Willford based largely on subjective factors.  Willford gives preferences to Caucasian students over Asian students.

167.   Plaintiff is informed and believes and based thereon alleges that the outcome of Defendant Willford's intentional discrimination favoring Caucasian applicants has resulted in a disproportionate number of selected leadership students who are Caucasian.

168.   Defendant Willford recommended to the administration that N.Y. be disqualified from the election for ASB president.  For months after N.Y. was disqualified, the Defendants told N.Y., his parents, and his prior counsel that at the time they disqualified him they had no way of knowing who had received the most votes.  This was not true.  One of the features of the software used for the elections is that it provides real-time results.  Defendants' deliberately misleading statements evidences an attempt to cover up Defendant Willford's

1    desire to advance the student who was then in second place; not

2    coincidentally a Caucasian female student.

3        169.    Defendant Willford's favorable treatment towards the creators and

4    distributors of other similar videos demonstrates that her condemnation of N.Y.'s

5    video was simply a ruse designed to disqualify N.Y. from the elections in order to

6    allow a Caucasian student to ascend to the ASB presidency.

7        170.    Other non-sanctioned videos include one that portrayed Latinos as

8    sexual predators who prey on weak women and makes a mockery of their

9    accents.   The video also portrays extensive imagery of kidnapping, sexual

10   assault and harassment, torture, perpetrator/ interrogator dressed as an ISIS

11   radical, and disturbing depiction of violence and terrorism using C4 designed to

12   bomb the school and hurt the school community.   The video even makes an

13   inference that De la Salle, a rival Catholic school is a terrorist organization.

14   Another video glorified drug use.   Still another includes explicit sexual imagery

15   of rubbing nipples and striptease while money is thrown as part of the skit

16   performed in real time in front of the student body and approved by

17   Defendant Willford, the other defendants and leadership team. There are

18   numerous other videos like these that plaintiff alleges were produced and

19   approved and supported by the board of education, the other defendants

20   (the district, the school administration) and teachers as part of the school

21   curriculum and activities.   And perhaps the most relevant was a tweet by the

22   previous ASB president, during her tenure as ASB President, also Caucasian,

23   during N.Y.'s expulsion, mocking Catholics.   Finally, a 'Pepe the Frog' poster,

24   which typically connotes racist, anti-Semitic or other bigoted theme was

25   created by a leadership student and posted on school campus during school

26   hours in preparation for a football match against Monte Vista High School and

27   was approved by Defendant Willford.   None of these videos, projects,

performances, or activities received any condemnation or sanction from Defendant Willford or the other defendants (the rest of the school's administration).  The only student punished for images in a video was the Asian Catholic student.  Part of that punishment was to divest him of his elected office and give it to a student of a favored class.

171.    Willford sought support for actions by turning to a Muslim-American friend.  Through the friend, whom she used as a surrogate, Willford fermented outrage in the Muslim-American community in order to provide cover for her discrimination against N.Y. based on his race.

172.    The conduct previously alleged violates Title VI of the Civil Rights Act of 1964 as codified at 42 U.S.C. § 2000d.

173.    Defendant Willford's violations were intentional in that she engaged in acts, practices, or omissions that have the foreseeable effect of discriminating against N.Y. based race.

174.    The remaining Defendants knew or should have known that Defendant Willford's actions were motivated by animus towards N.Y. based on his race.

175.    The actions made by each of the Defendants were ratified by each of the other Defendants.

176.    Plaintiff is informed and believes and based thereon alleges that one of the ways that the other defendants ratified Willford's actions was by authorizing her to contact a leadership teacher at California High School (Cal High) and discussed having N.Y. address the Muslim Union of Cal High to publicly apologize for the video.  Cal High has a significantly higher population of Muslim students than SRVHS, and Ms. Willford's intention was to publicly shame N.Y.

177.   On February 13, 2017, during a meeting with Assistant Principal Jamie Keith, Plaintiff brought the other videos produced and created by other students in classes like Video Production, Leadership, and English that exhibited the same attributes like the James Bond parody that N.Y. participated in to her attention.  She informed N.Y. and his parents that despite these videos, they (all the defendants) support Willford's decisions and actions regarding N.Y.'s punishment.

178.   The defendants further ratified each other's actions by surreptitiously conducting an alternate punishment for the other student participants in the James Bond parody video without offering the same to N.Y. The other students, two Caucasians and two Afghan-Americans had to only create a video that reflects the furtherance of chilling students' civil liberties.

179.   As a direct and proximate result of the Defendants actions, Plaintiff was deprived of a liberty interest and suffered damages, as a result of the violation of his Civil Rights, including but not limited to the chilling of his constitutional rights, emotional damages, embarrassment, harm to reputation, humiliation, stress and/or mental anguish and all other damages directly and or consequentially associated with the deprivation of one's civil rights, including attorneys' fees and costs associated with vindicating his civil rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment for Plaintiff and against Defendants as follows:

A.   An order declaring that Defendants' complained about conduct is unconstitutional and violates the First and Fourteenth Amendments of the U.S. Constitution;

B.   An order declaring that the section of the student election rules allowing for punishment of students who post "inappropriate

Second Amended Complaint
3:17-CV-03906-MMC

material" is unconstitutional on its face because it violates students' rights to Free Speech and Due Process;

C.    Prejudgment and post-judgment interest at the rate allowed by law;

D.    Costs of suit, including attorneys' fees and costs pursuant to 42 U.S.C. §1988;

E.    Actual, nominal, and punitive damages to be determined at trial;

F.    Such other declaratory relief consistent with the injunction as appropriate; and

G.    All other relief to which Plaintiff may be entitled.

### JURY DEMAND

Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully Submitted,

Dated: June 20, 2018          RANDAZZA LEGAL GROUP, PLLC

By:    */s/ D. Gill Sperlein*
         D. GILL SPERLEIN
         MARC. J. RANDAZZA

Attorneys for Plaintiff,
N.Y.

Case No. 3:17-cv-03906-MMC

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 20, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that a true and correct copy of the foregoing document being served via transmission of Notices of Electronic Filing generated by CM/ECF.

Respectfully submitted,

Employee,
Randazza Legal Group, PLLC