James Carlos McFall
CA Bar No. 322116; TX Bar No. 24083479
Edwin M. Buffmire
TX Bar No. 24078283 *pro hac vice*
Eric D. Wong
TX Bar No. 24102659 *pro hac vice*
**JACKSON WALKER LLP**
2323 Ross Ave., Suite 600
Dallas, Texas 75204
(214) 953-6000
jmcfall@jw.com
ebuffmire@jw.com
ewong@jw.com

Jonathan G. Fetterly
CA Bar No. 228612
Katherine Keating
CA Bar No. 217908
Douglas A. Alvarez
CA Bar No. 318919
Thomas P. Kinzinger
CA Bar No. 323889
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111-4070
(415) 675 3400
jon.fetterly@bclplaw.com
katherine.keating@bclplaw.com
doug.alvarez@bclplaw.com
thomas.kinzinger@bclplaw.com

**Attorneys for Plaintiff N.Y.**

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| **N.Y.**, through his guardians David and Leilanie Yu,<br><br>          Plaintiff,<br><br>vs.<br><br>**SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT; RICK SCHMITT** in his personal and official capacities as Superintendent of the San Ramon Valley Unified School District; **DR. JASON REIMANN**, in his personal and official capacities as Director of Education Services of the San Ramon Valley Unified School District; **RUTH STEELE**, in her personal and official capacities as Principal of San Ramon Valley High School; **JASON KROLIKOWSKI**, in his personal and official capacities as Principal of San Ramon Valley High School; **JAMIE KEITH** in her personal and official capacities as Assistant Principal of San Ramon Valley High School; **DEARBORN RAMOS** in her personal and official capacities as Assistant Principal of San Ramon Valley High School; **BERNIE PHELAN** in his personal and official capacities as Assistant Principal of San Ramon Valley High School; **JANET WILLFORD**, in her personal and official capacities as Leadership Teacher of San Ramon Valley High School; and **KERRI CHRISTMAN GILBERT** in her personal | Case No.: 3:17-CV-03906-MMC<br><br>**FIFTH AMENDED COMPLAINT:**<br><br>**42 U.S.C. § 1983 - FIRST AMENDMENT VIOLATIONS (FREE SPEECH); FOURTEENTH AMENDMENT VIOLATIONS (DUE PROCESS AND EQUAL PROTECTION)**<br><br>**VIOLATIONS OF CALIFORNIA CIVIL CODE §52.1**<br><br>**VIOLATIONS OF CALIFORNIA CONSTITUTION, ARTICLE I, §§ 1, 2**<br><br>**VIOLATIONS OF CALIFORNIA EDUCATION CODE, §§ 48907, 48950**<br><br>**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br><br>**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**<br><br>**INVASION OF PRIVACY**<br><br>**DEMAND FOR JURY TRIAL** |

-2-

and official capacities as Resident Substitute )
Teacher of San Ramon Valley High School, )
                                      )

        Defendants.

# I.

## INTRODUCTION.

1.     The First Amendment generally prohibits school officials from regulating *off-campus* student speech.  Further, fifty years ago, the Supreme Court famously proclaimed that the First Amendment protects the rights of students to speak and engage in expressive activities on-campus:

> "[S]tudents . . . do not shed their constitutional rights to freedom of speech or expression *at the schoolhouse gate*. * * * Any word spoken in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance.  But our Constitution says we must take this risk . . . ; and our history says that it is this sort of hazardous freedom – this kind of openness – that is the basis of our national strength and of the independence and vigor of Americans . . . ."

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 508-09 (1969).

2.     But here, the San Ramon Valley Unified School District and at least eight District officials (collectively, "Defendants") punished a student with a stellar academic record for speech made *far beyond the schoolhouse gate* when his *off-campus* speech (1) had no likelihood of causing a "substantial disruption" to school activities, and (2) did not interfere with the constitutional rights of any student.  Instead of complying with constitutional mandates, Defendants punished N.Y. for his off-campus speech—a parody video created entirely off-campus depicting N.Y. as a James Bond-type hero who rescues a person kidnapped by two members of an extremist group who attempted to force the victim to participate in a

video game competition (the "James Bond Parody" or "Parody"). Defendants' censorship and punishment was unconstitutional under *Tinker* and long-standing Ninth Circuit precedent.

3.     In *Tinker*, the Supreme Court held that the First Amendment prohibited school officials from regulating highly-controversial student speech – specifically, students wearing black armbands on-campus in protest of the Vietnam War.[1] That speech was offensive to friends of a former student who had been killed while serving in Vietnam or who otherwise supported the war, caused students with divergent opinions on the war to make comments and issue warnings to other students, and even caused at least one teacher's lesson plan to be "wrecked" by disputes with protesting students.[2] Under those facts, the Court held that the First Amendment prohibited school officials from regulating the protesting students' speech because it (1) was not likely to cause a substantial disruption to school activities, and (2) did not interfere with the constitutional rights of any particular student.[3] The Court emphasized that school officials' "undifferentiated fear or apprehension of disturbance" is not sufficient to overcome students' First Amendment rights.[4]

4.     The Ninth Circuit has recognized two narrow exceptions to the general rule prohibiting school officials from regulating off-campus student speech,[5] neither of which is applicable to the speech at issue here: (1) when the speech contains "credible threats of [school] violence;" or (2) when the speech targets a particular student with threats of violence or sexual

---

[1] The speech at issue in *Tinker* occurred in December 1965, a time in which more than 200,000 U.S. troops were deployed to Vietnam and in which major protest marches and draft card burnings were occurring throughout the country. 393 U.S. at 509-10, n.4.
[2] *Id.* at 510, n.4; *see also id.* at 518, 524 (Black, J., dissenting).
[3] *Id.* at 509, 514.
[4] *Id.* at 508.
[5] *See Morse v. Frederick*, 551 U.S. 393, 404 (2007) (recognizing that, had the student in *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675 delivered the same speech – an "elaborate, graphic, and explicit sexual metaphor" – "in a public forum *outside the school context*, it would have been protected") (emphasis added).

-4-

harassment.[6]  Those very limited exceptions serve as a "threshold test" that must be satisfied "before applying *Tinker* to speech that originates off-campus."[7]

5.    Further, the Ninth Circuit has held that school officials cannot punish a student for off-campus speech unless the speech poses a threat that is both "credible" and "ongoing," rather than merely "just any perceived threat of school violence arising from off-campus speech."[8]  Thus, the First Amendment prohibits school officials from regulating off-campus student speech, including speech that is violent in nature or content, when the speech is "old, highly fantastical, unspecific, and unaccompanied by other indicia of a violent intent" such that no reasonable school officials would perceive the speech to contain a credible and ongoing threat:

> "At a certain point, discipline may lose its basis in reasonable, ongoing concerns of campus safety, disruption, or interference with the rights of other students, and instead become *primarily a punitive, retrospective response* to the student's speech.  Such discipline would be in conflict with *Tinker*."[9]

---

[6] *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 710 (9th Cir. 2019) (holding that school did not violate student's free speech rights by expelling student for creating a "hit list" in his personal journal, naming 22 students who attended his high school and one former employee, and stating "I am God" and "All These People Must Die"); *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1148 (9th Cir. 2016) (holding that school officials did not violate First Amendment by regulating jokes about oral sex and acts of harassment and ridicule directed at a disabled student in a public park near the school); *Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062, 1068 (9th Cir. 2013) (holding that school did not violate student's free speech rights when it expelled student for sending a series of messages threatening to commit a school shooting to friends via the social website MySpace from his home computer after school hours); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 989 (9th Cir. 2001) (holding that school did not violate student's free speech rights when it expelled him on an emergency basis for a poem from the perspective of a school shooter which he wrote at home and eventually brought to school).

[7] *Wynar*, 728 F.3d at 1068; *McNeil*, 918 F.3d at 707-08 ("[C]ourts considering whether a school district may constitutionally regulate off-campus speech must determine . . . whether the speech bears a sufficient nexus to the school," which is satisfied when the speech poses a "a credible, identifiable threat of school violence," or identifies particular students as "specific targets" of violence or sexual harassment.  Off-campus student speech cannot be regulated under *Tinker* unless the speech is first shown to bear this "nexus to the school."); *see also C.R.*, 835 F.3d 1142; *LaVine*, 257 F.3d 981.

[8] *McNeil*, 918 F.3d at 709, 711.

[9] *Id.* at 710-11 (citing *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608 (5th Cir. 2004); *LaVine*, 257 F.3d at 991-92)) (emphasis added).

6.     Yet here, on February 9, 2017—two days after N.Y. and his friends voluntarily removed the James Bond Parody from YouTube, and when no "reasonable, ongoing concerns of campus safety, disruption, or interference with the rights of other students" existed[10]—Defendants punished N.Y. for the off-campus Parody.

7.     At the time, N.Y. was serving as the San Ramon Valley High School (the "School") Junior Class President and was a member of the School's Leadership Class,[11] a graded course taught by Defendant Janet Willford.  He was a candidate for the School's 2017-18 Associated Student Body (ASB) President at the time Defendants made the decision to punish him for the Parody.

8.     N.Y. and his friends filmed the Parody during non-school hours, with no school resources, and with no oversight by school officials.  N.Y.'s two Muslim friends developed the idea for the allegedly offensive antagonists and voluntarily played the antagonists.  The group intended to make an entertaining film for themselves and their friends.  They did not prepare a script, and each participant individually developed their characters, improvised their lines without any prior review or consultation, and brought their own props to the off-campus filming location.  One of N.Y.'s friends, not N.Y., edited the raw footage and posted the final version of the Parody to his personal YouTube webpage.[12]  Statistics showed that the Parody

---

[10] *Id.* at 711.

[11] The Leadership Class is a graded "cocurricular activity" which offers participating students ten hours of credit towards graduation.  *Compare* Cal. Educ. Code § 35160.5(a)(3) (West 2019) (a "cocurricular activity" is "a program that may be associated with the curriculum in a regular classroom"), *with id.* at § 35160.5(a)(2) (an "extracurricular activity" "is not part of the regular school curriculum, is not graded, does not offer credit, and does not take place during classroom time").  At the time Defendants' punished N.Y., the Junior Class President position and his role in the Leadership Class were two of his most valued cocurricular activities.

[12] At approximately 8:30 a.m. on February 7, 2017, a student told N.Y. that certain individuals "may" find the Parody offensive, but that she was not personally offended by the video.  N.Y. and his friends did not intend for the Parody to be offensive.  N.Y. immediately requested that the student editor remove the Parody from YouTube, which was done within minutes.

-6-

received approximately 30 views during the 12 hours it was available on the student editor's YouTube page.

9.     Defendant Willford favored the student who ran against N.Y. in the ASB President election. That student and her parents (both of whom are close friends with Defendant Willford) complained to Defendant Willford about the Parody. Defendant Willford immediately took steps to undermine N.Y.'s candidacy. Specifically, she solicited a copy of the Parody to the School by falsely representing to N.Y. and his co-creators that she wanted to "protect" them, and that she needed to view the Parody to do so. Defendant Willford showed the film to students, teachers, and administrators who had not previously seen or heard of the film.

10.    Thereafter, Defendant Willford and the School's then-administrators—Defendants Ruth Steele, Dearborn Ramos, Jamie Keith, and Bernie Phelan—made the collaborative decision to strip N.Y. of his position as Junior Class President, disqualify him in the election for 2017-18 Associated Student Body (ASB) President,[13] withhold the election results, and permanently suspend and remove him from the Leadership Class. Defendants Ramos, Keith, and Phelan interrogated N.Y. for nearly three hours and failed to notify N.Y.'s parents before informing him of their punishment decision. Defendants Willford, Steele, Ramos, Keith, and Phelan claimed that the Parody was "racist," "culturally insensitive," and violated a School election rule prohibiting "inappropriate" campaign material because two

_____

[13] The School's ASB President election is much more than a popularity contest. Like adult politicians, candidates for ASB President and for other elected positions in the School's student government have historically employed a wide-array of campaign strategies intended to increase name recognition, solicit the support of certain groups, and ensure that students actually vote.

Fifth Amended Complaint
3:17-CV-03906-MMC

friends of N.Y. who are of Middle Eastern descent and practicing Muslims played the antagonists. That justification is false and pretextual.

11.  Superintendent Rick Schmitt and Director of Educational Services Dr. Jason Riemann were notified of the decision to punish N.Y. in late-February 2017. Not only did Defendants Schmitt and Riemann endorse the initial punishment decision, but they took additional, independent steps to further punish N.Y. for his off-campus speech and expressive activities.

12.  Defendants' "punitive, retrospective response" to N.Y.'s speech violates the First Amendment,[14] California law, and the District policies.

13.  The election rule and the manner in which Defendants enforced the rule against N.Y. are unconstitutional. The First Amendment prohibits government officials from regulating speech based solely on their subjective views, including when a governmental rule or regulation purportedly provides government officials with "unfettered discretion" to regulate speech they find disagreeable.[15] The election rule regulates a much broader scope of speech than state and federal law allow, and neither the rule nor any of the District officials who enforced the rule against N.Y. provided prior notice as to the type or categories of material considered "inappropriate" and subject to regulation.[16]

---

[14] *See McNeil*, 918 F.3d at 710-11 (citing *Porter*, 393 F.3d 608; *LaVine*, 257 F.3d at 991-92).

[15] *Real v. City of Long Beach*, 852 F.3d 929, 934 (9th Cir. 2017) (recognizing that government regulations which provide government officials "unfettered discretion" to regulate protected activities are unconstitutional) (citing *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755–56 (1988)); *see also Cox v. State of La.*, 379 U.S. 536, 558 (1965) ("[T]he practice in . . . allowing unfettered discretion in local officials in the regulation of the use of the streets for peaceful parades and meetings is an unwarranted abridgment of appellant's freedom of speech and assembly secured to him by the First Amendment . . . .").

[16] *See, e.g., Gooding v. Wilson*, 405 U.S. 518, 529 (1972) (criminal statute punishing utterance to another of "opprobrious words or abusive language" is void for overbreadth); *Lewis v. City of New Orleans*, 415 U.S. 130, (1974); *Burch v. Barker*, 861 F.2d 1149, 1155-56, 1159 (9th Cir. 1988) (holding that school preapproval policy was unconstitutionally vague and overbroad when policy required all written student communications, including non-school sponsored communications, to be free from "libel, slander, obscurity (sic), personal attacks or

-8-

14. Further, Defendants punished N.Y. for the James Bond Parody, but they did not punish similarly situated students, including members of the Leadership Class, for similar speech and expressive activities. The Parody contains the same or substantially similar content, images, and storylines as that contained in films created and posted to social media by other members of the School's student body before, during, and after N.Y.'s time at the School.[17] Unlike the Parody, many of those films were created on-campus, were created and disseminated with the School's resources, were subject to pre-publication review and approval by School officials, and displayed the School's name and moniker.[18] Certain individuals may find those films "inappropriate" or "offensive." Yet Defendants did not punish the students who made those films for their speech—certainly, not to the degree Defendants punished N.Y. for the Parody.

15. In mid-May 2017, more than three months after Defendants punished N.Y., Defendants reinstated N.Y. as Junior Class President and informed N.Y. and his parents that N.Y. received the most votes in the February election. N.Y. became the first elected Asian American ASB President at the School.

16. Thereafter, one or more Defendants and other District officials and employees created a new controversy and further infringed on N.Y.'s constitutional rights. The District, Defendant Schmitt, as well as Defendant Willford and other District officials and employees who disagreed with N.Y.'s reinstatement, caused a walkout of more than 100 students, prompted a highly contentious May 2017 District Board meeting, and promoted a false

---

incitement to illegal action(s)," "unauthorized solicitation," and to not be distributed in a manner that "interefere[s] with or disrupt[s] the normal educational process").
[17] *See infra* ¶¶ 133-35.
[18] *Id.*

Fifth Amended Complaint
3:17-CV-03906-MMC

narrative about N.Y. and the contents of the Parody through the media and members of the San Ramon/Danville community.

17.     For example, N.Y.'s history teacher, Heidi Stepp, falsely reported to the media, local politicians, Muslim organizations, and numerous other non-school officials that N.Y. mocked and disparaged Muslims and that he refused to apologize.  Ann Katzburg, another District employee, sent correspondence to numerous non-school officials regarding N.Y. and the Parody.  In one email to Defendant Schmitt and at least one other non-school official, Ms. Katzburg falsely reported that the District determined after an investigation that N.Y. violated the California Penal Code's "hate crime" statute in connection with the Parody. In another letter sent to more than 1,000 people, Ms. Katzburg accused N.Y. of engaging in religious discrimination against Muslim Americans in violation of the Civil Rights Act.

18.     Defendants—specifically, the District, Defendant Schmitt, and Defendant Willford—knew that District employees and non-District officials with whom they were communicating were engaging in a malicious and deliberate campaign to inflict emotional distress on N.Y., yet they did nothing to protect N.Y. from that conduct. For example, on May 19, 2017, District Board Member Denise Jennison forwarded Defendant Schmitt an email from Karen Pearce in which Ms. Pearce encouraged a number of individuals, including District employee Kerri Pike, to protest N.Y.'s reinstatement at the May 2017 District Board meeting. Defendant Schmitt admits that he did not instruct Ms. Jennison or Ms. Pike to stop communicating about N.Y., the Parody, or the discipline imposed against N.Y.  He also did nothing to protect N.Y. from the backlash he received as a result of District officials and employees working with third parties to promote a false narrative about N.Y, and the Parody.

-10-

Nor did he do anything to prevent District officials and employees from further disclosing N.Y.'s confidential and self-identifying information.

19.     Defendant Schmitt also spoke directly with at least one person who is not an employee of the District about N.Y., the Parody, and the disciplinary sanctions against N.Y. Defendant Schmitt was aware that those types of communication were prohibited by law from discussing that type of information. Yet he admits engaging in those communications without N.Y.'s or his parents' authorization.

