James Carlos McFall
(SBN 322116); TX Bar No. 24083479
Edwin M. Buffmire
TX Bar No. 24078283 *pro hac vice*
Eric D. Wong
TX Bar No. 24102659 *pro hac vice*
**JACKSON WALKER LLP**
2323 Ross Ave., Suite 600
Dallas, Texas 75204
(214) 953-6000
jmcfall@jw.com
ebuffmire@jw.com
ewong@jw.com

Jonathan G. Fetterly (SBN 228612)
Katherine Keating (SBN 217908)
Douglas A. Alvarez (SBN 318919)
Thomas P. Kinzinger (SBN 323889)
**BRYAN CAVE LEIGHTON PAISNER LLP**
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111-4070
(415) 675-3400
jon.fetterly@bclplaw.com
katherine.keating@bclplaw.com
doug.alvarez@bclplaw.com
thomas.kinzinger@bclplaw.com

**Attorneys for Plaintiff N.Y.**

Mark E. Davis (SBN 79936)
Adam J. Davis (SBN 275964)
Patrick Malloy (SBN 308249)
**DAVIS & YOUNG, APLC**
160 The Alameda, Suite 210
San Jose, CA  95126
(669) 245-4200
mdavis@davisyounglaw.com
adavis@davisyounglaw.com
pmalloy@davisyounglaw.com

**Attorneys for Defendants San Ramon Valley Unified School District; Rick Schmitt; Dr. Jason Reimann; Ruth Steele; Jason Krolikowski; Jamie Keith; Dearborn Ramos; and Bernie Phelan**

JOINT MOTION FOR STIPULATED DISMISSAL – PAGE 1
3:17-CV-03906-MMC

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **N.Y.**, through his guardians David and Leilanie Yu, | Case No.: 3:17-CV-03906-MMC |
| Plaintiff, | **JOINT MOTION FOR STIPULATED DISMISSAL** |
| vs. | |
| **SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT; RICK SCHMITT** in his personal and official capacities as Superintendent of the San Ramon Valley Unified School District; **DR. JASON REIMANN**, in his personal and official capacities as Director of Education Services of the San Ramon Valley Unified School District; **RUTH STEELE**, in her personal and official capacities as Principal of San Ramon Valley High School; **JASON KROLIKOWSKI**, in his personal and official capacities as Principal of San Ramon Valley High School; **JAMIE KEITH** in her personal and official capacities as Assistant Principal of San Ramon Valley High School; **DEARBORN RAMOS** in her personal and official capacities as Assistant Principal of San Ramon Valley High School; **BERNIE PHELAN** in his personal and official capacities as Assistant Principal of San Ramon Valley High School; **JANET WILLFORD**, in her personal and official capacities as Leadership Teacher of San Ramon Valley High School; and **KERRI CHRISTMAN GILBERT** in her personal and official capacities as Resident Substitute Teacher of San Ramon Valley High School, | |
| Defendants. | |

**JOINT MOTION FOR STIPULATED DISMISSAL**

1. Plaintiff N.Y. (referred to herein as "Plaintiff," "Nathaniel Yu," or "Nathaniel"), through his guardians David and Leilanie Yu, and Defendants San Ramon Valley Unified School District, Rick Schmitt, Dr. Jason Reimann, Ruth Steele, Jason Krolikowski, Jamie Keith, Dearborn Ramos, Bernie Phelan (collectively, the "District Defendants"),[1] represent that they have reached a resolution of their disputes by settlement agreement. Therefore, pursuant to Federal Rules of Civil Procedure 41(a)(1)(A)(ii), the Parties stipulate to the following facts and legal conclusions, as well as the dismissal, with prejudice, of all causes of action against the District Defendants set forth in the Fifth Amended Complaint.

2. WHEREFORE, Nathaniel and the District Defendants respectfully request that the Court enter the Agreed Order of Dismissal in conformance with the instant Stipulation:

**FACTUAL BACKGROUND**

**A.   Introduction**

3. Nathaniel previously attended San Ramon Valley High School (the "School"). His peers elected him to serve as the School's Junior Class President. During his Junior year at the School, Nathaniel ran for 2017-2018 Associated Student Body ("ASB") President and won, making him the first Asian-American elected as ASB President since the School's founding in 1910.