20.     Defendants claim that the May and June 2017 events justify their decision to punish N.Y. for off-campus speech made in February 2017. But Defendants and other District officials caused those events, not the Parody.    Further, any controversy resulting from Defendants' and other District officials' reaction to the Parody *cannot* as a matter of law establish that the Defendants' February 9, 2017 decision to punish N.Y. for the Parody complied with *Tinker*.[19] That includes: any controversy resulting from Defendants Steele, Ramos, Keith, Phelan, and Willford's decision to punish N.Y.; Defendants the District, Schmitt, and Riemann's decision to support the punishment, including the over three month suspension from the Leadership Class; Defendant Schmitt's decision to reinstate N.Y. and to allow N.Y. to serve as the ASB President after previously disqualifying him; acts of District officials and employees, including those engaged in directly by, or with the knowledge and support, of Defendants the District, Schmitt, and Willford to encourage a walkout, contentious District Board meeting, and further public backlash against N.Y.; and the acts of all

---

[19] *See McNeil*, 918 F.3d at 711 (citing *Porter*, 393 F.3d 608; *LaVine*, 257 F.3d at 991-92)); *see also J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094, 1118 (C.D. Cal. 2010) ("Clearly, however, the School cannot point to the discipline itself as a substantial disruption . . . .").

Fifth Amended Complaint
3:17-CV-03906-MMC

Defendants, as well as those of their agents and employees, in which they mischaracterized the contents and nature of the Parody in an effort to align the student body, the media, members of the public, and local Muslim leaders against N.Y.

21.     Defendants' unconstitutional conduct caused N.Y. to suffer actual damages, including multiple constitutional deprivations, severe emotional distress, financial loss, reputational harm, and fear resulting from, among other things, actual threats of violence to N.Y.'s life.  N.Y. is entitled to the relief detailed below, and respectfully requests that the Court, after a trial or dispositive motion on the merits, enter judgment in favor of N.Y., and award all relief available at law and equity to which N.Y. is justly entitled.

## II.

## JURISDICTION AND VENUE

22.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  The controversy arises under the United States Constitution; 42 U.S.C. § 1983; and 28 U.S.C. §§ 2201, 2202.  The Court has authority to award attorney's fees pursuant to 42 U.S.C. § 1988.  Each of the acts, or threats of acts, alleged herein were done by Defendants, or their officers, agents, and employees, under color and pretense of the statutes, ordinances, regulations, customs, and usages of the School and the District.  Further, N.Y.'s state law claims are based on the same set of operative facts, and are so related to the claims arising under federal law that they form part of the same case or controversy under Article III of the United States Constitution.

23.     The Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4 and California Code of Civil Procedure § 410.10.  Defendants are

domiciled in the State of California, and N.Y.'s claims against Defendants arise out of Defendants' actions in California.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). Defendants reside in the Northern District of California, and a substantial part of the acts or omissions giving rise to N.Y.'s claims occurred in the Northern District of California.

## III.

## THE PARTIES[20]

25.     Plaintiff N.Y., who brought this action as a minor by and through his guardians Leilanie Yu and David Yu, is a natural person and a citizen of the United States and the State of California, residing in Contra Costa County.

26.     Defendant San Ramon Valley Unified School District is a public entity in the State of California duly organized under the laws of the State of California to provide, among other things, education to minors in public schools within its boundaries. The District at all times mentioned herein has had its principal place of business in Contra Costa County, California. The District is responsible for enacting and enforcing its customs, policies, practices, and laws related to the suspension and student discipline complained about below.

27.     Defendant Rick Schmitt[21] is a natural person and a citizen of the United States and the State of California. N.Y. brings this action against Defendant Schmitt in both his personal capacity and in his official capacity as Superintendent of the District.

---

[20] N.Y. omits from this Fifth Amended Complaint Kerri Christman Gilbert who the Court dismissed with prejudice. The lack of express repleading against Gilbert is not a waiver of N.Y.'s claims against her, which N.Y. expressly preserves for the purpose of appeal.
[21] All titles herein refer to titles held by the individuals at the time of the incident. Some of the Defendants may no longer hold those positions.

-13-

28.     Defendant Dr. Jason Reimann is a natural person and a citizen of the United States and the State of California.  N.Y. brings this action against Defendant Reimann in both his personal capacity and in his official capacity as Director of Education Services of the District.

29.     Defendant Ruth Steele is a natural person and a citizen of the United States and the State of California.  N.Y. brings this action against Defendant Steele in both her personal capacity and in her official capacity as Principal of the School.

30.     Defendant Jason Krolikowski is a natural person and a citizen of the United States and the State of California.  N.Y. brings this action against Defendant Krolikowski in both his personal capacity and in his official capacity as Principal of the School.

31.     Defendant Jamie Keith is a natural person and a citizen of the United States and the State of California.  N.Y. brings this action against Defendant Keith in both her personal capacity and in her official capacity as Assistant Principal of the School.

32.     Defendant Dearborn Ramos is a natural person and a citizen of the United States and the State of California.  N.Y. brings this action against Defendant Ramos in both her personal capacity and in her official capacity as Assistant Principal of the School.

33.     Defendant Bernie Phelan is a natural person and a citizen of the United States and the State of California.  N.Y. brings this action against Defendant Phelan in both his personal capacity and in his official capacity as Assistant Principal of the School.

34.     Defendant Janet Willford is a natural person and a citizen of the United States and the State of California.   N.Y. brings this action against Defendant Willford in both her personal capacity and in her official capacity as Leadership Teacher at the School.

-14-

## IV.

## FACTS COMMON TO ALL CLAIMS

**A.      N.Y. spent years cultivating a reputation for leadership and developing an exceptional academic record.**

35.      N.Y. attended schools within the District from 2005 until he graduated from the School in 2018.  During his time as a student within the District, N.Y. participated in numerous extracurricular and cocurricular activities, and enjoyed substantial academic success.   Among other things, he took multiple Advanced/Honors classes, earned recognition nine times for maintaining a 3.5 GPA or higher, and participated in an anti-bullying intervention club upon the recommendation of his teachers.  He also cultivated a reputation of trust and leadership among his fellow students, as evidenced by his election to several student government posts.  District personnel never suspended or expelled N.Y. from any class, cocurricular activity, or extracurricular activity for any reason until Defendants engaged in the unlawful conduct giving rise to this action.

36.      In 2016, N.Y.'s peers elected him Junior Class President.  As Junior Class President, N.Y. presided over the Junior Class and officer meetings, prepared meeting agendas, and represented the class in meetings and School activities during the 2016-17 school year.

**B.      N.Y. enrolled in the Leadership Class and decided to run for ASB President.**

37.      N.Y.  enrolled in the School's  Leadership Class in conjunction with his role as Junior Class President.  The Leadership Class is an elective, "cocurricular activity" which meets four times per week and in which students receive ten hours of credit towards graduation.  *Compare* Cal. Educ. Code § 35160.5(a)(3) (West 2019) (a "cocurricular activity" is "a program that may be associated with the curriculum in a regular classroom"), *with id*. at § 35160.5(a)(2)

(an "extracurricular activity" "is not part of the regular school curriculum, is not graded, does not offer credit, and does not take place during classroom time").

38. Defendant Willford teaches the School's Leadership Class. The course provides students opportunities to work with their peers, staff, and community members. The Leadership Class is intended to help students in elected and appointed roles develop the skills necessary to fulfill their duties and develop their leadership skills.

39. In late-January 2017, N.Y. decided to run for ASB President, a position he hoped to hold the following school year. Historically, the ASB President position was the highest elected office within the School's student government.[22] As such, it represents one of the highest honors a student can achieve, and reflects very positively on the winning student's resume and college and university applications.

40. All students in grades 9 through 11 are eligible to vote in the ASB President election. The election is much more than a popularity contest. Historically, winning candidates, much like candidates for state and local office, developed and carried-out campaign strategies aimed at soliciting the support of certain groups of students, and ensuring that such students actually turn out to vote.

41. Effective campaigning is therefore critical for candidates who wish to stand out, and students historically employed a wide array of strategies intended to marshal votes in their favor. Such strategies range from traditional campaign signs posted in the School's hallways, to posts on Snapchat, Instagram, and other social media platforms.

---

[22] As described in detail below, following Defendants' reinstatement of N.Y. as Junior Class President and recognition as ASB President, Defendants Schmitt and Willford punished N.Y. by creating a new position for the second-place finisher, which bestowed upon her the powers and privileges historically reserved for ASB President, effectively stripping N.Y. of the same. *See infra* at ¶ 188.

Fifth Amended Complaint
3:17-CV-03906-MMC

42.     In late-January 2017, N.Y. attended a mandatory information meeting.  During that meeting, a fellow student approached N.Y. with an idea to make a video in an effort to increase N.Y.'s name recognition.  On February 1, 2017, N.Y. turned in his election application and began brainstorming and preparing his campaign strategy.

**C.     Campaign Rules were long in place, but were not historically enforced—certainly not to the degree Defendants enforced the Rules against N.Y.**

43.     Candidates for all elected offices, including ASB President, were required to read the Leadership Election Package promulgated by Defendants, which included the following rules (the "Campaign Rules"):

> - Campaign signs and materials may be posted **beginning Monday at 6:00 AM**.  This includes posting anything on Twitter, Snapchat, Instagram, etc.
> - There is a maximum budget of **$75** for campaigning materials.  Please keep your receipts as we will check them
> - You may only have 30 signs up on campus at any given time.  Yes, we count.
> - ***Please have discretion when creating campaign signs and slogans, as any inappropriate material will be removed and the candidate is [sic] subject to be pulled from the election***.

(emphasis in original).  Defendants admit that they did not further define "inappropriate material," and the Campaign Rules did not cross-reference any other policies, rules, or procedures explaining the meaning of the term.

44.     Over the years, candidates for various student government positions and students who supported particular candidates developed a wide-array of campaign strategies and tactics to increase voter turnout and garner support from individual students and student groups.  Traditionally, and certainly during N.Y.'s years at the School, students enjoyed leeway to create and publish messages that they believed were interesting and would garner support

from students. Certain individuals would find some of those messages "inappropriate." *See, e.g., infra* ⁋ 145.

45. During N.Y.'s years at the School, students relied heavily on film and social media to promote certain messages, including messages relating to the Leadership Class or in support of a particular student's candidacy for elected student government positions. Unlike the Parody, many of those films were made on-campus, created and disseminated with the School's resources, displayed the School's and Leadership Class's name and moniker, and were subject to pre-publication review and approval by School officials. *See infra* ⁋⁋ 133-150. Further, unlike the Parody, some of those films contained threats of violence to the School, and/or targeted particular students with threats of violence or harassment. *Id*. Yet Defendants did not punish the students who created or who were featured in those films—certainly not to the degree Defendants punished N.Y. for the Parody. Upon information and belief, prior to February 9, 2017, no student was ever expelled from the Leadership Class, removed from office, or stripped of the powers and privileges traditionally reserved for the ASB President as punishment for creating or being featured in a film supporting his, her, or another student's candidacy.

**D.      N.Y. and his friends created the James Bond Parody**

46. On Saturday, February 4, 2017, N.Y. and a group of his friends filmed the James Bond Parody at a friend's house off-campus. N.Y. portrayed a James Bond-type hero who rescues a fellow student captured by two armed males who were trying to force the victim to participate in an international video game competition. The group did not prepare a script and each "character" created their own lines and scenes in an impromptu fashion and without any

-18-

prior deliberation.  The Parody was intended to capture the attention of viewers and increase

N.Y.'s name recognition.

47.    As in many Hollywood-type action films, the Parody features two antagonists.

Two of N.Y.'s friends and fellow classmates at the School  happen to be practicing Muslims.

Those students, not N.Y., conceived and developed the idea for the antagonists,  voluntarily

decided to play the antagonists, developed their own lines, and brought their own props to the

off-campus filming location.

48.    The group *did not* use School property or equipment to create the Parody.  The

Parody *does not* feature the School's or the Leadership Class's name or logo,.  Indeed, neither

the School nor the Leadership Class are mentioned in the Parody.

49.    The District officials, including Defendants Schmitt, Defendant Reimann, and

as well as Defendants Steele, Ramos, Keith, and Willford admit that the Parody contains no

credible threats of violence to the School and no threats of violence or harassment to any

particular student.  Indeed, there is not a single student identified in the Parody who did not

participate in the film's creation.

50.    At the end of the day of filming, one of the students took all of the raw footage

home with him.[23]   That student edited various scenes, added certain effects, and ultimately

developed the final version of the Parody.

51.    On February 6, 2017, the student editor uploaded the final version of the Parody

to his personal YouTube webpage.  The next morning, a fellow student told N.Y. that, though

she was not personally offended by the Parody, other individuals "may" find the video

---

[23] This student happens to be a Caucasian male.

Fifth Amended Complaint
3:17-CV-03906-MMC

offensive.  N.Y. promptly requested that the student who uploaded the Parody remove it from YouTube.  The student editor removed the Parody within a matter of minutes, and did not post or disseminate the video thereafter.  Those events, including the removal of the Parody, occurred prior to the time students began casting votes in the election.

52.     The Parody was available on YouTube for approximately 12 hours, mostly overnight.  Statistics showed that the Parody reached approximately 30 views before it was taken down.  To the best of N.Y.'s knowledge, no one downloaded or further distributed the Parody. The February 7th school day and the election progressed without issue.

53.     The first two scenes of the Parody contain a disclaimer and a warning which, among other things, make clear that: (1) the Parody was made on private property, off-campus; (2) the Parody was created for purposes of entertaining students who enjoy watching PG-13 movies; (3) the Parody features violence and kidnapping, but no one was actually harmed; and (4) all participants featured in the Parody voluntarily agreed to their roles.  The disclaimer provides:

> "DISCLAIMER: ALL ACTORS IN THIS FILM AGREED TO THEIR ROLES, NO ONE WAS FORCED TO FILM ANYTHING.  THIS FILM IS FOR ENTERTAINMENT PURPOSES ONLY.  NO ONE WAS HARMED IN THE MAKING OF THIS FILM.  THIS FILM WAS SHOT ON PRIVATE PROPERTY."

The warning provides:

> "WARNING: IF YOU DO NOT ENJOY WATCHING PG-13 MOVIES PLEASE BE ADVISED, THIS FILM CONTAINS[:] [sic] VIOLENCE, AND KIDNAPPING.  YOU DO NOT HAVE TO WATCH IF THESE ARE NOT APPEALING TO YOU.  NO ONE IS FORCING YOU TO WATCH THIS.  THIS WAS ALL FILMED WITH THE PURPOSE OF BEING ENTERTAINING, FULL OF ACTION, AND FUNNY.  ENJOY!"

Fifth Amended Complaint
3:17-CV-03906-MMC

**E.** **Defendant Willford obtained the James Bond Parody by falsely representing her intentions.**

54.     At 2:36 p.m. on February 7, 2017, hours after the Parody was already taken down, N.Y. received a text from Defendant Willford, his Leadership Class teacher. Defendant Willford inquired about the Parody and requested a link to it. N.Y. explained that he and his friends created the Parody for the purpose of entertainment. The Parody was not created for the School or the entire student body. N.Y. also explained that the Parody had been voluntarily removed from YouTube and that there was no longer an active link to the film.

55.     At 8:42 a.m. the next day, Defendant Willford again texted N.Y., stating that she wanted to "protect" him, but that she needed to view the Parody to do so. N.Y. and the other students who created the Parody met with Defendant Willford and agreed to provide her with a copy the following day. The student editor eventually downloaded an edited copy to a storage device.

56.     On February 9, the student editor brought the storage device with him to the School. At the time, the student editor was enrolled in the School's Video Production Class, a graded course taught by Chad Cochran. Defendant Willford contacted Mr. Cochran prior to the start of the class, and instructed him to obtain a copy of the Parody from the student editor who Defendant Willford referred to as "the student who made the film" so they could watch the Parody with Defendant Ramos. Mr. Cochran had not heard of or seen the Parody prior to the time Defendant Willford brought the Parody to his attention.

57.     Thereafter Defendant Willford asked Mr. Cochran and two Leadership students to watch the Parody without N,Y, and his co-creators. Neither Mr. Cochran nor the two Leadership students had previously seen the Parody. Defendant Willford then showed the film

to Defendants Steele, Ramos, Keith, and Phelan, the School's then-principal and assistant principals, none of whom had heard of the Parody prior to the time Defendant Willford brought it to their attention

58.     Prior to Defendant Willford obtaining and viewing the Parody, the only persons who had complained to her about the Parody were the student running against N.Y. for ASB President, that student's parents (both of whom are close friends of Defendant Willford), and another student running on a "joint ticket" with the student N.Y. was running against. Defendant Willford disregarded the obvious bias of those students and parents and decided to use the Parody as a tool to ensure that her favored candidate, not N.Y., would be declared the winner of the ASB election.

**F.     Defendants punished N.Y. for the Parody when there was no threat that the speech would disrupt school activities or interfere with any student's rights.**

59.     The election polls were scheduled to close at the end of the School day on February 9, 2017. That day, just before 1:00 p.m., Defendants Ramos and Keith, both Assistant Principals, summoned N.Y. to the School's administrative offices. They interrogated N.Y. about the Parody and asked him to write a statement. N.Y. hesitated because he believed Defendants were demanding an admission of wrongdoing.

60.     During the interrogation, Defendants Ramos and Keith played the Parody, and threatened to severely punish N.Y. for his protected speech. Defendant Keith told N.Y. that he violated School rules and expressed that a suspension would adversely affect his chances of being admitted to the colleges and universities he hoped to attend.