4. Nathaniel and four of his friends, all of whom were students at the School, created and released a film intended as a parody of James Bond or similar spy thriller, depicting Nathaniel as a James Bond-type hero who rescues a person kidnapped by two members of an extremist group who were attempting to force the victim to participate in a video game competition (the "Parody"). The Parody constitutes the speech at issue in this case.

---

[1] Defendant Janet Willford is not a party to this Stipulation. Further, as far as it relates to events occurring prior to July 2017, Defendant Jason Krolikowski is excluded from any stipulated facts referenced below.

5.     Defendants in this case are: San Ramon Valley Unified School District (the "District"), of which the School is a part; Rick Schmitt, the current Superintendent of the District; Dr. Jason Reimann, the former Director of Education Services of the District; Ruth Steele, the former Principal of the School; Jason Krolikowski, the current Principal of the School; Jamie Keith, Dearborn Ramos, and Bernie Phelan, the former Assistant Principals of the School; and Janet Willford, the current Leadership Teacher of the School ("Defendant Willford").

6.     The District Defendants took various disciplinary actions toward Nathaniel as a result of his speech and expressive activity by removing him from his then-held position as the elected Junior Class President, removing him from the Leadership Class for more than three months, disqualifying him from the ASB President election, did not provide the election results, and announcing one of his peers the winner of the ASB President election despite Nathaniel having received the most votes. Thereafter, the District reversed the sanctions against Nathaniel and reinstated him to the aforementioned positions and the Leadership Class.

7.     Nathaniel brought the instant action against Defendants to vindicate his constitutional and statutory rights, alleging violations of his First Amendment rights (Count II), his First Amendment rights by retaliation (Count III), his Fourteenth Amendment Due Process rights (Count IV), his Fourteenth Amendment Equal Protection Rights (Count V), his rights under Title VI of the Civil Rights Act of 1964 (Count VI), his free speech rights under the California Constitution (Count VII), his rights under the California Education Code §§ 48907 and 48950 (Count VIII), as well as claims for intentional infliction of emotional distress (Count IX), negligent infliction of emotional distress (Count X), and invasion of privacy (Count XI).

**B.     Nathaniel created, and removed, the Parody before the election started.**

8.     In late-January 2017, Nathaniel attended a mandatory information meeting about running for ASB President. During this meeting, a fellow student approached Nathaniel with an idea

to make a video in an effort to increase Nathaniel's name recognition. On February 1, 2017, Nathaniel turned in his signed election application.

9. On Saturday, February 4, 2017, Nathaniel and a group of his friends filmed the Parody at a friend's house off-campus. The group did not prepare a script, and each participant individually developed their characters, improvised their lines without any prior review or consultation, and brought their own props to the off-campus filming location. Nathaniel portrayed a James Bond-type hero who rescues a fellow student captured by members of an extremist group who were trying to force the victim to participate in an international video game competition.

10. The group did not use School property or equipment to create the Parody. The Parody does not feature School's or the Leadership Class's name, logo, or other indicia. Indeed, neither the School nor the Leadership Class are mentioned in the Parody. The Parody was intended to parody elements of popular video games, films, and movies, including scenes and content from the 007 film franchise. The Parody features Nathaniel and his co-creators using Nerf guns and movie prop weapons. The Parody does not contain a credible threat of violence to the School or to any student.

11. At the end of the day of filming, one of the students took all of the raw footage home with him. This student edited various scenes, added certain effects, and ultimately developed the final version of the Parody. On February 6, 2017, the student editor uploaded the final version of the Parody to his personal YouTube webpage.

12. The next morning, a fellow student told Nathaniel that, though she was not personally offended by the Parody, other individuals "may" find the video offensive. Nathaniel promptly requested that the student who uploaded the Parody remove it from YouTube. The student editor removed the Parody within a matter of minutes and hours before students began casting votes in the election. The student also did not post or disseminate the video thereafter. The February 7th school day and the election progressed without issue.

13. The Parody was available on YouTube for approximately twelve hours, mostly overnight. Statistics showed that the Parody reached approximately thirty views before it was taken down. To the best of Nathaniel's knowledge, no one downloaded or further distributed the Parody.