61.     Defendant Phelan, also an Assistant Principal, eventually joined the interrogation. He focused on the Nerf and imitation guns used in the Parody, and argued that

if a student brought a photo of himself holding any firearm, even if for recreational purposes or sport with a parent, the School would have a District official bring the student in for questioning and obtain a warrant to search the student's home.[24]

62. Defendants Ramos, Keith, and Phelan did not provide N.Y. an opportunity to eat lunch, drink water, or use the restroom during the interrogation. Hungry, tired, thirsty, and in need of a restroom break, N.Y. eventually wrote the following statement:

> "Me and my friends got together on a Saturday to make a video for my ASB [Student Body] campaign. We all got together to make a James Bond type film. We wanted something entertaining and to keep the people who viewed it laugh. There was no script. Everyone came up with their own lines and everyone consented to their roles. After the video was released, there were a lot of kids that enjoyed the short film, but as soon as we got word that some people got offended by the video, we took it down immediately. We did not ever intend to hurt anybody's feeling or make them feel unsafe. When I was younger I used to get bullied a lot. I don't really talk much about it now. I was beat by another student in a bathroom. I have never wished or want anybody to experience the pain that I felt, whether it is physical or verbal. I am sorry that this incident turned out the way that it did. I was not raised by my parents to stereotype, be a racist or offend other people. My intent for the video was to portray me as a hero like James Bond saving the day. I personally didn't expect the turnout. I want to be able to apologize personally to anyone that was affected. I understand that people didn't take it the way me and my friends wanted people to see it. I am sorry for all the trouble this has caused, for admin, other students, and especially my leadership teacher. This video does not depict my personal character nor ability to be a good student. I am not the type of person who doesn't care or is selfish. I hope that this decision that I have made doesn't affect more people."

63. Defendants Ramos, Keith, and Phelan interrogated N.Y. for nearly three hours, while N.Y.'s four friends were questioned for less than an hour. Further, in violation of District

---

[24] Other videos created by students, including students enrolled in the Leadership Class, featured, among other things, acts of kidnapping and torture by terrorists, firearms, knives, sexually explicit images, and scenes that certain individuals would find to be racially and culturally insensitive. *See infra* ¶¶ 133-150.

Fifth Amended Complaint
3:17-CV-03906-MMC

policy, Defendants Ramos, Keith, and Phelan detained N.Y. past the end of the school day without notifying his parents. Defendant Keith, apparently uncomfortable with the decision to hold N.Y. past 3:00 p.m., eventually asked another administrator whether she could release N.Y. Defendants Ramos, Keith, and Phelan released N.Y. at approximately 3:20 p.m., ten minutes after the ASB President election results were scheduled to be posted, and 20 minutes past the end of the school day.

64. The California Education Code and District policy require school official to contact parents prior to suspending students. Cal. Ed. Code § 48911. Defendants Steele, Keith, Ramos, and Phelan did not contact N.Y.'s parents during the interrogation or before they notified N.Y. of the decision to suspend N.Y. from the Leadership Class. Defendants did, however, contact the parents of the students who created the Parody with N.Y.

65. Shortly thereafter, N.Y. learned that Defendant Willford, at the direction of and with the approval of Defendants Steele, Ramos, Keith, and Phelan, disregarded all votes cast in his favor, and declared another student the winner of the ASB President election. Defendants, however, refused to disclose the actual vote totals.

66. On Monday, February 13, 2017, at an in-person meeting, Defendant Keith informed N.Y. and his parents of the decision by Defendants Steele, Ramos, Keith, Phelan, and Willford to remove N.Y. from the Leadership Class. Defendant Keith stated that she and Defendants Steele, Ramos, and Phelan made their decision because of the Parody and upon the recommendation of Defendant Willford.

67. At that meeting, Defendant Keith alluded to the need to make an example out of N.Y. Defendant Keith also provided a copy of the District's Suspension Notice, but did not

-24-

fill-out the student information section or sign the form as the suspending official. Rather,

Defendant Keith merely checked the following violations:

<table>
<tr><td>a.</td><td>Possessed, sold, or otherwise furnished any firearm, knife, explosive, or other dangerous object, unless, in the case of possession of an object of this type, the pupil obtained written permission to possess the item from a certificated school employee, which is concurred in by the principal or the designee of the principal.</td></tr>
<tr><td>b.</td><td>Disrupted school activities or otherwise willfully defied the valid authority of supervisors, teachers, administrators, school officials, or other personnel engaged in the performance of their duties.</td></tr>
<tr><td>c.</td><td>Possessed an imitation firearm. As used in this section, "imitation firearm" means a replica of a firearm that is so substantially similar in physical properties to an existing firearm as to lead a reasonable person to conclude that the replica is a firearm.</td></tr>
<tr><td>d.</td><td>Harassed, threatened, or intimidated a pupil who is a complaining witness or a witness in a school disciplinary proceeding for the purpose of either preventing that pupil from being a witness or retaliating against that pupil for being a witness, or both.</td></tr>
<tr><td>e.</td><td>Engaged in an act of bullying, including, but not limited to, bullying committed by means of an electronic act, as defined in subdivisions (f) and (g) of Section 32261, directed specifically toward a pupil or school personnel.</td></tr>
<tr><td>f.</td><td>Harassment, threats, or intimidation creating an intimidating or hostile educational environment (Ed Code 48900.4)</td></tr>
</table>

68.    The California Education Code provides:

A pupil suspended from a school for any of the reasons enumerated in Sections 48900 and 48900.2 may be assigned, by the principal or the principal's designee, to a supervised suspension classroom for the entire period of suspension if the pupil poses no imminent danger or threat to the campus, pupils, or staff, or if an action to expel the pupil has not been initiated.

Cal. Ed. Code § 48911.1(a). Further, the California Education Code prohibits school districts

from claiming financial "apportionments" from governmental agencies for students assigned

to "supervised suspension classroom[s]" unless the suspension classroom "promotes

-25-

completion of schoolwork and tests missed" by the student during the suspension. (*See, e.g.*, Cal. Ed. Code § 48911.1(c).)

69.    At the conclusion of the February 13, 2017 meeting, Defendant Keith told N.Y. that he could not return to the Leadership Class, but provided no directions as to where he was supposed to go or what he was supposed to do during that period of the school day. Neither Defendant Keith, Defendant Willford, nor any of the other Defendants arranged for N.Y. to receive educational instruction during the suspension. Nor did they provide any directions to N.Y. regarding where he was supposed to go during the Leadership Class period. N.Y. was therefore deprived of valuable educational instruction, assignments, and experiences that he would have received but for Defendants Steele, Ramos, Keith, Phelan, and Willford's decision to "permanently suspend" him from the Leadership Class.

70.    The California Education Code and District policies limit the grounds upon which a student may be suspended. Defendants Schmitt and Reimann, the District's current-Superintendent and the former Director of Educational Services, admit that none of the grounds identified in the Suspension Notice Defendant Keith provided to N.Y. were applicable to N.Y. and his conduct in connection with the Parody. (*See, e.g.*, Cal. Ed. Code § 48900.)   Yet Defendants Schmitt and Reimann supported the unconstitutional sanctions that Defendants Steele, Ramos, Keith, Phelan, and Willford enforced against N.Y. for the Parody, including the more than three month suspension from the School's Leadership Class.

71.    The California Education Code and District policy expressly prohibit school officials from suspending students from graded courses for more than five days. School officials are required to seek alternative means of correcting the at-issue behavior *before*

Fifth Amended Complaint
3:17-CV-03906-MMC

suspending a student. (*See, e.g.*, Cal. Ed. Code § 48911.) Alternative measures include a conference with the student's parents and participation in restorative justice programs.

72.     Defendants were aware of those laws and policies.  Indeed, those laws and policies are clearly enumerated in publicly available District policies and manuals. The District conducts annual training seminars for administrators that emphasize the need for school officials to comply with these laws and policies. Defendants Steele, Ramos, Keith, and Phelan, were required to attend those seminars during N.Y.'s tenure as a student at the School. Despite the training and in violation of the express provisions of law and policy, Defendants Steele, Ramos, Keith, Phelan, and Willford "suspended" N.Y. from the Leadership Class for more than three months because of the Parody.

73.     Defendants Schmitt and Reimann, as well as Deputy Superintendent Taylor, were aware of the unlawful suspension in late-February 2017.  Ms. Taylor expressed to Defendant Schmitt that she did not believe the suspension was in NY.'s best interest. Defendant Schmitt disregarded Ms. Taylor's advice. Recently obtained documents and deposition testimony confirmed that, from the time in February 2017 that they learned about the Parody until the decision was made to reinstate N.Y., Defendants Schmitt and Reimann supported the unlawful suspension imposed against N.Y. by Defendants Steele, Ramos, Keith, Phelan, and Willford.

74.     Defendants' suspension decision, threats, and acts of intimidation chilled N.Y.'s constitutional and statutory rights.

**G.      Defendants knowingly violated N.Y.'s clearly-established rights.**

75.      Recent deposition testimony and documents unearthed during discovery confirm that Defendants knew their decision to punish N.Y. for the Parody was unlawful at least as early as February 17, 2017, eight days after the initial punishment decision.

76.      On February 17, 2017, at 7:20 AM, N.Y.'s then-attorney sent an e-mail to the Defendants, explaining that the sanctions Defendants imposed against N.Y for the Parody were unconstitutional under *Tinker*.   Defendant Steele immediately notified Defendant Reimann and Deputy Superintendent Taylor.   They instructed Defendant Steele to confer with legal counsel about the contents of the email prior to meeting with the Yus and their attorney.

77.      That same morning, in a desperate attempt to find a post hoc justification for the punishment decision they knew was unconstitutional, Defendants Steele, Ramos, Keith, and Phelan directed Defendant Willford and Mr. Cochran to prepare statements to the file regarding N.Y. and the Parody. Defendant Willford and other school officials were clearly concerned that their punishment decision violated *Tinker*. Willford admits reading  *Fraser*, *Morse*, and probably *Tinker* in conjunction with preparing her February 17th statement to the file. Heidi Stepp testified that she provided Willford with a copy of *Tinker* in February. Willford also admitted to discussing First Amendment rights with Matthew Fraser, the plaintiff in *Bethel v. Fraser*. Evidencing the urgency with which Defendants were attempting to paper-up the file, Defendant Willford stated in her e-mail transmitting her statement: "I hope I have done this right . . . rushed for time!"

78.      Mr. Cochran wrote a substantially similar statement to the file that same day. He recommended that N.Y. be removed from the ASB election.

-28-

79.     That same morning, Defendant Steele instructed Defendants Ramos, Keith, and Phelan to contact and obtain written statements from *all* students and parents who Defendant Willford claimed were "offended" by the Parody on or prior to Feb. 9, 2017.   Defendants Steele, Ramos, and Keith admit that they could not recall discussing the Parody with with a single student or parent, other than N.Y., his co-creators, or the co-creators' parents at that time.  Indeed, they admit that their February 9th decision to punish N.Y. was based entirely on Defendant Willford's unsupported representation that "many" students were offended by the Parody and their subjective distaste for the Parody.

80.     Defendants Steele, Ramos, Keith, and Phelan were not able to identify on their own a single student or parent who was offended by the Parody because they relied almost entirely on Defendant Willford's representations in making their initial February 9, 2017 decision to punish N.Y. Therefore, their February 17 efforts to paper-up the file could only be successful if they enlisted Willford to assist them in their *post hoc* attempt to justify N.Y.'s punishment. Thus, within hours of District officials directing Defendant Steele to confer with counsel regarding the punishment decision, Defendants Steele, Ramos, Keith, and Phelan for the first time asked Defendant Willford to provide a list of the students and parents who she claimed had expressed complaints to her about the Parody.

81.     Then, eight days after Defendants decided to punish N.Y., Defendants Steele, Ramos, Keith, and Phelan, with Defendant Willford's assistance and/or at the direction of Defendant Willford, obtained statements from members of the Leadership Class. The statements are from N.Y.'s opponent in the election; her running mate; the two vice-presidents of ASB to whom Willford showed the video; and three other students.  The statements are

strikingly similar. Each statement mentions that the Parody is, in the student's personal opinion, "inappropriate," "offensive," "hurtful," or "dumb."

82.     Importantly, not one of the statements indicates that the Parody posed a credible or ongoing threat of violence to the School, reasonably led School officials to forecast the Parody causing a substantial disruption to School activities, or targeted a particular student with threats of violence or harassment. Defendants' after-the-fact conduct appears to be intended to paper-up the file with documents they hoped would support their unconstitutional conduct.

83.     Defendant Schmitt admits that the Parody did not cause a "substantial disruption." Indeed, Defendant Schmitt testified that the only substantial disruption occurred because of his May 2017 decision to reverse the unconstitutional sanctions against N.Y.

84.     On Friday, March 10, 2017, at a meeting attended by Defendant Willford, N.Y., his parents, and his then-attorney, Defendant Willford admitted that the specific provision of the Campaign Rules prohibiting "inappropriate material" was ambiguous and unclear. Notwithstanding the admitted ambiguity in the Campaign Rules, as well as the fact that the Parody did not in any way disrupt the activities of the School or target any particular student, Defendant Steele informed N.Y. that the decision to punish him (including the decision to strip of his Junior Class President position and suspend him from the Leadership Class) was final and not subject to review or appeal.

85.     On March 17, 2017, Defendants Steele, Ramos, Phelan, Keith, and Willford, with the knowledge and support of Defendants Schmitt and Reimann, prepared and sent N.Y.'s counsel an e-mail in which they offered N.Y. the opportunity to potentially return to the Leadership Class. Defendants conditioned N.Y.'s return and potential reinstatement on

-30-

satisfying certain requirements, including obtaining the support and approval of students in the Leadership Class and speaking with Muslim students at other schools regarding instances of discrimination affecting members of the Muslim community throughout the nation.

86.     Deputy Superintendent Taylor testified that the conditions Defendants placed on N.Y. were not "restorative" as Defendants contend, but rather were punitive.

87.     N.Y. rejected Defendant's conditions because they would not allow him to fully return to the Leadership Class or reinstate him to his elected positions.

88.     The "restorative options" offered by Defendants as a condition to reinstatement were imposed only upon N.Y., and not any of the co-creators of the Parody. Deputy Superintendent Taylor testified that she was not aware of any other student's attendance and enrollment in a graded class being conditioned on agreeing to demands similar to those presented to N.Y.

89.     Defendants Schmitt and Reimann endorsed and supported Defendants Steele, Ramos, Keith, Phelan, and Willford's collective decision to punish N.Y. for the Parody. Indeed, on May 20, 2017, Defendant Schmitt told at least one District employee that he supported punishing N.Y. for the Parody despite being concerned that the punishment violated N.Y.'s constitutional rights to engage in speech and expressive activities:

From: Ann Katzburg <akatzbu@yahoo.com>
Date: Sat, May 20, 2017 at 11:32 PM
Subject: Thoughts
To: Janetwillford@gmail.com <Janetwillford@gmail.com>, Kerri Pike
<kerri.lee.pike@gmail.com>, Bob Donovan <bobjdono@gmail.com>

first amendment challenge came about, he was convinced that the
district would lose. He wants to come up with a resolution and

in, I've had a few revelations. I spoke to Rick today (again)
about his decision. He experienced a first amendment
altercation 15 years ago in his district. He said he supported
the action the entire time of what happened to N.Y . When the
first amendment challenge came about, he was convinced that the
district would lose. He wants to come up with a resolution and

Lastly, as irony would have it, a couple of nights ago I was
watching the news and saw the Sikh community rise above an

He is as upset as I am about the student's choice to utilize
discriminatory practices to solicit votes. He agrees that this
is not the type of student that deserves to lead, however, we

**H.      Defendants knew the Campaign Rules were vague and ambiguous, yet they insisted on punishing N.Y. pursuant to the Rules.**

90.     Thereafter, during the summer of 2017, Defendants refused to release N.Y.'s

semester grades. Defendants did so even though N.Y. had completed all required coursework.

91.     Defendants' animus towards N.Y. is further evidenced by the fact that

Defendants only required the other students involved in the production of the Parody –

specifically, the two students who developed and portrayed the allegedly offensive antagonists,

and the student who actually edited and uploaded the Parody to YouTube – to make a video

displaying the "proper" method of complying with the School's guidelines when making

Fifth Amended Complaint
3:17-CV-03906-MMC

videos.[25]  Defendants never offered this option to N.Y., who only learned about the disparate punishment from his fellow students.

**I.     The Contra Costa County Superior Court recognized that Defendants appear to have punished N.Y. "without fully considering" his First Amendment rights.**

92.     For several months, Defendants refused to reverse their punishment of N.Y. and refused to release the actual ASB President election results despite repeated requests from N.Y., his parents, and counsel. Defendants Schmitt and Reimann received a document containing the election results in February 2017. However,  Defendant Willford was admittedly opposed to disclosing the vote totals. All Defendants, including Defendants Schmitt and Reimann, supported the decision to withhold the election results.

93.     On April 7, 2017, N.Y. filed an *ex parte* petition for writ of mandamus in the Superior Court of California for Contra Costa County, that case being numbered MSN17-0585. The court set a briefing schedule and hearing date.

94.     Prior to the April 26, 2017 hearing, the court issued a tentative ruling.  The court recognized:

> "[I]t appears the District made its decisions without fully considering whether or not Petitioner's First Amendment constitutional rights had been violated.  Thus, an issue to be resolved is whether the video constituted protected speech and whether or not Respondent's disciplinary action violated Petitioner's 1st Amendment constitutional rights." Notwithstanding these findings, the court denied the petition, explaining N.Y.'s petition, as presented, did not "me[et] the requirements for writ relief . . . ."

95.     On May 15, 2017, N.Y.'s counsel informed the District in writing that N.Y. intended to file a lawsuit based on Defendants' unconstitutional conduct.  The letter presented

---

[25] N.Y. does not believe those students should have been punished for their free speech.

-33-

N.Y.'s claims and demanded Defendants return N.Y. to the *status quo anti*, reimburse him for legal fees and damages, offer an apology, and implement "procedures designed to prevent future violations."

96.     On May 16, 2017, the District informed N.Y. that he would be permitted to return to the Leadership Class and reinstated as Junior Class President, effective May 18, 2017. The District revealed that N.Y. "received the most votes" in the ASB President election, and would be permitted to serve in the position during his senior year.  Further, the District informed N.Y. that Defendants would take no further retaliatory actions against him.

## J.     Defendants punished N.Y. despite knowing that his punishment violated his First Amendment rights.

97.     Defendants knew their disciplinary actions were unlawful the entire time. However, Defendants punished N.Y. for more than three months despite knowing all along that it was unconstitutional to do so.