14. The Parody did not cause a substantial disruption to the School's activities, did not threaten violence to the School, and did not target any particular person with violence, discrimination, bullying, or harassment. The District Defendants have no evidence and do not assert that anyone was deprived of educational benefits or opportunities as a result of the Parody. Further, the District Defendants have no evidence and do not assert that the Parody bullied, harassed, or discriminated against anyone. Finally, the District Defendants have no evidence and do not assert that the Parody portrays any sexual content.

**C.     Defendants learned of the Parody only after its removal from YouTube.**

15. At 2:36 p.m. on February 7, 2017, Nathaniel received a text from Defendant Willford, his Leadership Class teacher. Defendant Willford inquired about the Parody and requested a link to it. Nathaniel explained that the Parody had been removed from YouTube and there was no longer an active link to the film.

16. The next day, Nathaniel and the other students who created the Parody met with Defendant Willford. Defendant Willford requested a copy of the Parody. The student editor agreed to provide her a copy.

17. On February 9, the student editor brought a storage device containing a copy of the video to the School. The student editor delivered the device to Chad Cochran, the School's video production teacher.

18. Thereafter, Defendant Willford and Mr. Cochran viewed the Parody with other School officials and certain students in the Leadership Class. Defendant Willford did not provide Nathaniel or the other students who created the Parody the opportunity to watch the film with her.

**D.     Defendants disciplined Nathaniel for the Parody.**

19.     The ASB President election polls were scheduled to close after lunch on February 9, 2017.  That day, just before 1:00 p.m., Defendant Ramos, an Assistant Principal at the School, summoned Nathaniel to the School's administrative offices.  Defendant Ramos stated that the Parody could be viewed as racist, offensive, and might potentially violate a rule prohibiting "inappropriate" campaign material.  Defendants Ramos and Keith asked him to write a statement.  Nathaniel hesitated because he believed they were demanding an admission of wrongdoing.  Nevertheless, Nathaniel apologized for any misconceptions and misinterpretations one may have had about the Parody to the school officials.

20.     While questioning Nathaniel, Defendants Ramos and Keith played the Parody, and advised Nathaniel of potential punishment relating to the Parody for his expressive activities. Defendant Keith told Nathaniel that the Parody may have violated School rules.  Defendant Phelan, also an Assistant Principal, eventually joined the investigation.

21.     The District Defendants did not contact Nathaniel's parents.  The District Defendants did, however, contact the parents of the students who created the Parody with Nathaniel.

22.     Defendants Ramos, Keith, and Phelan discussed the Parody with Nathaniel for nearly three hours, while Nathaniel's four friends were questioned for less than one hour.  Further, Defendants Ramos, Keith, and Phelan kept Nathaniel past the end of the school day without notifying his parents.

23.     While still being interviewed, Nathaniel was informed by Defendant Ramos that the School had disregarded all votes cast in his favor and declared another student the winner of the ASB President election, pursuant to a Leadership Class rule prohibiting "inappropriate" material.  The District Defendants offered no guidance as to the "inappropriate" standard or which School employees were responsible for determining whether campaign material violated that standard.  The Election Rules did not specify that candidates would not be allowed to serve in an office to which they were elected for creating material that allegedly violated the "inappropriate" standard.  Further, the Election

Rules expressly authorized candidates to use their discretion when creating campaign materials. Indeed, the Leadership Class teacher later asked Nathaniel to help amend the campaign election rules and to further clarify the term "inappropriate" campaign materials, in the context of future ASB elections.

24. On Monday, February 13, 2017, at an in-person meeting, Defendant Keith informed Nathaniel and his parents of the District Defendants' decision to remove Nathaniel from the Leadership Class. Defendant Keith stated that Defendants reached their decision because of the Parody and upon the recommendation of Defendant Willford.

25. Because of their subjective concerns and/or disapproval of the alleged inappropriateness and offensiveness of the content of the Parody, the District Defendants removed Nathaniel from his elected Junior Class President position, disqualified him from the ASB President election, and removed him from the Leadership Class for over three months. Through the course of discovery, Plaintiff identified several videos created by other students and District employees that depicted violence, sexual overtones, offensive stereotypes, and the consumption of illegal substances. Many of those films were created on campus with school resources and did not result in punishment for any of these individuals.

26. The District Defendants made this decision after the approximately three-hour interview with Nathaniel and obtaining written statements from him and the other co-creators. Although the District retained a scanned copy of Nathaniel's written statement, they failed to preserve Nathaniel's and the other co-creators' original statements and never produced them in this lawsuit.