98.     Defendant Schmitt has an extensive understanding of the First Amendment. Indeed, he testified that he was "confident in understanding . . . the nuance" of the school-sponsored speech doctrine in particular due to his involvement in multiple First Amendment cases spanning decades. Indeed, on May 17, 2017, Defendant Schmitt emphasized the power of the First Amendment and the "no choice" position the District is in regarding N.Y's reinstatement.

**From:**    Schmitt, Rick [EC] <RSchmitt@srvusd.net>
**Sent:**    5/17/2017 11:03:27 AM
**To:**      Taylor, Toni [EC], Reimann, Jason [EC]
**Cc:**
**Subject:** FW: Reflectins about the Yu Case

Toni, please make sure Ann knows background to this no choice district position here. Jason, please continue to help Janet understand the power of the 1st Amendment & our legal system. Our opinions are not relevant here. The SRVHS staff will not be "bewildered" if they have the facts.

Thanks to both
R

Fifth Amended Complaint
3:17-CV-03906-MMC

99. Handwritten notes taken from a meeting between Defendant Schmitt, Defendant Willford, and others further confirm Schmitt's understanding of the First Amendment and student speech precedent.

100. Deputy Superintendent Taylor testified that she knew students have the same First Amendment rights as other Americans, and remembered talking to Defendant Schmitt about that legal reality months before Defendants reversed their unconstitutional sanctions against N.Y. Ms. Taylor testified: "[Schmitt] has a keen understanding of the first amendment rights of students, and that students have the same rights . . . inside the school building as they do outside the school building."

101. Defendant Willford admitted in her deposition that she may have read *Fraser*, *Morse*, and likely *Tinker*. She admitted to receiving at least some of those cases from Heidi Stepp. Ms. Stepp testified that she gave at least *Tinker* to Defendant Willford in February 2017. Defendant Willford also spoke to Matthew Fraser, the actual plaintiff in the landmark *Fraser* decision.

102. Defendants Schmitt, Reimann, and Steele conferred with an attorney concerning the First Amendment and its implications for their treatment of N.Y. in February and March of 2017.

103. Defendants Keith and Steele had an understanding of student speech protections at the time she chose to punish N.Y. Defendant Keith testified that she studied and taught the four student speech cases decided by the Supreme Court: *Tinker*, *Hazelwood*, *Fraser*, and *Morse*. Indeed, Defendant Keith testified to knowing the underlying facts and holdings of each of those cases. Similarly, Defendant Steele testified that she studied *Tinker* when getting her administration credentials around 2004-2005.

-35-

**K.    Defendants' efforts to chill N.Y.'s speech caused N.Y. to receive death threats.**

104.    On May 18, 2017, Defendant Reimann spoke to the Leadership Class about N.Y.  He claimed that Defendants reversed the decision to punish N.Y. for his speech because N.Y. filed suit against Defendants in an effort to vindicate his constitutional rights.  Defendant Reimann's statement implied that Defendants made the decision solely to avoid litigation, and not because Defendants erred in punishing N.Y. for exercising his right to free speech and expression guaranteed by federal and state law.

105.    That same day, Defendant Willford and multiple District employees, and third parties with whom they were communicating launched a malicious, extreme, and outrageous campaign intended to, or with a reckless disregard for the almost certain probability that their conduct would, (1) exacerbate tensions, (2) pressure the school board to reinstate the unconstitutional sanctions against him, and (3) cause N.Y. to suffer humiliation, mental anguish, severe emotional and physical distress, lost education and employment opportunities, and loss of income. That egregious conduct caused N.Y., a 16-year-old student at the time, to suffer severe emotional stress and receive death threats.

Fifth Amended Complaint
3:17-CV-03906-MMC

106.     First, N.Y.'s history teacher, Heidi Stepp, contacted numerous individuals who were not employees of the School about N.Y. and the Parody. Among other things, she encouraged people to contact the School's only Muslim teacher and to share the writ with "the department union people."

---

**Jeanne Scheppach** <jscheppach@gmail.com>
To: The Stepp Family <heidiastepp@gmail.com>
Fri, May 19, 2017 at 10:51 AM

Do you want me to tell our Muslim teacher?

Sent from my iPhone
[Quoted text hidden]

**Heidi Stepp** <heidiastepp@gmail.com>
To: Jeanne Scheppach <jscheppach@gmail.com>
Fri, May 19, 2017 at 10:52 AM

Yes.

---

**jeanne scheppach** <jscheppach@gmail.com>
To: Heidi Stepp <heidiastepp@gmail.com>
Fri, May 19, 2017 at 4:46 PM

Holy crap the video sounds terrible--wrong on multiple levels. Who would make such a thing? I can't believe what I read...and the district clearly should not cave. Past legal precedent is in their favor--the teacher is in the right 100% and protected by past precedent. Is it that the district just wants to avoid legal fees then? WTF????

Would you be okay with me sharing the writ to my department union people?
[Quoted text hidden]

**The Stepp Family** <heidiastepp@gmail.com>
To: jeanne scheppach <jscheppach@gmail.com>
Fri, May 19, 2017 at 4:49 PM

ABSOLUTELY!!!  Get it out there!!!!
[Quoted text hidden]

---

107.     On May 18, 2017, Ms. Stepp sent an email regarding N.Y. and the Parody to a number of individuals who were not employees of the District. In that e-mail, Ms. Stepp also recounts spreading information about N.Y. and the Parody to politicians, journalists at the East Bay Times, and the Council on American Islamic Relations ("CAIR"). In that e-mail, Ms. Stepp accused N.Y. of engaging in "ethnic bias against Muslims" and refusing to apologize.

Fifth Amended Complaint
3:17-CV-03906-MMC

She also encouraged the recipients to further spread her false narrative and to attend the upcoming Board meeting to express their "outrage" over N.Y.'s reinstatement:

**The Stepp Family** <heidiastepp@gmail.com>       Thu, May 18, 2017 at 2:42 PM
To: Shalini Reddy <shareddi@hotmail.com>, Amy Rickard <Amyrickard@gmail.com>, Marilyn Lucey <marilynlucey@gmail.com>

Hey,

A student who ran for ASB President at SRVHS made a campaign video that was inappropriate. It involved ethnic bias against Muslims. Our leadership teacher deemed it inappropriate and immediately suspended the kid from Leadership.

The student never apologized and as a matter of fact, the student's parents sued for his reinstatement. The District fought the first round and backed Janet, the leadership teacher, Ruth and Ruth's boss Jason Reimann. The first judge dismissed the case because he/she said it was filed under the wrong writ. It needed to be a freedom of speech case. The family refiled and added a financial lawsuit against the District. The attorneys for the District advised the District to settle and to reinstate the student as President of ASB.

1. There is a strict guideline for campaign videos and conduct of students on ASB. The student broke it.
2. The student never apologized. Instead his family sued.
3. The District was just recognized as a "non-hate" District earlier this week but they are reinstating a student whose video was blatantly disparaging to Muslims.
4. What's the point in having ANY rules/code of conduct/criteria for a prestigious position like ASB President if parents can just bully the District via a financial lawsuit into submitting into their wishes?
5. Early on, Janet asked for an apology and then things could have been attempted to be remedied, but the student/family refused.

I have contacted Joyce Tsai (East Bay Times, Cheryl Cook Kallio, and CAIR. Cheryl is FIRED UP about this (she and I have been friends for years b/c of We the People).

You all have invested your time and energy into making this District a better place. Here's what you can do to help.

Copy and paste this email to anyone you know who would be outraged at our District's decision to reinstate the student after no apology and no regret.

There is a Board meeting on Tuesday. It would be awesome to have a strong show of support and speakers to speak on our Leadership's program behalf. The reinstatement of this student is a blatant disrespect to rules, in general, and his video that mocked Muslims was sufficient to disqualify the student from the campaign. We have Muslim students AND a Muslim teacher on campus.

Thank you for reading.
H

Fifth Amended Complaint
3:17-CV-03906-MMC

108.    That same day, Ms. Stepp expressly authorized Karen Pearce to include verbatim language from her initial e-mail regarding N.Y. and the Parody:

> On May 18, 2017, at 3:00 PM, Stepp, Heidi [SR] <HStepp@srvusd.net> wrote:
>
> Nope.  Not at all.  I don't know if I will do that...but I have contacted 3 friends who have worked with the District PTSA on student health and safety issues (and inclusiveness) and I am hoping they get the word out too.  I am soooo angry.
>
> **From:** Karen Pearce [mailto:bkpearce@yahoo.com]
> **Sent:** Thursday, May 18, 2017 2:56 PM
> **To:** Stepp, Heidi [SR] <HStepp@srvusd.net>
> **Subject:** Re: Support for Leadership Program
>
> Would posting parts of your note on FB as well be overkill?
>
> Sent from iphone-please pardon any typos

109.    After gaining Ms. Stepp's permission, Karen Pearce, a close friend of Defendant Willford wrote on Facebook:

-39-



Karen Pearce
May 18 at 3:27pm · Danville, CA · ⊕

San Ramon Valley Unified School District just caved in to legal bullying by
parents of a junior who ran for SRVHS ASB President using a racially
offensive "joke" video as his campaign tactic.
He and his friend dressed up like Muslim terrorists and had fake guns. I saw
the video and was so outraged.
These kids agree to a campaign contract with clear consequences for
breaking it...you will not get an office. I know it well bc my daughter is the
current ASB president.

Initially the boy was not allowed to be president. Parents sued. Parents
refused to have their son apologize or take any responsibility for a dreadful
decision.
AND I heard from students that parents changed their (losing) lawsuit to a
freedom of speech suit and asked for big $$$. DISTRICT caved!!!! Gave in
rather than stand up for all the principles they expect our kids to learn and
exhibit. Boy returns tomorrow as new ASB President. UNBELIEVABLE!!

As a mom who expects (forces) her kids to abide by their contracts...
As a mom who saw the ASB kids have to enforce their ASB contract on their
friends this year...
As a parent who expects my kids to accept responsibility for poor choices
and apologize...
As a citizen in a country where racial slurs (even in jest) are NOT OK...
I am outraged.

SRVUSD--think about the precedent you just set. You pretty much tied the
hands of your principals, teachers and safety staff. Get caught drinking--just
sue. Don't like your grade--sue. Apparently things like right and wrong don't
matter here anymore.

There is a Board meeting on Tuesday. It would be awesome to have a
strong show of support and speakers to speak on our Leadership program's
behalf. The reinstatement of this student is a blatant disrespect to rules, in
general, and his video that mocked Muslims was sufficient to disqualify the
student from the campaign. This situation is not just a HS thing. The
outcome is precedent for all sorts of unfair behavior.

👍 Like     💬 Comment     ➤ Share

110.    Ms. Pearce also took to Instagram:

Fifth Amended Complaint
3:17-CV-03906-MMC



**Karen Pearce** at San Ramon Valley High School.
May 18 at 4:12pm · Instagram · 🌐

Raising kids just got harder thanks to SRVUSD and the parents of a SRVHS student who used a racially insensitive video against Muslims as his campaign for ASB President. Parents didn't like that the campaign contract he signed dictated that he wasn't allowed into office so they brought multiple suits against the District AND refused to have their son apologize/take responsibility for a poor decision. SRVUSD caved and are forcing the leadership class and school to have this boy as their role model and leader next year. What kind of example is this SRVUSD??? How do you hope to uphold all the other behavior and conduct contracts with students?? Kids make mistakes--I get it. But it's the authority figures (parents, school, District) that need to teach accountability. Parents--this is what your tax dollars are supporting. I feel so bad for this boy and the life lesson his parents are choosing...don't like something--sue.
I hope the local media follows this. It's just not right. Please share. I have to believe good will win!!!@ktvujuliehaener @eastbaytimes
#thisiscrazy #srvusd #srvhs #upside_down #charactermatters

111.    As seen, Ms. Pearce included information from Ms. Stepp's e-mail in her May 18th social media posts.

112.    Ms. Stepp testified that she never saw the view, but she still engaged in the retaliatory conduct because she disagreed with the Yus' decision to file suit to vindicate N.Y.'s constitutional rights.

113.    Similarly, Ann Katzburg, a District employee, sent an email to Defendant Schmitt and at least one other person who was not an employee of the Distric, in which she falsely reported that the District determined after an investigation that N.Y. violated the California Penal Code's "hate crime" statute in connection with the Parody.

From: Katzburg, Ann [EC]
Sent: Friday, May 19, 2017 2:45 PM
To: Schmitt, Rick [EC]
Cc: LSpotts@cta.org; Donovan, Bob [EC]; Willford, Janet [SR]
Subject: Filing of a uniform complaint

May 19, 2017

To:     Rick Schmitt, SRVUSD Superintendent

From:

        Re:     Uniform Complaint Procedure (UCP) Complaint for discrimination on basis of
        religion and national origin and ancestry

This UCP complaint is for violation of state law prohibiting discrimination (Penal Code

        Section 422.55 and Education Code Section 220) on the basis of religion and national origin
        and ancestry. A student who was a candidate for ASB president violated California law,
        district policy as well as the express regulations for San Ramon Valley High School student
        leadership campaigns.

After an investigation, the school proved that the unlawful discriminatory behavior took place
and appropriate discipline of the student was administered per district policy. Later, district
leadership chose to revoke that appropriate discipline of the perpetrator and thus has violated

114.   Ms. Katzburg also spoke with local politicians about N.Y. and drafted a letter accusing N.Y. of committing civil rights violations which she sent to, or directly caused to be seen and signed by, more than 1,000 people which included false accusations that N.Y. engaged in religious discrimination against Muslim Americans in violation of the Civil Rights Act:

2. This type of speech is in violation of the Civil Rights Act. While the free speech argument is relevant,
there is also an issue of Title IV of the Civil Rights Act, which obligates schools to prevent
discrimination. According to Federal law, public schools have the obligation to protect students against
discrimination. This includes religious discrimination. By allowing a student to enter a leadership
position as student body president, San Ramon Valley High is implicitly endorsing bigotry towards
Muslim American students. Free speech is one issue, but allowing a student to be rewarded for a
display of bigotry is another issue.

Fifth Amended Complaint
3:17-CV-03906-MMC

115.    Further, Defendant Schmitt, Defendant Willford, and other District officials (with the help of Ms. Pearce and others) caused an uproar and media frenzy by, among other things, mischaracterizing N.Y. and the contents of the James Bond Parody and allowing N.Y.'s personal information to be released.  Neighborhood discussions on social media sites such as Nextdoor.com became so heated that Nextdoor.com had to completely shut down the threads. Defendants' conduct ultimately led to N.Y. and his family receiving threats of violence and death.  N.Y. raised these issues with School administrators, including Defendant Krolikowski, who did nothing to address them, and instead ratified and enabled further retaliation against N.Y.

116.    Defendant Willford communicated information regarding N.Y.'s grades and the unconstitutional disciplinary actions taken against N.Y. to third parties. That information is confidential as a matter of law and Defendant Willford was prohibited from disclosing it without N.Y.'s parents' consent. *See* The Family Educational Rights and Privacy Act (FERPA) 20 U.S.C. § 1232g; Cal. Educ. Code. § 49076.

117.    Defendant Schmitt was well aware of the unlawful, retaliatory actions that District employees like Defendant Willford and Ms. Katzburg were taking against N.Y. Defendant Schmitt, however, failed to take any steps to protect N.Y. Indeed, Defendant Schmitt endorsed the retaliatory actions his agents or employees were taking against N.Y. following N.Y.'s reinstatement. Defendant Schmitt failed to take any steps to prevent Defendant Willford's, Ms. Katzburg's, or Ms. Stepp's unauthorized disclosures of N.Y.'s information or to protect N.Y. from foreseeable backlash resulting therefrom.

118.    Shortly thereafter, local media outlets posted articles regarding a "lewd" and "racist" terrorism video that specifically named N.Y. Ms. Pearce, as well as Spojmie Nasiri,

president of the Bay Area CAIR—who was initially contacted by Stepp—were quoted in the article.

119.    On May 24, 2017, Geraldine Herron, N.Y.'s Spanish teacher encouraged her students to e-mail the Superintendent in protest of the District's decision to reinstate N.Y. so that "all [their] voices are heard."  Ms. Herron appears to have intended to retaliate against N.Y. for the Parody and for taking steps to vindicate his constitutional rights.

120.    Two days later, on May 26, 2017,  students participated in a walkout to protest the District's decision to reinstate N.Y.  District policy requires that students be marked absent. However, in an effort to further retaliate against N.Y. for the Parody and for taking steps to vindicate his constitutional rights, Defendants encouraged additional students to participate in the walkout and to protest N.Y.'s reinstatement by excusing the absences of students who participated in the walkout.

121.    During the following weeks, Defendants and other District officials took steps to further retaliate against N.Y. for the Parody and for taking steps to vindicate his constitutional rights.  For example, on May 29, 2017, N.Y.'s photography teacher, Andrew Williams, sent his class an email intended to align members of the class against N.Y., which Defendants did nothing to address.

122.    On June 13, 2017, Ms. Katzburg's letter was presented the District Board with her letter which she had gotten more than 1,000 persons to sign, including more than 140 District teachers, staff, and employees.. Ms. Katzburg's letter regarding N.Y. and the District's decision to reinstate N.Y. that was presented to the Board contained misstatements of law and fact, including a statement that N.Y. violated the Civil Rights Act and engaged intentional

-44-

discrimination against Muslims on the basis of race and national origin. Defendants did little to nothing to ease tensions and dispel the mischaracterizations of N.Y. and the Parody.

123.    These reprisals continued during the next school year.  On two consecutive Mondays during the first two weeks of school, vandals defaced and left hate speech on N.Y.'s parking space and the senior parking lot entrance to the School.  The vandals messages contained homophobic slurs and statements ridiculing N.Y. for his faith as a practicing Catholic.