27. In May 2017, the District eventually reversed the disciplinary actions taken against Nathaniel by reinstating him to the position of elected Junior Class President, acknowledging that he had received the most votes in the ASB President election, would be permitted to serve as the School's ASB President during the upcoming school year, and would be reinstated to the Leadership Class. Defendants failed to preserve the official vote count and never produced it in this lawsuit. It is

undisputed, however, that Nathaniel received the most votes for ASB President.  Further, the District created the position of ASB Ambassador—a position that did not exist previously or subsequently—for the student who received the second-highest votes in the 2017 ASB Election.

28. Thereafter, certain District employees who disagreed with the District's decision to reinstate Nathaniel promoted a false narrative about him and the contents of the Parody through the media and members of the San Ramon/Danville community, including the false characterization of Nathaniel as a "racist" who used a Muslim discrimination video.

29. For example, a teacher at the School who had not seen the Parody falsely reported to the media, local politicians, local and national Muslim organizations, and other non-School officials and School officials that Nathaniel mocked and disparaged Muslims.  Another District employee who had not seen the Parody sent correspondence to numerous non-School officials regarding Nathaniel and the Parody.  Indeed, in one email, that employee falsely reported that the District determined after an investigation that Nathaniel violated the California Penal Code's "hate crime" statute in connection with the Parody. In another letter sent to, and signed by, more than 1,000 people, that same employee expressed, without any evidentiary basis, that Nathaniel engaged in religious discrimination against Muslim Americans in violation of the Civil Rights Act in connection with the Parody.  The District never determined that Nathaniel had violated any state or federal statute in connection with the Parody.

30. Nathaniel is a practicing Catholic.  In August of 2017, during Nathaniel's first day at school his senior year, his designated parking spot was vandalized on two occasions with language that mocked his faith.  The School was unable to determine the identity of the individual(s) responsible for the vandalism.  The School did not prepare an incident report regarding the vandalism.

## APPLICABLE LEGAL STANDARD

31. Fifty years ago, the Supreme Court famously proclaimed that the First Amendment protects the rights of students to speak and engage in expressive activities on-campus:

> "[S]tudents . . . do not shed their constitutional rights to freedom of speech or expression *at the schoolhouse gate*. * * * Any word spoken in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk . . . ; and our history says that it is this sort of hazardous freedom – this kind of openness – that is the basis of our national strength and of the independence and vigor of Americans . . . ."

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 508-09 (1969).

32. "The Supreme Court has outlined four types of student speech that schools may restrict, each governed by its own lead case: (1) 'vulgar, lewd, obscene, and plainly offensive speech' is governed by *Fraser*; (2) 'school-sponsored speech' is governed by *Hazelwood [School District v. Kuhlmeier*, 484 U.S. 260 (1988)]; (3) 'speech promoting illegal drug use' is governed by *Morse v. Frederick*, 551 U.S. 393 (2007); and (4) 'speech that falls into [none] of these categories' is governed by *Tinker*." *C.R.*, 835 F.3d at 1148-49 (internal citations and quotation marks omitted).

33. Speech controlled by *Tinker* can only be regulated if it (1) "substantially interfere[s] with the work of the school," or (2) "impinge[s] upon the rights of other students." 393 U.S. at 509, 514; *McNeil*, 918 F.3d at 709, 711 (quoting *Tinker*, 393 U.S. at 508); *see also Burch*, 861 F.2d at 1151 (applying *Tinker* to student's off-campus student speech—specifically, an underground newspaper made off-campus and without school resources—brought to school-sponsored barbeque on-campus); *J.C. ex rel. R.C.*, 711 F. Supp. 2d at 1109 (applying *Tinker* to student's off-campus "YouTube video").

34. Defendants contend that the Parody constituted "school-sponsored" speech under the *Hazelwood* standard because it was made in the context of a school election.

35. Defendants also contend that the initial decision to take action against Nathaniel was based on concerns that portions of the Parody had been reported as offensive and inappropriate in violation of the "inappropriate" material provision of ASB Election Rules. The District, however, never perceived the contents of the Parody as rising to the level of "hate speech," harassment, or discrimination against anyone.