124.    N.Y. reported those acts of vandalism and harassment to Defendant Krolikowski, the School's new principal. However, Defendant Krolikowski, failed to investigate, document, or to prepare an investigation report as is required by District policy. Defendants, including Defendant Krolikowski, similarly did nothing to address the behavior of the students or teachers who personally attacked N.Y. by calling him a racist in a School class, and refused to provide N.Y.'s student records upon request by N.Y.'s parents. Defendants Willford and Krolikowski also deliberately isolated and undermined N.Y. in his capacity as ASB President.  For example, they sent the runner-up in the ASB President election to a Cultural Responsiveness event in August 2017 that ASB Presidents from all other high schools in the district attended, while intentionally concealing the event from N.Y.  Defendant Krolikowski also refused to assist N.Y. in obtaining feedback from the student body regarding a gender neutral bathroom initiative.  Defendants undertook these actions in retaliation for N.Y.'s speech and for taking steps to vindicate his constitutional rights.

125.    Defendants punished N.Y. for months despite knowing Defendant Willford manufactured the controversy and despite there being no evidence of a substantial disruption sufficient to regulate or discipline N.Y. for the Parody.

-45-

126.    On February 9, 2017—the date Defendants decided to punish N.Y. for the Parody—there were no facts which could have reasonably would have led Defendants to forecast the Parody causing (1) a substantial disruption to the School's activities, or (2) interference with the constitutional rights of any student.  Indeed, Defendants  admit that the only people who complained about the parody prior to the time Defendant Willford brought it the Parody to their attention are the student who ran against N.Y. in the ASB election, that student's running mate, and the parents of the student who ran against N.Y, both of whom are close, personal friends of Defendant Willford. Defendants' response to N.Y.'s speech was punitive, retrospective, and did not address any ongoing or credible threat to the School's safety, the School's activities, or to the rights of any student.

127.    Defendants and other District officials, not N.Y. or the Parody, caused the walkout, contentious District Board meeting, and media frenzy that culminated in N.Y. receiving threats of violence and death.

**L.    Rules promulgated by the District and School purported to allow officials to regulate speech in violation of state and federal law.**

128.    The District subjects all of its students to District Rule BP 5145.2.  This rule provides, among other things, that "[s]tudents are prohibited from making any expressions or distributing or posting any materials that are obscene, libelous, or slanderous."  BP 5145.2 purports to authorize the discipline of students, including suspension and expulsion, for both on-campus and off-campus speech.

129.    Student & Parent Handbooks promulgated by the School during N.Y.'s tenure contain similar prohibitions.  For example, one School Handbook purports to authorize District

Fifth Amended Complaint
3:17-CV-03906-MMC

officials to punish students (including by suspending or expelling students) for both on-campus and off-campus speech made with District "digital tools" that may be deemed "inappropriate."

130.     Further, in order to participate in extracurricular and cocurricular activities, the District requires students and parents to turn in a signed copy of a Student Activity/Trip Permission Form and Code of Conduct Agreement.  This document states:

> "Activities Leaders and School Administrators may require students to provide projects, plans for activities, statements, announcements, or other works in advance of publishing, or occurrence, for pre-approval.  If the proposed works, or activities, are inconsistent with this Contract, or with the District policies, then school officials may preclude the use of any District resource towards the proposed work, or activity. . . . Consequences arising from violations of this Contract may be given  in addition to punishments for violations of the Policies."

131.     District Rule BP 6145 also applies to all District students.  This Rule states:

> "When attending or participating in extra- curricular and cocurricular activities on or off campus, district students are subject to district policies and regulations relating to student conduct.  Students who violate district policies and regulations may be subject to discipline including, but not limited to, suspension, expulsion, transfer to alternative programs, or denial of participation in extracurricular or cocurricular activities in accordance with Board policy and administrative regulation."

132.     As seen, District and School rules purport to authorize District officials to regulate both on-campus and off-campus speech that is not reasonably likely to cause a substantial disruption to the School's activities, and does not interfere with the constitutional rights of any student.

**M.     Defendants have not punished similarly situated students for creating films and materials that many individuals would find inappropriate and offensive.**

133.     Other similarly situated students at the School, including members of the Leadership Class and candidates for student government, have created and have been featured

-47-

in films containing content that certain individuals would also consider "inappropriate." Unlike the Parody, many of those films were made on-campus, with School resources, were subject to pre-publication review and approval by School officials, and displayed the School's name and moniker. Further, unlike the Parody, many of those films threatened violence to the School, and targeted particular students with threats of violence and harassment.

134. For example, on or about January 28, 2012 during the tenure of Defendant Willford and Mr. Cochran, Ms. Taylor and shortly before Defendant Steele's tenure, the School's Leadership Class published a parody film titled "*Mission Possible*" to the Leadership Class's YouTube account. The film, used as an introductory presentation for schools participating in the Tri Valley Leadership Conference hosted by the School, features a "terrorist" wearing a ski mask who kidnaps and tortures a student.[26] Another student portraying an Ethan Hunt-type character—the protagonist of the popular Mission Impossible film series who is regularly depicted using guns, knives, explosives, and other weapons and engaging in extreme acts of violence in an effort to achieve his "missions"—violently kills the terrorist before a "C4" explosive device explodes *on-campus* and destroys School facilities. The creators filmed many of the scenes, including the explosion and torture scenes, on-campus. *See, e.g., Mission Possible* at 1:25-4:17, 4:43-5:38, 5:55-8:13. The film also depicts and discusses the School's name and moniker. *See, e.g., id.* at 8:43-46 ("SAN RAMON WOLVES, The Power of The Pack"), 3:48-51 ("I hope he doesn't find Torre behind the School. . . .").

---

[26] The characters featured in the film express that the "terrorist" is from De La Salle High School, a Catholic school located in Concord, California. Certain individuals who watched the film believe this statement was intended to convey to viewers that the school itself is a terrorist organization or that practicing Catholics are members of a terrorist organization.

-48-

135.    The *Mission Possible* film also contains a scene mocking Spanish-speakers for their accents and portraying Latino men as hypersexual predators. *See id.* at 3:31-49 (Protagonist: "The Dons. . . . Hola Señorita. Cómo te llamas? You can't resist my powers. . . ." Antagonist female: "Something about those Spanish guys gets me every time."), at 3:23-49 ("AMADOR DONS[,] ALCALANES DONS[,] The Power of The Spanish Swooners"). Those representations are rooted in racist and culturally insensitive stereotypes regarding Latinos.[27]

136.    Mr. Cochran, the Video Production Class teacher, participated in multiple videos associated with the school. In one video he asks Will Ferrell to help him chaperone a school dance. After imposing his face on a photo of Mr. Ferrell's high school prom date, Mr. Cochran uses the rainbow symbol—a symbol that multiple Defendants testified that they knew to be associated with and regularly used by the LGTBQ+ community—above his head to ask Mr. Ferrell to join him. Multiple individuals, including Defendant Krolikowski, were offended by Mr. Cochran's use of the rainbow symbol, as they perceived Mr. Cochran to be potentially mocking and triviliazing LGBTQ relationships.

---

[27] *See, e.g.,* Nuño, Ph.D., Stephen A., *Opinion: When jokes feed into "hyper-sexual Latino" stereotypes*, NBC LATINO, Aug. 9, 2013, *available at* http://nbclatino.com/2013/08/09/opinion-when-jokes-feed-into-latino-hyper-sexual-stereotypes/ (last visited May 28, 2019) (During Mexican actor Diego Luna's interview with Conan O'Brien, "Mr. Luna and O'Brien talked about the changing demographics of the country and how speaking Spanish would be a necessity in the future. Luna said, '47 million people speak Spanish today and we like having sex, so multiply that [by] eight . . .' and you get the picture of where the country is headed. . . . No doubt, [] Luna meant his gesture as a joke, and some Latino males may feel this stereotype [of Latinos being 'hyper-sexual'] is one to be celebrated. But it's not only false, it feeds into stereotypes that hurt our community."); *Mexican and Latino Stereotypes*, FERRIS STATE UNIVERSITY JIM CROW MUSEUM OF RACIST MEMORABILIA, *available at* https://www.ferris.edu/HTMLS/news/jimcrow/mexican.htm (last visited May 28, 2019) ("The stereotypical depictions of Mexicans, especially those thought to be in the United States illegally, are harsh and demeaning. The men are portrayed as illiterate criminals. The women are depicted as hypersexual. Both men and women are portrayed as lazy, dirty, physically unattractive menaces.").

Fifth Amended Complaint
3:17-CV-03906-MMC

137.    Mr. Cochran also worked with Leadership Class students and teachers to create a film titled "*Avengers spoof*," a parody of the Avengers franchise filmed on campus with school resources during the tenure of Defendants Willford and Steele, and Mr. Cochran and Ms. Taylor. School officials played the video for members of the student body at rally. In addition to numerous scenes of violence and explosions on campus, the film mocks persons of Mexican heritage by depicting a teacher wearing a sombrero while traditional Mariachi music is playing in the background – imagery which is rooted-in or capable of promoting racist and culturally insensitive stereotypes about persons of Mexican heritage;

138.    Defendant Willford also participated in arguably offensive and inappropriate school videos. First, Defendant Willford and Mr. Cochran worked with Leadership Class students to create a homecoming film in which they parodied "*Forest Gump*," a Hollywood motion picture film in which Tom Hanks plays a young man with a below-average IQ and significant physical disabilities. The spoof involved an SRVHS student without physical or mental disabilities portraying Forrest Gump, a character who lived with both. The students who participated in the Forrest Gump video were not punished.  Both Defendant Willford and Mr. Cochran also allowed their children play characters in the film.  It was produced during Defendant Willford, Steele, and Ramos, and District employee Cochran and Taylor's tenure.

139.    Additionally, Defendant Willford appeared in a Vine-themed video for the School's Mr. GQ competition. The video featured a partially nude student covered in peanut butter, derogatory references to "gingers" or persons with red hair and freckles, and extensive participation by School personnel. None of the students involved in that video were reprimanded.

-50-

140.    The School and Leadership Class also sponsored an annual Belly Flop Competition at the school. A video promoting the 2015 competition included a derogatory image of a student in a swimsuit wearing a "Keffiyeh," a traditional headdress worn by Saudi Arabian men and boys, while other students perform bowing gestures in an apparent attempt to emulate traditions that exist in certain Middle Eastern countries but which could racial stereotyping regarding persons of Saudi Arabian descent. It also included a partially nude student performing a striptease. The video was filmed on campus. None of the students who participated were punished.

141.    The School also created videos every year before Homecoming to announce which students were elected to Homecoming Court. Those films contain scenes featuring partially nude students, references to sex and rating women, students getting hit with a car, a kid getting "chloroformed," kidnapping, and references to students at rival schools as cavemen.

142.    The School hosts an annual pageant for male students called the Mr. GQ competition. Over the years, the competition and the introduction films played before the competition have included content and images that certain individuals may find "inappropriate" or "offensive," including: students referring to women as "b*tches" in rap songs, partially nude competition participants, sexually explicit dancing routines, and culturally insensitive portrayals of Jamaican and Rastafarian culture.

143.    Another video created by a Leadership Class and Video Production Class student titled "*JUUL*" currently has over 400,000 views on YouTube and was created during

-51-

the tenure of all Defendants except Defendant Steele. Defendant Krolikowski and Mr. Cochran believe the film promotes illegal drug and tobacco use.[28] In the video, the student declares:

- "I think I'm in love with a Juul."

- "Got your b*tch upside down sucking me in a handstand."

Despite the explicit reference to oral sex, frequent use of profanity, and promotion of illegal drug use, neither Defendants Schmitt, Krolikowski, Keith, nor Mr. Cochran disciplined the student for creating the video.

144.   In another film created in 2016 by students at the school, including students in the Leadership Class, titled, "*We Goin' Win*" point fake guns at the camera in a threatening manner and refer to an "Asian Invasion" by their school.

145.   Similarly, in 2016, a student who ran against N.Y. in the School's Junior Class President election created and published a video on social media in which he expressed that N.Y. and individuals who supported N.Y.'s candidacy were "trash."   Likewise, in 2017, the same year that N.Y. ran for ASB President, a student running for Senior Class President and a student running for ASB Vice President created and published a video on social media in which he depicted himself "besting" the female student he was running against by superimposing his and her photos on the faces of certain professional basketball players.   The film featured

---

[28] Under California law, persons under the age of 21 are prohibited from purchasing alcohol, tobacco, and marijuana. *See, e.g.,* Cal. Bus. & Prof. Code, § 25658.5; Cal. Health & Saf. Code, § 11362.1. Further, under age consumption of these substances are prohibited by both federal and state law. *See, e.g.* 15 U.S.C.A. §§ 1333, 1334; *Gonzales v. Raich*, 545 U.S. 1, 2 (2005) ("Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except as authorized by the CSA. . . . Marijuana is classified as a Schedule I substance, . . . based on its high potential for abuse, no accepted medical use, and no accepted safety for use in medically supervised treatment . . . .   This classification renders the manufacture, distribution, or possession of marijuana a criminal offense.") (internal citations omitted).

-52-

numerous scenes in which he forcefully "dunked" on, tripped, outmaneuvered, and scored on his female competition.

146. Similarly situated students, including students enrolled in the Leadership Class and candidates for leadership positions in the School's student government, created the films discussed in Paragraphs 133 through 150 above.

147. Defendant Willford taught the Leadership Class when the films discussed in Paragraphs 133 through 150 above were made. Defendant Willford and the other Defendants did not punish the students who created or who were featured in those films for their speech – certainly not to the degree N.Y. was punished for the Parody. N.Y. is of the belief, and hereby alleges, that Defendants' disparate treatment of him was because of the content of his speech.

148. Additionally, other similarly situated students in the general student body created and published films and materials that certain individuals would find offensive or inappropriate. Such films and materials include:

> (1) films containing violent images of students being fatally shot and stabbed;
>
> (2) a poster of "Pepe the Frog" – an image which is widely believed to promote racist and anti-Semitic ideologies[29] – published at the School in connection with a football game against Monte Vista High School;

149. Many of the films and other materials discussed above were made by similarly situated students in connection with extracurricular and cocurricular activities. Again, students created many of those films on-campus, with the School's resources, submitted them for pre-publication review and approval by School officials, and displayed the School's name and

---

[29] *See, e.g.,* Roy, *How 'Pepe the Frog' went from harmless to hate symbol*, LOS ANGELES TIMES, *available at* https://www.latimes.com/politics/la-na-pol-pepe-the-frog-hate-symbol-20161011-snap-htmlstory.html *Pepe the Frog, General Hate Symbols*, ANTI-DEFAMATION LEAGUE, *available at* (last visited May 29, 2019).

Fifth Amended Complaint
3:17-CV-03906-MMC

moniker. But Defendants did not punish the students who created those films and materials – certainly not to the degree N.Y. was punished for the Parody.

150. Further, many of the School's students participate in the annual "*Assassins*" game. The game is a local "tradition" in which the School's students, traditionally seniors, shoot each other in public with Nerf and other imitation guns that are sometimes painted black to make them appear real. Organizers assign the targets. The last student standing wins a cash prize. Defendnat Steele testified that law enforcement has warned that, from the perspective of non-participants, students who participate in the Assassins game appear to be threatening or engaging in actual violence.

151. Defendant Willford also knew of and spoke publicly about the Assassins game during the years N.Y. was enrolled at the School. One or more of the other Defendants, as well as other School officials, also knew of the Assassins game.

152. During N.Y.'s junior year, the then-ASB President and the elected ASB Vice President during N.Y.'s senior year, one of whom being Karen Pearce's daughter, participated in the Assassins game. Like N.Y., those students were subject to the Leadership Class Code of Conduct, which contained requirements similar to those set forth in the Campaign Rules. Yet Defendant Willford and the other Defendants did not punish those students for participating in the game; rather, they authorized and at times encouraged the practice to continue.

153. N.Y. is of the belief, and hereby alleges, that Defendants' disparate treatment of him was because of the content of his speech.

**N. Defendants' unlawful conduct caused N.Y. to suffer significant damages.**

154. Defendants' unconstitutional conduct caused N.Y. a great deal of stress, pain, suffering, and reputational harm. N.Y. lost weight, and was even admitted to the hospital for an elevated heart rate.

155. Having no other means to protect himself, N.Y. brought this action, through his parents in an effort to vindicate his right of free speech and other rights enshrined by the federal and state constitutions and other provisions of federal and state law, recover damages for Defendants' unlawful conduct, prevent further harassment directed at him in retaliation for exercising his rights, and protect other students from being punished for engaging in speech and expressive activities pursuant to vague and overbroad regulations.

**V.**

**FIRST CAUSE OF ACTION[30]**

**[Dismissed by Court Order]**

**VI.**

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Violations of U.S. Const., amend. I**

*Seeking Declaratory and Monetary Relief against Defendants*
*Schmitt, Reimann, Steele, Keith, Ramos, Phelan, and*
*Willford in their personal capacities*

156. N.Y. re-alleges and incorporates herein by reference the allegations in the preceding paragraphs.

---

[30] In accordance with the Court's September 21st Order (Dkt. No. 82) dismissing N.Y.'s First Cause of Action claiming violations of the First and Fourteenth Amendments and seeking injunctive relief, N.Y. does not replead that claim herein. However, such omission is not intended as and should not be construed as a waiver of such claim which is expressly preserved for purposes of appeal. N.Y. leaves in place the Cause of Action header and number in order to maintain the numbers of the remaining causes of action for consistency and ease of reference.

Fifth Amended Complaint
3:17-CV-03906-MMC

157.     "[S]tudents in public schools do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *C.R.*, 835 F.3d at 1148 (quoting *Tinker*, 393 U.S. at 506). "Schools must achieve a balance between protecting the safety and well-being of their students and respecting those same students' constitutional rights." *Id.* (quoting *LaVine*, 257 F.3d at 987).

158.     "The Supreme Court has outlined four types of student speech that schools may restrict, each governed by its own lead case: (1) 'vulgar, lewd, obscene, and plainly offensive speech' is governed by *Fraser*; (2) 'school-sponsored speech' is governed by *Hazelwood [School District v. Kuhlmeier*, 484 U.S. 260 (1988)]; (3) 'speech promoting illegal drug use' is governed by *Morse v. Frederick*, 551 U.S. 393 (2007); and (4) 'speech that falls into [none] of these categories' is governed by *Tinker*." *C.R.*, 835 F.3d at 1148-49 (internal citations and quotation marks omitted).