36. Regardless, the Parody did not target the School or any particular student with threats of violence, intimidation, or harassment. The Parody was posted on YouTube for only a few hours and was viewed by a limited number of individuals before it was removed. The District Defendants have no evidence and do not assert that anyone was deprived of educational benefits or opportunities as a result of the Parody. Further, the District Defendants have no evidence and do not assert that anyone was bullied, harassed, threatened, or discriminated against by the Parody. Nathaniel contends that Defendants' multiple forms of discipline chilled his constitutional rights.

## **CONCLUSION**

37. As a result of the Parody, Defendants removed Plaintiff Nathaniel Yu from his position as the School's Junior Class President, disqualified him in the election for ASB President, and removed him from the Leadership Class for more than three months. Though the District eventually reversed all disciplinary actions against Nathaniel, the District acknowledges and sincerely regrets the adverse effects, disruption, and emotional distress Nathaniel and his family experienced and continue to experience, including threats of violence against them, because of the reaction to the Parody and various misrepresentations related to the content of the Parody.

38. The Parody's purpose was to entertain and was not intended to threaten or demean any person, race, or culture. The District Defendants and Nathaniel support the ideals of the First Amendment and believe that its guarantees of free speech are one of the bedrock principles that binds our democracy. The District Defendants have no evidence and do not assert that Nathaniel is a racist or that he tried to offend anyone in connection with the Parody. The District Defendants have no evidence and do not assert that anyone was deprived of educational benefits or opportunities as a result of the Parody. Further, the District Defendants have no evidence and do not assert that the Parody bullied, harassed, or discriminated against anyone. The Parties have worked in cooperation to find a resolution which embraces the First Amendment in the current era of digital technology and social

media, especially in the educational setting.  The Parties agree that it is mutually beneficial to resolve this matter.

39. The Parties have entered a settlement agreement dated February 20, 2020.

40. WHEREFORE, in conjunction with this Joint Motion for Stipulated Dismissal and the settlement agreement, the Parties agree to a dismissal of all claims with prejudice and request that the Court enter the proposed order to that effect, attached hereto as Exhibit A.

Dated: April 7, 2020

Respectfully Submitted

| | |
|---|---|
| *s/ James Carlos McFall* | */s/* |
| James Carlos McFall | Mark E. Davis |
| CA Bar No. 322116; TX Bar No. 24083479 | CA Bar No. 79936 |
| Edwin M. Buffmire | Adam J. Davis |
| TX Bar No. 24078283 *pro hac vice* | CA Bar No. 275964 |
| Eric D. Wong | Patrick Malloy |
| TX Bar No. 24102659 *pro hac vice* | CA Bar No. 308249 |
| **JACKSON WALKER LLP** | **DAVIS & YOUNG, APLC** |
| 2323 Ross Ave., Suite 600 | 160 The Alameda, Suite 210 |
| Dallas, Texas 75204 | San Jose, CA 95126 |
| (214) 953-6000 | (669) 245-4200 |
| jmcfall@jw.com | mdavis@davisyounglaw.com |
| ebuffmire@jw.com | adavis@davisyounglaw.com |
| ewong@jw.com | pmalloy@davisyounglaw.com |
| | |
| Jonathan G. Fetterly | **Attorneys for Defendants San Ramon Valley Unified School District; Rick Schmitt; Dr. Jason Reimann; Ruth Steele; Jason Krolikowski; Jamie Keith; Dearborn Ramos; and Bernie Phelan** |
| CA Bar No. 228612 | |
| Katherine Keating | |
| CA Bar No. 217908 | |
| Douglas A. Alvarez | |
| CA Bar No. 318919 | |
| Thomas P. Kinzinger | |
| CA Bar No. 323889 | |
| **BRYAN CAVE LEIGHTON PAISNER LLP** | |
| Three Embarcadero Center, 7th Floor | |
| San Francisco, CA 94111-4070 | |
| (415) 675 3400 | |
| jon.fetterly@bclplaw.com | |
| katherine.keating@bclplaw.com | |
| doug.alvarez@bclplaw.com | |
| thomas.kinzinger@bclplaw.com | |

**Attorneys for Plaintiff N.Y.**

## ATTORNEY ATTESTATION

I hereby attest that I have on file all holograph signatures for any signatures indicated by a conformed signature ("/s/") within this E-filed document or have been authorized by all counsel to show their signature on this document as /s/.

Dated:  April 7, 2020                              By:   */s/ James Carlos McFall*_____
                                                                                James Carlos McFall