159.     The James Bond Parody is governed by the standards set forth in *Tinker*.[31] Defendants are therefore liable for violating N.Y.'s First Amendment rights unless they produce evidence sufficient to establish that, at the time the decision to punish N.Y. was made, they reasonably anticipated that the Parody would either (1) "substantially interfere with the work of the school," or (2) "impinge upon the rights of other students." 393 U.S. at 509, 514; *McNeil*, 918 F.3d at 709, 711 (quoting *Tinker*, 393 U.S. at 508); *see also Burch*, 861 F.2d at 1151 (applying *Tinker* to student's off-campus student speech—specifically, an underground newspaper made off-campus and without school resources—brought to school-sponsored

---

[31] *See McNeil*, 918 F.3d at 710; *C.R.*, 835 F.3d at 1145-47; *Wynar*, 728 F.3d at 1072; *LaVine*, 257 F.3d at 989; *see also Burch*, 861 F.2d at 1155-56, 1159.

-56-

barbeque on-campus); *J.C. ex rel. R.C.*, 711 F. Supp. 2d at 1109 (applying *Tinker* to student's off-campus "YouTube video"). Defendants cannot satisfy their burden.

**A.    Defendants cannot establish that the James Bond Parody was likely to "substantially interfere" with the work of the School.**

160.    Defendants cannot establish that the Parody was likely to substantially interfere with the work of the School at the time on February 9, 2017 that Defendants Steele, Ramos, Keith, Phelan, and Willford made the initial collaborative decision to punish N.Y.  Further, all Defendants, including Defendants Schmitt and Reimann, who learned of the Parody in February 2017 and supported the punishment cannot establish that the Parody was likely to substantially interfere with the work of the School at any point during N.Y.'s three month suspension between February and mid-May 2017.

161.    The student speech at-issue in *Tinker* occurred in December 1965, a time in which more than 200,000 U.S. troops were deployed to Vietnam as part of Operation Rolling Thunder.  School officials punished a group of students who wore black armbands to the school to protest the war.  *Id*. at 504.  The record reflected the highly-controversial nature of the student speech, as well as the fears school officials had about the speech offending particular students and the *possibility* of the speech causing disrupting the school environment:

> "[T]he [ ] armbands caused comments, warnings by other students, the poking of fun at them, and a warning by an older football player that other, nonprotesting students had better let them alone.  There is also evidence that a teacher of mathematics had his lesson period practically 'wrecked' chiefly by disputes with [a protesting student] who wore her armband for her 'demonstration.' * * * A former student of one of our high schools was killed in Viet[n]am [sic]. Some of his friends are still in school and it was felt that if any kind of a demonstration existed, it *might* evolve into something which would be difficult to control."

Fifth Amended Complaint
3:17-CV-03906-MMC

*Id*. at 517-518, n.3-n.4 (emphasis added); *see also id*. at 518, 524 (Black, J., dissenting) (stating that the speech "took the students' minds off their classwork and diverted them to thoughts about the highly emotional subject of the Vietnam war . . . [because] some of the wounded and the dead [were] their friends and neighbors").

162.    Under those facts, the Court held that the First Amendment prohibited the school officials from regulating the protesting students' speech. *Id*. at 509, 514. As the Court explained, "our independent examination of the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of the armbands [to protest the Vietnam War] would [(1)] substantially interfere with the work of the school or [(2)] impinge upon the rights of other students." *Id*. at 509.

163.    Generally, school officials cannot regulate off-campus student speech. *Morse*, 551 U.S. at 404; *see also Wynar*, 728 F.3d at 1068. The Ninth Circuit recognizes two narrow exceptions to this general rule, neither of which is applicable to the speech at issue here: (1) when the speech contains "credible threats of [school] violence;" or (2) when the speech targets a particular student with threats of violence or sexual harassment. *McNeil*, 918 F.3d at 709, 711; *see also C.R.*, 835 F.3d 1148; *Wynar*, 728 F.3d at 1068; *LaVine*, 257 F.3d at 988-89. Those very limited exceptions serve as a "threshold test" that must be satisfied "before applying *Tinker* to speech that originates off-campus." *Wynar*, 728 F.3d at 1068; *see also McNeil*, 918 F.3d at 707-08; *C.R.*, 835 F.3d 1142; *LaVine,* 257 F.3d 981.

164.    Further, the Ninth Circuit has held that school officials cannot punish a student for off-campus speech unless the speech poses a threat that is both "credible" and "ongoing," rather than merely "just any perceived threat of school violence arising from *off-campus* speech." *McNeil*, 918 F.3d at 709, 711. Thus, the First Amendment prohibits school officials

from regulating off-campus student speech, including speech that is violent in nature or content, when the speech is "old, highly fantastical, unspecific, and unaccompanied by other indicia of a violent intent" such that no reasonable school officials would perceive the speech to contain a credible and ongoing threat:

> "At a certain point, discipline may lose its basis in reasonable, ongoing concerns of campus safety, disruption, or interference with the rights of other students, and instead become *primarily a punitive, retrospective response* to the student's speech. Such discipline would be in conflict with *Tinker*."

*McNeil*, 918 F.3d at 710-11 (citing *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608 (5th Cir. 2004); *LaVine*, 257 F.3d at 991-92)) (emphasis added).

165.    Courts consistently hold that the speech cannot be regulated under *Tinker* in instances such as this where off-campus student speech does not pose a "credible" and "ongoing" threat to school violence, school activities, or the constitutional rights of a particular student. *See, e.g., Burch*, 861 F.2d at 1150, 1158-59 (emphasizing that students' distribution of "non-school sponsored," underground newspaper cannot be subject to regulation under *Tinker* "on the basis of undifferentiated fears of possible disturbances or embarrassment to school officials, and no more than undifferentiated fear appears as a basis for regulation in this case"); *Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d at 1118. This is true even when student speech is extremely controversial, offensive, hurtful to certain students, distracting, frequently and repeatedly discussed by students during school, and/or interrupts a certain teacher's lesson plan. *See generally Tinker*, 393 U.S. 503. Indeed, as the Supreme Court has explained, even where speech "inflict[s] great pain," the government "cannot react to that pain by punishing the speaker" because "[a]s a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder*,

562 U.S. at 460-61 (finding members of Westboro Baptist Church engaged in First Amendment protected speech when they picketed American soldier's funerals while carrying signs celebrating the death of soldiers as God's righteous vengeance for the United States' and its military's tolerance for homosexuality – *e.g.*, "Thank God for Dead Soldiers," "Fags Doom Nations," "America is Doomed," "Priests Rape Boys," and "You're Going to Hell").

166.    For example, in *Beverly Hills Unified Sch. Dist.*, a student challenged school officials' decisions to punish the student for creating a video off-campus which depicted classmates in an unflattering light and referred to one particular student as a "slut," "spoiled," and "the ugliest piece of sh*t I've ever seen in my whole life." 711 F. Supp. 2d at 1119-20. The school officials argued that the speech created a "general buzz" that was distracting to students and the fact that administrators expended hours pulling students out of class to deal with personality conflicts and hurt feelings resulting from the speech supported a finding of a substantial disruption. *Id.* at 1119.  The Central District rejected that argument, reasoning: "For the *Tinker* test to have any reasonable limits, the word 'substantial' must equate to something more than the ordinary personality conflicts among middle school students that may leave one student feeling hurt or insecure." *Id*.

167.    Here, Defendants cannot establish that the James Bond Parody was likely to substantially interfere with the operation of the School.  The Parody contains no threats of violence directed at the School or a particular student.  The Parody was created and published entirely off-campus, during non-school hours, and without school resources.  In fact, the Parody begins with a disclaimer to that effect.  Further, the Parody does not in any way target any student with threats of violence or harassment.  Indeed, there is not a single student identified in the Parody who did not participate in its creation.

-60-

168.     Off-campus student speech may cause school officials to pull students out of class for purposes of investigating the speech, create a "buzz" which diverts students' attention away from classroom activities, and even "wreck" one or more teacher's lesson plans; but the First Amendment requires school officials to "take that risk." *Tinker*, 393 U.S. at 506, 508-09; *Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d at 1119-20.  School officials violate the First Amendment when they regulate or punish students for off-campus speech unless, at the time the decision is made, there are facts which reasonably led the officials to believe the speech would either (1) "substantially interfere with the work of the school," or (2) "impinge upon the rights of other students." *Tinker*, 393 U.S. at 509, 514; *McNeil*, 918 F.3d at 709, 711. Further, any such threat posed by the off-campus speech must first be shown to be both "credible" and "ongoing" before it is subject to regulation under *Tinker*.  *McNeil*, 918 F.3d at 709-11.

169.     That one or more students or school officials may have been "offended" or "hurt" by the content of the James Bond Parody does not support a finding of a substantial disruption.  *See Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 768 (9th Cir.) ("[T]he mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint cannot justify a school's decision to punish or prohibit student speech.") (quoting *Tinker*, 393 U.S. at 508–09).

170.     Finally, school officials cannot rely on their own disciplinary actions or reactions to speech to regulate or punish student speech under *Tinker*'s substantial disruption prong.  *See, e.g., Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d at 1118 ("Clearly, however, the School cannot point to the discipline itself as a substantial disruption . . . .").  But here, one or more Defendants have attempted to do just that.  For example, they contend that the

controversial events from May and June 2017—specifically, the walkout, the contentious District Board meeting, and the resulting media frenzy—evidence a substantial disruption sufficient to justify their February 9, 2017 decision to punish N.Y. for the Parody. Not only did those events occur more than three months after the Parody was voluntarily removed from YouTube, but Defendants are responsible for causing those events to occur. Indeed, Defendant Schmitt testified that the only material and substantial disruption to the school he is aware of occurred because of the May 2017 decision to reverse the unconstitutional sanctions against N.Y. Defendants cannot justify their First Amendment violations by pointing to their disciplinary actions and overreactions to the Parody. *See id.*

**B.     Defendants cannot establish that the James Bond Parody was likely to "impinge on the rights of other students" to be secure and to be let alone.**

171.    Under the second prong of *Tinker*, school officials may restrict speech when it "collides 'with the rights of other students to be secure and to be let alone.'" *Wynar*, 728 F.3d at 1070 (quoting *Tinker*, 393 U.S. at 514). While "it is certainly not enough that the speech is merely offensive to some listener," *Wynar*, 728 F.3d at 1072 (internal citations omitted), off-campus speech that specifically targets a "*particular*" student in a manner and to a degree that the student is made to feel insecure, less capable of performing as a student, and less capable of interacting with his or her peers may be regulated under the second prong of *Tinker*. *C.R.*, 835 F.3d 1142.

172.    For example, *C.R.* involved graphic jokes about oral sex and acts of harassment directed at a disabled student in a public park near the school shortly after school hours. 835 F.3d at 1145-47. The plaintiff argued that the school's regulation of his speech was unconstitutional under both prongs of *Tinker* because it occurred in a public park off-campus

-62-

which buttressed campus, and did not involve threats of violence directed at the school. *Id.* at 1145–46. The court disagreed. In holding that the off-campus speech could be regulated under the second prong of *Tinker*, the court explained that the speech occurred in such "close temporal and physical proximity to the school, on property that is not obviously demarcated from the campus itself," targeted a particular student, and was likely to cause the targeted student to feel insecure, less capable of performing as a student, and less capable of interacting with her peers. *Id.* at 1150–51 (quoting *Tinker*, 393 U.S. at 508).

173. Further, the Ninth Circuit has also held that off-campus speech that threatens violence against a particular student or against the school in general may be regulated under the second prong of *Tinker*. *McNeil*, 918 F.3d at 710; *C.R.*, 835 F.3d at 1150-51; *Wynar*, 728 F.3d at 1072; *LaVine*, 257 F.3d at 989. However, the court also held that off-campus student speech cannot be regulated under *Tinker*'s second prong merely because certain people may find the speech offensive or controversial. *See, e.g., Wynar*, 728 F.3d at 1072.

174. Here, the James Bond Parody does not target the School or any particular student with threats of violence or harassment. Indeed, in contrast to films made by other similarly situated members of the general student body and Leadership Class, *see supra* ¶¶ 88-98, the Parody does not identify or mention the School, and does not contain any credible threats of violence to the School or any particular student.

**C.    The Campaign Rule is unconstitutionally vague and overbroad.**

175. Defendants Steele, Ramos, Keith, Phelan, and Willford with the knowledge and support of Defendants Schmitt and Reimann impermissibly punished N.Y. for violating the

vague and overbroad Campaign Rule prohibiting "inappropriate" material.[32]  School officials throughout the country have cited substantially similar rules in previous attempts to justify restriction of speech without satisfying either prong of *Tinker*.  But the Ninth Circuit has held such regulations unconstitutional under the vagueness and overbreadth doctrines.  For example, in *Burch*, school officials punished students for distributing copies of a non-school sponsored newspaper at a school-sponsored barbeque on school grounds pursuant to a policy requiring all written communications distributed by students on campus: (1) to be free from "libel, slander, obscurity (sic), personal attacks or incitement to illegal action(s)," and "unauthorized solicitation;" and (2) to not be distributed in a manner that "interfere[s] with or disrupt[s] the normal educational process."  861 F.2d at 1151.  The Ninth Circuit held that the policy was unconstitutionally vague and overbroad, and school officials violated the First Amendment by enforcing the policy against the students.  *Id*. at 1155-59; *see also Gooding*, 405 U.S. 518; *Lewis*, 415 U.S. 130.

176.    Each act of punishment Defendants made pursuant to the unconstitutionally vague Campaign Rule—a list which includes but is not limited to his removal from the Leadership Class, the interrogation, the removal from the office of Junior Class President, the disqualification from the 2017-18 ASB President election, the failure to disclose the election results—constitutes an independent constitutional violation.

177.    Defendants did not punish similarly situated students, including students in the Leadership Class, who created films and materials which certain individuals would find "inappropriate."  *See, e.g., supra* ¶¶ 88-98. Unlike the Parody, many of those films and

---

[32] The decision was made upon the recommendation of Defendant Willford who herself has acknowledged that the Campaign Rule is vague and should be revised.

Fifth Amended Complaint
3:17-CV-03906-MMC

materials threaten violence to the School and/or target particular students with threats and harassment. Further, unlike the Parody, many of those films and materials were made on-campus, created and disseminated with the School's resources, subjected to pre-publication review by School officials, bore the name of the School and Leadership Class, and were approved by School officials. Yet Defendants did not punish the students who created those films and materials.

178. Further, Defendants did not punish similarly situated students who created the Parody with N.Y. in a manner similar to how they punished N.Y. Defendants' invocation of the Campaign Rule to justify their unconstitutional conduct, including the disparate treatment of N.Y., is false and pre-textual. *See Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 526 (9th Cir. 1992) (finding that students adequately pled First Amendment violation by "alleging that the school officials' reasons for requesting the removal of the buttons were false and pretextual [when the students alleged that] . . . the buttons caused no classroom disruption[, . . .] and many of their classmates wore the same buttons, but that none were asked to remove them. . . .").

**D.      Defendants intentionally chilled N.Y.'s speech.**

179. "The school room prepares children for citizenship, and the proper exercise of the First Amendment is a hallmark of citizenship in our country." *Chandler*, 978 F.2d at 527; *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) ("[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks . . . ."). "[T]o demonstrate a First Amendment violation, a plaintiff must provide evidence showing that by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in

[the defendant's] conduct." *Lacy v. Maricopa Cty.*, 693 F.3d 896, 916 (9th Cir. 2012) (quoting *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)) (alterations in original).

180. Here, Defendants' conduct violates the First Amendment and would chill a person of ordinary firmness from continuing to engage in protected First Amendment activity—specifically, creating and publishing a parody video entirely off-campus, which did not (1) pose a credible and ongoing threat to the School, (2) threaten to substantially disrupt the School's activities, or (3) target a particular student with threats of violence or harassment. Defendants' conduct would discourage ordinary students from exercising their First Amendment rights, including the right to create or be featured in action-themed parodies, comedic parodies, and even documentaries examining actual, real-life events because of the very real possibility that one or more District officials may, in their unfettered discretion, determine that speech is "inappropriate" and grounds for punishment. *See, e.g., Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d at 1119. Further, despite Defendants' contention, the First Amendment prohibits government officials from having unfettered discretion to determine if speech is "inappropriate." *See Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992) (holding that ordinance was unconstitutional because it "contain[ed] more than the possibility of censorship through uncontrolled discretion").

181. N.Y.'s protected speech was a substantial or motivating factor in the Defendants' conduct. But for the James Bond Parody, and Defendants' subjective disapproval of certain elements of it, they would not have interrogated N.Y., stripped him of his Junior Class presidency, disqualified him from the ASB President election, or removed him from the Leadership Class.

-66-

182.    It is well-established that the government cannot regulate speech simply because it may be hurtful, offensive, or inappropriate to certain individuals.  *See Wynar*, 728 F.3d at 1072; *Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d at 1117.  Further, it is well-established that school officials cannot regulate off-campus speech like the Parody unless (1) there are facts which may reasonably lead school authorities to forecast a "substantial disruption" to the School's activities, or (2) interferes with the rights of a particular student's constitutional right to be "secure and to be let alone."   *Wynar*, 728 F.3d at 1070 (quoting *Tinker*, 393 U.S. at 508, 514).   Defendants knew their conduct violated N.Y.'s clearly established constitutional rights at all relevant times, including on February 9, 2017 – the date Defendants decided to punish N.Y. for the Parody.  Yet Defendants not only punished N.Y. for the Parody, but, in the months following the February 9th decision, rejected numerous requests to reverse their decision, and retaliated against N.Y. for taking steps to vindicate his clearly-established constitutional rights.

183.    Defendants' unconstitutional conduct deprived N.Y. of his right to an education, which includes his right to participate in cocurricular activities such as the Leadership Class and the rights, responsibilities, and privileges of the positions to which he was elected in connection with the Leadership Class.   N.Y. specifically alleges that Defendants' are liable for the chilling of his First Amendment rights, emotional damages, harm to reputation, embarrassment, humiliation, stress and/or mental anguish, and all other damages directly and/or consequentially associated with the deprivation of one's civil rights, including attorneys' fees and costs associated with vindicating his rights.

Fifth Amended Complaint
3:17-CV-03906-MMC

**VII.**

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Violations of U.S. Const., amend. I by Retaliation**

*Seeking Declaratory and Monetary Relief against Defendants*
*Schmitt, Reimann, Steele, Krolikowski, Keith, Ramos,*
*Phelan, and Willford in their personal capacities*

184.    N.Y. re-alleges and incorporates herein by reference the allegations in the preceding paragraphs.

185.    "To establish a First Amendment retaliation claim in the student speech context, a plaintiff must show that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Pinard*, 467 F.3d at 770.

186.    The James Bond Parody enjoys the First Amendment protection. As such, Defendants cannot punish N.Y. for the Parody because it had no likelihood of causing a "substantial disruption" to the School's activities, and posed no threat of interfering with the constitutional rights of any particular student. *See generally Tinker*, 393 U.S. 503.

187.    Similarly, N.Y.'s efforts to vindicate his rights by petitioning the state court for a writ of mandate and by filing the instant action are protected by the First Amendment. *Steshenko v. Gayrard*, 70 F. Supp. 3d 979, 994 (N.D. Cal. 2014) ("Petitioning a government agency or the courts for redress of grievances is an activity protected by the First Amendment") (citing *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)).

188.    After N.Y. filed his state court petition for writ of mandate and after N.Y. notified Defendants of his intent to file the instant action to vindicate his rights, Defendants

-68-

and multiple district employees, including Ms. Katzburg, retaliated against N.Y. by, among other things:

    a.    condemning N.Y. for engaging in First Amendment activity;

    b.    disseminating confidential and self-identifying information about N.Y. and his school records to third-parties who were neither students nor District officials;

    c.    intentionally withholding N.Y.'s semester grades throughout the summer of 2017 even though all required work had been completed;

    d.    severely limiting the powers and privileges historically bestowed upon the ASB President, including by creating a School Constitution that prevented N.Y. from selecting his cabinet, creating an impeachment process and a recall procedure designed to encourage N.Y.'s removal and replacement, creating a new position for the runner-up in the ASB President election, and transferring the ASB President's powers and privileges to the runner-up; and

    e.    failing to protect N.Y. against harassment and threats of violence caused by Defendants and other District employees, including Ms. Stepp and Ms. Katzburg, including acts of vandalism, hate speech, and death threats directed at N.Y.

189. Defendants retaliated against N.Y. for the Parody and for petitioning the state court to vindicate his constitutional rights. Defendants knew that the those activities enjoyed constitutional protection, yet they retaliated against N.Y. for engaging in thoes activities. But for N.Y.'s decision to engage in constitutionally protected activities, Defendants would not have punished N.Y., nor engaged in conduct that caused him to receive death threats.

190. Defendants' conduct would chill a person of ordinary firmness from continuing to engage in First Amendment activity, including the right to engage in protected off-campus speech and to seek judicial relief when School officials engage in unconstitutional conduct that

causes students to suffer damages. *See, e.g., Pinard*, 467 F.3d at 771 (holding that students' "petition and complaints" against a coach were "constitutionally protected," and that "defendants' suspension of the plaintiffs would lead ordinary student athletes in the plaintiffs' position to refrain from complaining about an abusive coach").

191.     As a direct and proximate result of Defendants' actions, N.Y. suffered damages including but not limited to, the chilling of his First Amendment Rights, emotional distress, harm to reputation, embarrassment, humiliation, stress and/or mental anguish, and all other damages directly and/or consequentially associated with the deprivation of one's civil rights, including attorneys' fees and costs associated with vindicating his civil rights.

## VIII.

## FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### (Violation of the 14th Amendment to the United States Constitution – Right to Due Process)

*Seeking Injunctive and Declaratory Relief against Defendants Schmitt, Reimann, Steele, Keith, Ramos, Phelan, and Willford in their official capacities; and Seeking Declaratory and Monetary Relief against Defendants Schmitt, Reimann, Steele, Keith, Ramos, Phelan, and Willford in their personal capacities*

192.     N.Y. re-alleges and incorporates herein by reference the allegations in the preceding paragraphs.

193.     Defendants' policies and conduct violate the Due Process Clause of the Fourteenth Amendment.

194.     "[T]the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (quoting *Rumsfeld v. Forum for Academic and Institutional Rights*, 547 U.S. 47, 59 (2006)).

-70-

195.    The California Supreme Court has further recognized "the vital importance of student participation in educational extracurricular programs." *Hartzell v. Connell*, 35 Cal.3d 899, 909 (Cal. 1984).  "Such activities are generally recognized as a fundamental ingredient of the educational process," *see id.*, and "all educational activities—curricular or 'extracurricular'—offered to students by school districts fall within the free school guarantee of article IX, section 5" of the California Constitution. *Id.* at 911; *see also Goss v. Lopez*, 419 U.S. 565, 575 (1975) ("A 10-day suspension from school is not de minimis in our view and may not be imposed incomplete disregard of the Due Process Clause"); *Cal. Ass'n for Safety Educ. v. Brown*, 30 Cal. App. 4th 1264, 1278 (Cal. Ct. App. 1994).  California law also guarantees students the right to engage in speech to the limits of the First Amendment.  *See Lovell By and Through Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 371 (9th Cir. 1996) ("the California Education Code extends students' free speech rights while on campus to the same extent those rights may be exercised outside of the school context").

196.    As in the First Amendment context, vague and overbroad regulations that restrict speech are unconstitutional under the Due Process Clause of the Constitution. *See FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253-55 (2012).  The Due Process Clause requires "that regulated parties should know what is required of them so they may act accordingly," while also requiring "precision and guidance . . . so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*; *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 554-55 (9th Cir. 2004) (holding that requirement for physicians to treat patients "with consideration, respect, and full recognition of the patient's dignity and individuality" was vague in violation of due process because the terms "consideration," "respect," "dignity," and "individuality" were not defined and had widely varying meanings to different people).  In cases involving

-71-

speech, "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox TV Stations*, 567 U.S. at 253–55.

197. N.Y. was entitled to adequate notice of School policies, rules, and procedures which could subject him to disciplinary action for his off-campus speech, so as to enable him to adequately govern his conduct. *See id.* Yet Defendants failed to provide adequate notice of what constituted "inappropriate" speech prior to February 9, 2017, the date they decided to punish N.Y. for the James Bond Parody. Defendants instead left the interpretation of "inappropriate" speech to the subjective whims of Defendant Willford and other School officials. Defendants also failed to provide N.Y. notice of the degree to which he could be punished for engaging in speech deemed inappropriate.

198. Defendants knew or should have known of the applicable law governing their behavior, authority, duties and procedures. *See Goss*, 419 U.S. at 574 (establishing that states are "constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause"). Defendants knew or should have known N.Y. had the right and privilege to due process before any governmental deprivation of life, liberty, or property—a right which includes the right to participate in cocurricular or extracurricular educational activities. *See id.; Hartzell*, 35 Cal.3d at 909–11.

199. Yet after viewing the copy of the Parody, Defendants proceeded to interrogate N.Y., expel him from the Leadership Class, strip him of his Junior Class President position, prohibit him from assuming the office of ASB President, and to strip him of the rights and powers traditionally reserved for the ASB President, pursuant to the vague and overbroad Campaign Rule. Defendants based their decisions on Defendant Willford's and other School officials' subjective interpretations of the Parody and "inappropriate" speech. But, as

-72-

discussed, the First Amendment prohibits government officials from having unfettered discretion to determine if speech is inappropriate. *See Forsyth Cty.*, 505 U.S. at 133-34 (finding unconstitutional an ordinance that contained "more than the possibility of censorship through uncontrolled discretion," and recognizing the ordinance lacked "articulated standards" or "objective factors" for enforcement).

200. The Campaign Rules and Defendants' enforcement of them violated N.Y.'s right to due process. N.Y. had no choice but to accept the Rules in order to participate in the ASB President election, and the Rules failed to provide adequate notice as to the type of speech that was subject to regulation. *See id.*

201. The Student & Parent Handbook and California Education Code § 48900 *et seq.* further mandate that Defendants observe certain mandatory procedures before suspending or expelling N.Y. from cocurricular activities, including, without limitation:

> (1) a determination by Defendant Schmitt (the Superintendent) or the School's principal that N.Y. committed an act prohibited by California Education Code §§ 48900(a)-(r);
> (2) if suspended, a notice of suspension including a statement of facts leading to the suspension, the date and time when he could return to school, and a statement of his rights to have access to his student records;
> (3) if recommended for expulsion, a hearing before the District Disciplinary Review Board to determine whether expulsion was appropriate; and
> (4) if expelled, a determination by the Review Board that such punishment is warranted based upon substantial evidence.

202. Due process required Defendants to observe these mandatory procedures before suspending or expelling N.Y. *See Goss*, 419 U.S. at 575; *Fed. Home Loan Mortg. Corp. v. SFR Invs. Pool 1, LLC*, 893 F.3d 1136, 1147 (9th Cir. 2018) ("a legitimate claim of entitlement is determined largely by the language of the statute and the extent to which the entitlement is

-73-

couched in mandatory terms"). Defendants nonetheless punished N.Y. for the Parody without observing the required procedures, violating N.Y.'s right to Due Process.

203. It has long been established that school officials cannot regulate off-campus student speech like the Parody unless (1) there are facts which may reasonably lead school authorities to forecast a "substantial disruption" to the School's activities, or (2) interferes with the rights of a particular student's constitutional right to be "secure and to be let alone." *Wynar*, 728 F.3d at 1070 (quoting *Tinker*, 393 U.S. at 508, 514). Defendants knew their conduct violated N.Y.'s clearly established constitutional rights at all relevant times, including on February 9, 2017—the date Defendants decided to punished N.Y. for the Parody. Defendants also knew or should have known that they could not craft, adopt, pass, ratify, or enforce arbitrary, subjective, and unarticulated standards for regulating student speech. *See Fox TV Stations*, 567 U.S. at 253–55. Yet Defendants not only punished N.Y. for the Parody, but, in the months following the February 9th decision, rejected numerous requests to reverse their decision and retaliated against N.Y. for taking steps to vindicate his clearly-established constitutional rights.

204. As a direct and proximate result of Defendants' actions, N.Y. suffered damages. Such damages include, but are not limited to, the chilling of his constitutional rights, emotional damages, embarrassment, harm to reputation, humiliation, stress and/or mental anguish and all other damages directly and/or consequentially associated with the deprivation of one's civil rights, including attorneys' fees and costs associated with vindicating his civil rights.

205. N.Y. had no adequate and/or available post deprivation remedy

206. Defendants Schmitt and Reimann were aware of the facts and circumstances surrounding the punishment—including that N.Y. had been suspended from class for more

-74-

than five consecutive days, in violation of California Education Code. § 48911, based on conduct not punishable by suspension under California Education Code §§ 48900, 48900.3, or 48900.4—at least as early as late February 2017. Defendants Schmitt and Reimann endorsed and supported the "inappropriate" definition and subsequent punishment after they learned of the Parody. .

## IX.

### **FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**(Violation of the Equal Protection Clause of the 14th Amendment)**

*Seeking Declaratory and Monetary Relief*
*against Defendants Schmitt, Reimann, Steele, Keith, Ramos, Phelan, and Willford in their personal capacities.*

207. N.Y. re-alleges and incorporates herein by reference the allegations in the preceding paragraphs.

208. "Government action that suppresses protected speech in a discriminatory manner may violate both the First Amendment and the Equal Protection Clause." *Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 779 (9th Cir. 2014). "Where plaintiffs allege violations of the Equal Protection Clause relating to expressive conduct," courts "employ essentially the same analysis as [they] would in a case alleging only content or viewpoint discrimination under the First Amendment." *Id.* at 780 (quotations omitted).

209. As set forth above, Defendants punished N.Y. for his protected speech because of their subjective distaste for the content of the Parody when (1) no facts existed which could have reasonably led School officials to forecast the Parody causing a "substantial disruption" to the School's activities, and (2) the Parody was not capable of interfering with the rights of

a particular student to be "secure and to be let alone."   *Wynar*, 728 F.3d at 1070 (quoting *Tinker*, 393 U.S. at 508, 514).

210.   Defendants' treatment of other similarly situated students who created films and materials that certain individuals would find "inappropriate" further evidences the disparate manner in which they treated N.Y.  Such films contain content and scenes similar to that which Defendants Schmitt, Reimann, Steele, Keith, Phelan, Ramos, and Willford initially  Willford initially deemed "inappropriate" in the Parody.[33]  Further, many of those films and materials were made in connection with extracurricular and cocurricular School activities, including in connection with the Leadership Class and campaigns for both Junior Class President and ASB President.  Yet the students who created those films and materials suffered no punishment for their speech and expression.

211.   Further, neither Defendant Willford nor Defendants Schmitt, Ramos, or Krolikowski punished students, including elected officers in the Leadership Class, for participating in the Assassins game—a local "tradition" in which the School's students, traditionally seniors, shoot each other in public with Nerf and imitation guns that are sometimes painted black to resemble real guns.  Those students submitted to the same Code of Conduct imposed on N.Y. for the Parody.  Defendants Schmitt, Steele, Ramos, and Krolikowski were aware of the Assassins game and were in a position to instigate disciplinary action based on students' participation in the game. Yet, they took no disciplinary action against those students.

---

[33] Defendants Schmitt and Reimann did not participate in the initial February 9, 2017 decision to punish N.Y. However, they endorsed and supported the "inappropriate" definition and subsequent punishment after they learned of the Parody in late February 2017.

-76-

212. Defendants admit that N.Y. has the same rights to engage in speech and expressive activity as each of the students who created the Parody with him. Yet, Defendants imposed different and significantly less severe punishment on the students who created the Parody with N.Y. Each of those students engaged in the exact same conduct as N.Y. in connection with the Parody.

213. The students who created the films and engaged in the conduct discussed above, *see supra* §§ 46-53, including N.Y.'s friends who helped create the James Bond Parody, are similarly situated to N.Y. They were all students at the School who created and distributed videos via social media for the consumption of the public and student body. Any justification for punishing or regulating N.Y.'s speech and expression would apply equally to the students who created and distributed those films and videos.

214. On February 13, 2017, during a meeting with Defendant Keith, N.Y. brought examples of videos produced and created by other students in the School's Video Production, Leadership, and English classes. Unlike the Parody, some of those videos were made on campus with School resources and targeted particular students and the School in general with threats of violence and harassment. Defendant Keith showed a complete disregard for Defendants' disparate treatment of N.Y. Ultimately, Defendant Keith informed N.Y. and his parents that Defendants supported the decision to punish N.Y. for the Parody.

215. Defendants Schmitt and Reimann were aware of the facts and circumstances surrounding the punishment and disparate treatment of N.Y. at least as early as late-February 2017. They actively participated in a review of the ongoing punishment in February and March of 2017. Further, despite their awareness of the provisions of the California Education Code prohibiting school officials from suspending students for more than five days, *see* California

-77-

Education Code § 48903, Defendants Schmitt and Reimann endorsed the decision to suspend N.Y. from the Leadership Class for more than three months.

216. Government officials violate the Equal Protection Clause when they regulate or punish speech because the speaker is a member of a protected class or because of the content of the speech. *See, e.g., Carey v. Brown*, 447 U.S. 455, 471 (1980) (finding a violation of the Equal Protection clause "because the statute discriminates among pickets based on the subject matter of their expression"); *City of Ladue v. Gilleo*, 512 U.S. 43, 51 n.9 (1994) ("Like other classifications, regulatory distinctions among different kinds of speech may fall afoul of the Equal Protection Clause").

217. Similarly situated students were subject to the same or similar rules and regulations that Defendants enforced against N.Y. As opposed to treating all students equally, Defendants singled-out and punished N.Y. for engaging in the same or similar conduct as similarly situated students. Defendants' disparate treatment of him was because of the content of his speech. *See Jianjun Xie v. Oakland Unified Sch. Dist.*, No. C 12-02950, 2013 WL 812425, at *4 (N.D. Cal. Mar. 5, 2013) (recognizing such facts could support a finding of adverse treatment on account of race and ethnicity). Defendants' conduct violates the Equal Protection Clause.

218. As a direct and proximate result of Defendants' conduct, N.Y. suffered damages including but not limited to the chilling of his constitutional rights, emotional damages, embarrassment, harm to reputation, humiliation, stress and/or mental anguish and all other damages directly and/or consequentially associated with the deprivation of one's civil rights, including attorneys' fees and costs associated with vindicating his civil rights.

Fifth Amended Complaint
3:17-CV-03906-MMC

**X.**

**SIXTH CAUSE OF ACTION**
**Violations of Title VI of the Civil Rights Act of 1964**
**42 U.S.C. § 2000d.**

[not alleged in Fifth Amended Complaint]

**XI.**

**SEVENTH CAUSE OF ACTION**
**Cal. Civ. Code § 52.1**
**(Violation of California Constitution, Article I, § 2)**

*Seeking Declaratory and Monetary Relief against Defendant the District and against*
*Defendants Schmitt, Reimann, Steele, Krolikowski, Keith, Ramos,*
*Phelan, and Willford in their official and personal capacities[34]*

219. N.Y. re-alleges and incorporates herein by reference the allegations in the preceding paragraphs.

220. Like the First Amendment, "Article I, section 2, subdivision (a) of the California Constitution guarantees that 'every person may freely speak, write and publish his or her sentiments on all subjects . . . A law may not restrain or abridge liberty of speech or press.'" *Smith v. Novato Unified Sch. Dist.*, 150 Cal. App. 4th 1439, 1450 (Cal. Ct. App. 2007). "The purpose of both provisions is to abolish governmental censorship and to constitutionalize society's substantial interest in protecting the right to comment on issues of public concern." *Id.* (quotations omitted). Conduct that violates the First Amendment will therefore likewise violate Article I, section 2 of the California Constitution. *See id.*

221. As set forth above, Defendants infringed on N.Y.'s right of free speech protected under the First Amendment and California Constitution by interrogating him,

---

[34] Defendants have agreed to waive their Eleventh Amendment immunity with respect to N.Y.'s causes of action under California law.

Fifth Amended Complaint
3:17-CV-03906-MMC

expelling him from Leadership Class, stripping him of his position as Junior Class President, preventing him from assuming the position of ASB President, and by stripping the ASB President position of the rights and privileges historically afforded to the student elected to the position.

222. Defendants Steele, Ramos, Keith, Phelan, and Willford made the initial decision collectively to impose the aforementioned punishments on N.Y. based on no evidence of disruption and their subjective distaste for the video. Defendants Schmitt and Reimann learned of the facts and circumstances surrounding the punishment as early as late-February. They endorsed the punishments imposed upon N.Y.

223. N.Y. presented his written claim for damages before filing suit.

224. As a direct and proximate result of their threatening, intimidating, and coercive actions, Defendants deprived N.Y. of his civil rights, and directly and proximately caused him damages. Such damages include, but are not limited to, the chilling of his constitutional rights, emotional damages, embarrassment, reputational harm, humiliation, stress and/or mental anguish and all other damages directly and or consequentially associated with the deprivation of one's civil rights, including attorneys' fees and costs associated with vindicating his civil rights.

**XII.**

**EIGHTH CAUSE OF ACTION**
**Cal. Civ. Code § 52.1**
**(Violation of California Education Code §§ 48907, 48950)**

*Seeking Declaratory and Monetary Relief against Defendant the District and against Defendants Schmitt, Reimann, Steele, Krolikowski, Keith, Ramos, Phelan, and Willford in their official and personal capacities*

225. N.Y. re-alleges and incorporates herein by reference the allegations in the preceding paragraphs.

226. "The California Education Code ensures that 'a student shall have the same right to exercise his or her right to free speech on campus as he or she enjoys when off campus.'" *Lovell*, 90 F.3d at 371 (quoting Cal. Educ. Code § 48950 historical and statutory notes). Those provisions "extend[] students' free speech rights while on campus to the same extent those rights may be exercised outside the school context." *Id.* (citing Cal. Educ. Code §§ 48907 and 48950). "The plain language of section 48907 mandates that a school may not prohibit student speech simply because it presents controversial ideas and opponents of the speech are likely to cause disruption." *Novato Unified Sch. Dist.*, 150 Cal. App. 4th at 1457.

227. Defendants were aware of the breadth of free speech rights for students under California law. Provisions of those laws are cited in publicly available District policies.Indeed, Defendant Willford attached those policies to a declaration she submitted to the Contra Costa County Supreme Court in April 2017.

228. Superintendent Taylor testified that she knew students have the same First Amendment rights as other Americans, and remembers talking to Defendant Schmitt about that legal reality months before Defendants reversed their unconstitutional sanctions against N.Y. Taylor testified: "[Schmitt] has a keen understanding of the first amendment rights of

students, and that students have the same rights . . . inside the school building as they do outside the school building."

229.    The James Bond Parody is protected by the First Amendment. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("the creation and dissemination of information are speech within the meaning of the First Amendment"); *Dr. Seuss Ents., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1400 (9th Cir. 1997) ("Parody is regarded as a form of social and literary criticism, having a socially significant value as free speech under the First Amendment").

230.    As set forth above, Defendants Steele, Ramos, Keith, Phelan, and Willford made the initial decision to nonetheless punish N.Y. for his protected speech and expression. Such conduct violates California Education Code sections 48907 and 48950. *See Novato Unified Sch. Dist.*, 150 Cal. App. 4th at 1465 (finding violation of section 48907 based on punishment of a student for a poem entitled "Immigration" containing insensitive commentary on Mexican immigrants); *Lovell*, 90 F.3d at 371. N.Y. presented his written claim for damages before filing suit.

231.    Defendants Schmitt and Reimann learned of the facts and circumstances surrounding the punishment as early as late-February. They endorsed the punishments imposed upon N.Y. They actively participated in a review of the ongoing punishment in February and March of 2017.

232.    As a direct and proximate result of their threatening, intimidating, and coercive actions, Defendants deprived N.Y. of his civil rights and caused damages, including but not limited to the chilling of his constitutional rights, emotional damages, embarrassment, harm to reputation, humiliation, stress and/or mental anguish and all other damages directly and or

-82-

consequentially associated with the deprivation of one's civil rights, including attorneys' fees and costs associated with vindicating his civil rights.

## XIII.

### NINTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*Seeking Declaratory and Monetary Relief against Defendant the District and against Defendants Schmitt, , , , , , and Willford in their official and personal capacities*

233.   N.Y. re-alleges and incorporates herein by reference the allegations in the preceding paragraphs,

234.   The elements of a cause of action for intentional infliction of emotional distress are well settled. "A plaintiff must allege that (1) the defendant engaged in extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, severe emotional distress to the plaintiff; (2) the plaintiff actually suffered severe or extreme emotional distress; and (3) the outrageous conduct was the actual and proximate cause of the emotional distress." *Ross v. Creel Printing & Publishing Co.* (2002) 100 Cal.App.4th 736, 744–745 [122 Cal.Rptr.2d 787, 793] (internal citations omitted); *see also Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 960 (9th Cir. 2013).

235.   After N.Y. was reinstated as ASB President, one or more Defendants and other District officials and employees created a new controversy and further infringed on N.Y.'s constitutional rights.  The District, Defendant Schmitt, as well as Defendant Willford and other District officials and employees who disagreed with N.Y.'s reinstatement, caused a walkout of more than 100 students, prompted a highly contentious May 2017 District Board meeting, and

promoted a false narrative about N.Y. and the contents of the Parody through the media and members of the San Ramon/Danville community.

236. For example, N.Y.'s history teacher, Heidi Stepp, falsely reported to the media, local politicians, Muslim organizations, and numerous other non-school officials that N.Y. mocked and disparaged Muslims and that he refused to apologize. Ann Katzburg, another District employee, sent correspondence to numerous non-school officials regarding N.Y. and the Parody. In one email to Defendant Schmitt and at least one other non-school official, Ms. Katzburg falsely reported that the District determined after an investigation that N.Y. violated the California Penal Code's "hate crime" statute in connection with the Parody. In another letter sent to more than 1,000 people, Ms. Katzburg accused N.Y. of engaging in religious discrimination against Muslim Americans in violation of the Civil Rights Act.

237. Defendants—specifically, the District, Defendant Schmitt, and Defendant Willford—knew that District employees and non-District officials with whom they were communicating were engaging in a malicious and deliberate campaign to inflict emotional distress on N.Y., yet they did nothing to protect N.Y. For example, on May 19, 2017, District Board Member Denise Jennison forwarded Defendant Schmitt an email from Karen Pearce in which Ms. Pearce encouraged a number of individuals, including District employee Kerri Pike, to protest N.Y.'s reinstatement at the May 2017 District Board meeting. Defendant Schmitt admits that he did not instruct Ms. Jennison or Ms. Pike to stop communicating about N.Y., the Parody, or the discipline imposed against N.Y. He also did nothing to protect N.Y. from the backlash he received as a result of District officials and employees working with third parties to promote a false narrative about N.Y, and the Parody, nor did he do anything to

-84-

prevent District officials and employees from further disclosing N.Y.'s statutorily protected confidential and self-identifying information.

238.    The Defendants and the Defendants' employees' persecution of a high school student for exercising his constitution rights was extreme and outrageous. The actions by Defendants and Defendants' employees were taken knowingly, intentionally, and maliciously, for the purpose of harassment, oppression, and inflicting injury upon N.Y.  Defendants' conduct exceeded all bounds of what is tolerated in a civilized community.

239.    As a proximate result of the conduct of Defendants Schmitt and Willford, as well as Ms. Stepp and Ms. Katzburg, N.Y. suffered humiliation, mental anguish, reputational damage, severe emotional and physical distress, and has been injured in mind and body, as exemplified by his admittance to a hospital, loss of weight, and extreme stress associated with the death threats resulting from Schmitt, Willford, Stepp, and Kazburg's actions.  It was foreseeable at the time of Defendants' actions that, by targeting and persecuting N.Y. as they did, Defendants Schmitt and Willford, as well as District employees Ms. Stepp and Ms. Kaztburg would cause significant distress to N.Y. – a minor – and subject him to ridicule by his peers.  N.Y. presented his written claim for damages before filing suit.

240.    Defendants Schmitt and Willford, as well as District employees Ms. Stepp and Ms. Katzburg undertook their conduct knowingly, intentionally, and maliciously, for the purpose of harassment, oppression, and retaliation against N.Y., in reckless, wanton, and callous disregard of his safety, security, and constitutional rights.

241.    The District is liable for N.Y.'s injuries caused by Ms. Stepp and Ms. Katzburg under California Government Code §815.2.

---

Fifth Amended Complaint
3:17-CV-03906-MMC

242. As a result of Defendants Schmitt and Willford, as well as District employees Ms. Stepp and Ms. Katzburg's conduct, N.Y. suffered and continues to suffer general and special damages according to proof. Plaintiff seeks damages, including exemplary and punitive damages, from the District, Defendant Schmitt, and Defendant Willford, in an amount according to proof at trial.

### XIV.

### <u>TENTH CAUSE OF ACTION</u>
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

*Seeking Declaratory and Monetary Relief against Defendant the District and against Defendants Schmitt, Reimann, Steele, Krolikowski, Keith, Ramos, Phelan, and Willford in their official and personal capacities*

243. N.Y. re-alleges and incorporates herein by reference the allegations in the preceding paragraphs.

244. Alternatively, negligent infliction of emotional distress is a form of the tort of negligence, to which the elements of duty, breach of duty, causation and damages apply. *Huggins v. Longs Drug Stores Ca., Inc*. (Cal. 1993) 6 Cal.4th 124, 129 [24 Cal.Rptr.2d 587, 590, 862 P.2d 148, 151].

245. Defendants owed N.Y. a duty of care, which includes the duty not to interfere with his right to exercise free speech, as well as the duty not to disseminate N.Y.'s personal and private information to third parties and the duty to impose discipline only in accordance with California law and District policies and regulations

246. Defendants Steele, Ramos, Keith, Phelan, and Willford made the initial collaborative decision to punish N.Y. Defendants Schmitt and Reiman endorsed and supported that decision.

247.     Defendant Schmitt was aware that District employees were disseminating N.Y.'s personal and private information to third parties and were promoting a false narrative regarding N.Y. and the contents of the Parody in a manner that was likely to cause him to suffer severe emotional distress. *See supra* ¶¶ 237-257.

248.     Defendant Krolikowski, failed to investigate, document, or to prepare an investigation report as is required by District policy.  Defendants, including Defendant Krolikowski, similarly did nothing to address the behavior of the students or teachers who personally attacked N.Y. by calling him a racist in a School class, and refused to provide N.Y.'s student records upon request by N.Y.'s parents.  Defendants Willford and Krolikowski also deliberately isolated and undermined N.Y. in his capacity as ASB President.  For example, they sent the runner-up in the ASB President election to a Cultural Responsiveness event in August 2017 that ASB Presidents from all other high schools in the district attended, while intentionally concealing the event from N.Y.  Defendant Krolikowski also refused to assist N.Y. in obtaining feedback from the student body regarding a gender neutral bathroom initiative.  Defendants undertook these actions in retaliation for N.Y.'s speech and for taking steps to vindicate his constitutional rights.  *See supra* ¶ 125.

249.     Defendants knew or should have known that failing to comply with the duty of care set forth above would cause N.Y. severe emotional distress.

250.     As a proximate result of Defendants' conduct, N.Y. suffered humiliation, mental anguish, and severe emotional and physical distress, and has suffered injury to his mind and body.  N.Y. presented his written claim for damages before filing suit.

251.     N.Y. is entitled to recover all damages caused by Defendants' negligent conduct available at law, including general and special damages.

-87-

**XV.**

**ELEVENTH CAUSE OF ACTION**
**INVASION OF PRIVACY**

*Seeking Declaratory and Monetary Relief against Defendant the District and against Defendants Schmitt and Willford in their official and personal capacities*

252.    N.Y. re-alleges and incorporates herein by reference the allegations in the preceding paragraphs.

253.    Cal. Civ. Code §1798, *et. seq.*, Cal. Bus. & Prof. Code §22584, and Cal. Educ. Code §49073.6, *et. seq.*, prohibited Defendants from disseminating N.Y.'s personal and private information to third parties.

254.    Defendant Schmitt spoke directly with at least one person who is not an employee of the District about N.Y., the Parody, and the disciplinary sanctions against N.Y. Defendant Schmitt was aware at the time that federal and state statutes prohibit school officials from discussing that type of information. Yet he admits engaging in those communications without N.Y.'s or his parents' authorization.

255.    District employee Heidi Stepp disclosed to non-District employees information about N.Y. known to her only by virtue of her employment as a teacher at the School, including that "[a] student who ran for ASB President at SRVHS" had been "immediately suspended . . . from Leadership" by a teacher for an "inappropriate" video "involve[ing] ethnic bias against Muslims;" that the student had broken "a strict guideline for campaign videos and conduct of students on ASB;" and that "[t]he student never apologized."

256.    Defendant Willford communicated information regarding N.Y.'s grades and the unconstitutional disciplinary actions taken against N.Y. to third parties. That information is confidential as a matter of law and Defendant Willford was prohibited from disclosing it

-88-

without N.Y.'s parents' consent. *See* The Family Educational Rights and Privacy Act (FERPA) 20 U.S.C. § 1232g; Cal. Educ. Code. § 49076.

257.    Similarly, Ann Katzburg, a District employee, sent an email to Defendant Schmitt and at least one other non-school official, in which she falsely reported that the District determined after an investigation that N.Y. violated the California Penal Code's "hate crime" statute in connection with the Parody. Ms. Katzburg also spoke with local politicians about N.Y. and drafted a letter accusing N.Y. of committing civil rights violations which she sent to, or directly caused to be seen and signed by, more than 1,000 people which included false accusations that N.Y. engaged in religious discrimination against Muslim Americans in violation of the Civil Rights Act.

258.    Defendant Schmitt was well aware of the unlawful, retaliatory actions that District employees like Defendant Willford and Ms. Katzburg were taking against N.Y. Defendant Schmitt, however, failed to take any steps to protect N.Y. Indeed, Defendant Schmitt endorsed the retaliatory actions his agents or employees were taking against N.Y. following N.Y.'s reinstatement. Defendant Schmitt failed to take any steps to prevent Defendant Willford's, Ms. Katzburg's, or Ms. Stepp's unauthorized disclosures of N.Y.'s information or to protect N.Y. from foreseeable backlash resulting therefrom.

259.    Under California Government Code § 815.2, the District is liable for Stepp's and Katzburg's invasions of N.Y. right to privacy under California law, including the above statutes, through their disclosure of N.Y.'s personal and private information protected by the above statutes.   The invasion was offensive and objectionable to N.Y., and would be to a reasonable person of ordinary sensibilities.   The conduct consisted of providing N.Y.'s

personal and private information—information in which he had a reasonable expectation of privacy, and which California law prohibits from disclosure—to the public.

260.    The intrusion was into a private matter that was entitled to be private in that Defendants Willford and Schmitt, and District employees Stepp and Katzburg released N.Y.'s personal and private information without N.Y.'s consent.

261.    As a proximate result of Defendants Willford and Schmitt, and District employees Stepp and Katzburg's actions, N.Y. suffered damages, and sustained the injuries and damages described above and below.  N.Y. presented his written claim for damages before filing suit.

262.    Defendants Willford and Schmitt, and District employees Stepp and Katzburg committed the above-described acts knowingly, intentionally, and maliciously, for the purpose of harassment, oppression, and inflicting injury upon N.Y., and in reckless, wanton, and callous disregard of his safety, security, and civil rights.  By reason thereof, N.Y. claims exemplary and punitive damages in an amount according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff N.Y. respectfully prays that this Court enter judgment for Plaintiff and against Defendants as follows:

A.    An order declaring that Defendants' complained about conduct is unconstitutional and violates the First and Fourteenth Amendments of the U.S. Constitution, Title VI of the Civil Rights Act of 1964, Article I, § 2, of the California Constitution, and sections 48907 and 48950 of the California Education Code;

-90-

Fifth Amended Complaint
3:17-CV-03906-MMC

B.  For Causes of Action 2 through 11, actual, general, nominal, special, exemplary, and punitive damages to be determined at trial;

C.  Prejudgment and post-judgment interest at the rate allowed by law;

D.  Costs of suit, including attorneys' fees, and costs pursuant to 42 U.S.C. §1988;

E.  Such other equitable relief as appropriate; and

F.  All other and further relief to which Plaintiff may be justly entitled.

# **JURY DEMAND**

Plaintiff N.Y. hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: November 22, 2019

Respectfully submitted,


By: */s/ James Carlos McFall*
James Carlos McFall
CA Bar No. 322116; TX Bar No. 24083479
Edwin M. Buffmire
TX Bar No. 24078283 *pro hac vice*
Eric D. Wong
TX Bar No. 24102659 *pro hac vice*
**JACKSON WALKER LLP**
2323 Ross Ave., Suite 600
Dallas, Texas 75204
(214) 953-6000
jmcfall@jw.com
ebuffmire@jw.com
ewong@jw.com


Jonathan G. Fetterly
CA Bar No. 228612
Katherine Keating
CA Bar No. 217908
Douglas A. Alvarez
CA Bar No. 318919
Thomas P. Kinzinger
CA Bar No. 323889
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111-4070
(415) 675 3400
jon.fetterly@bclplaw.com
katherine.keating@bclplaw.com
doug.alvarez@bclplaw.com
thomas.kinzinger@bclplaw.com

**Attorneys for Plaintiff N.Y.**

Fifth Amended Complaint
3:17-CV-03906-MMC

## CERTIFICATE OF SERVICE

This is to certify that all counsel of record are being served with a copy of this instrument via the Court's CM/ECF system on this 22nd day of November, 2019

                                        */s/ James Carlos McFall*
                                        James Carlos McFall

24527197